CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

DEC 11 2003

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION
December 2003 Session

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Docket No. 2:03CR10115 |
| | ) | |
| CARLOS CARO | ) | 18 U.S.C. § 1117; 18 U.S.C. §§ 2, 7(3), 113(a); |
| JUAN MORENO-MARQUEZ | ) | 18 U.S.C. § 1791(a)(2) |
| FRANCISCO TIJERINA | ) | |
| REYMUNDO ESCAMILLA | ) | |
| SAMMY ENRIQUEZ | ) | |
| RICHARD GARZA | ) | |
| RIGOBERTO ALTAMIRANO-LOPEZ | ) | |

## SUPERSEDING INDICTMENT

The Grand Jury charges that at all times relevant to this Superseding Indictment:

1. Defendants CARLOS CARO ("CARO"), JUAN MORENO-MARQUEZ ("MORENO-MARQUEZ"), FRANCISCO TIJERINA ("TIJERINA"), REYMUNDO ESCAMILLA ("ESCAMILLA"), SAMMY ENRIQUEZ ("ENRIQUEZ"), RICHARD GARZA ("GARZA"), and RIGOBERTO ALTAMIRANO-LOPEZ ("ALTAMIRANO-LOPEZ"), were inmates at the United States Penitentiary-Lee County ("USP-Lee").

2. The victim, whose identity is known to the grand jury, was an inmate at USP-Lee.

3. The defendants, the victim, and others known and unknown to the grand jury were members of a gang known as the Texas Syndicate, also referred to as "TS."

## COUNT ONE

The Grand Jury charges that:

1. On or about August 29, 2003, in the Western District of Virginia, defendants CARO, MORENO-MARQUEZ, TIJERINA, ESCAMILLA, ENRIQUEZ, GARZA, and

Page 1 of 5

**FPD-VA-272**                                                                                       **JA 1**

ALTAMIRANO-LOPEZ, and others known and unknown to the Grand Jury, at USP-Lee, a place within the special maritime and territorial jurisdiction of the United States, did knowingly, willfully, and unlawfully, combine, conspire, confederate, and agree to kill another USP-Lee inmate ("victim"), who was also a member of the Texas Syndicate, by stabbing and otherwise assaulting him, in violation of Title 18, United States Code, Sections 7(3) and 1111.

2. Among the means the defendants and co-conspirators used to carry out the object of the conspiracy was to assault the victim with sharp objects.

3. In furtherance of the conspiracy and to effect its objects, the following overt acts, among others, were committed in the Western District of Virginia:

(1) On or about August 29, 2003, defendant CARO possessed a sharpened object designed and intended to be used as a weapon.

(2) On or about August 29, 2003, defendant MORENO-MARQUEZ possessed a sharpened object designed and intended to be used as a weapon.

(3) On or about August 29, 2003, defendant TIJERINA possessed a sharpened object designed and intended to be used as a weapon.

(4) On or about August 29, 2003, defendant ESCAMILLA possessed a sharpened object designed and intended to be used as a weapon.

(5) On or about August 29, 2003, defendant ENRIQUEZ possessed a sharpened object designed and intended to be used as a weapon.

(6) On or about August 29, 2003, defendant GARZA possessed a sharpened object designed and intended to be used as a weapon.

(7) On or about August 29, 2003, defendant ALTAMIRANO-LOPEZ possessed a sharpened object designed and intended to be used as a weapon.

(8) On or about August 29, 2003, defendant CARO assaulted the victim.

(9) On or about August 29, 2003, defendant MORENO-MARQUEZ assaulted the victim.

(10) On or about August 29, 2003, defendants TIJERINA, ESCAMILLA, ENRIQUEZ, GARZA, and ALTAMIRANO-LOPEZ met together and attempted to enter the recreation area to participate in the assault on the victim.

All in violation of Title 18, United States Code, Section 1117.

## COUNT TWO

The Grand Jury charges that:

On or about August 29, 2003, in the Western District of Virginia, defendants CARO and MORENO-MARQUEZ, as principals and aiders and abetters, at USP-Lee, a place within the special maritime and territorial jurisdiction of the United States, assaulted the USP-Lee inmate described in Count One with intent to commit murder.

All in violation of Title 18, United States Code, Sections 2, 7(3) and 113(a).

## COUNT THREE

The Grand Jury charges that:

On or about August 29, 2003, at USP–Lee, in the Western District of Virginia, defendants CARO, MORENO-MARQUEZ, TIJERINA, ESCAMILLA, ENRIQUEZ, GARZA, and ALTAMIRANO-LOPEZ, who were USP-Lee inmates, possessed, made, and obtained, and

Page 3 of 5

attempted to possess, make, and obtain, prohibited objects that were designed and intended for use as weapons.

All in violation of Title 18, United States Code, Section 1791(a)(2).

**FPD-VA-275**                                                                    JA 4

A True Bill,

_____
Foreperson

_____
John L. Brownlee
United States Attorney

Page 5 of 5

**FPD-VA-276**                                    **JA 5**

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JUN 30 2004

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

UNITED STATES OF AMERICA     )
                             )
            v.               )     Docket No. 2:03CR10115
                             )
CARLOS CARO                  )

## PLEA AGREEMENT

My counsel and I have entered into a plea agreement with the United States of America, by counsel, pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The terms and conditions of this agreement are as follows:

1.      **CHARGE(S) TO WHICH I AM PLEADING GUILTY AND WAIVER OF RIGHTS**

I will enter a plea of guilty to Count One of the Superseding Indictment, charging me with Conspiracy to Murder, in violation of 18 U.S.C. § 1117. The maximum statutory penalty for Count One is a fine of $250,000 and/or Life imprisonment, plus a period of supervised release. I understand that fees may be imposed to pay for incarceration or supervised release and that there will be a $100 special assessment per felony count of conviction. I further understand that my supervised release may be revoked if I violate its terms and conditions. If my supervised release is revoked, the original term of imprisonment may be increased. I understand that a violation of supervised release increases the possible period of incarceration.

My attorney has informed me of the nature of the charge(s) and the elements of the charge(s) that must be proved by the United States beyond a reasonable doubt before I could be found guilty as charged.

I acknowledge that I have had all of my rights explained to me and I expressly recognize that I have the following constitutional rights and, that by voluntarily pleading guilty, I knowingly waive and give up these valuable constitutional rights:

a.  The right to plead not guilty and persist in that plea.
b.  The right to a speedy and public jury trial.
c.  The right to assistance of counsel at that trial and in any subsequent appeal.
d.  The right to remain silent at trial.
e.  The right to testify at trial.
f.  The right to confront and cross-examine witnesses.
g.  The right to present evidence and witnesses in my own behalf.
h.  The right to compulsory process of the court.
i.  The right to be presumed innocent.

*Defendant's Initials:* _CDC_

Page 1 of 8

   j.   The right to a unanimous guilty verdict.

   k.   The right to appeal a guilty verdict.

I am also waiving any right I may have for a jury determination of any and all facts relevant to the application of any Sentencing Guidelines provisions and consent to a determination of any and all facts and a determination of the application of any and all Sentencing Guidelines factors by the United States District Judge. I understand that by signing this plea agreement I waive any right to a jury determination of sentencing factors that may exist under *Blakely v. Washington*, 2004 WL 1402697 (June 24, 2004), *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and any cases interpreting these two Supreme Court decisions.

I am pleading guilty as described above because I am in fact guilty and because I believe it is in my best interest to do so and not because of any threats or promises. There has been no representation made whatsoever by any agent or employee of the United States to me as to what the final disposition of this matter should or will be.

It is understood that the matter of sentencing is within the sole discretion of the Court, subject to the United States Sentencing Guidelines ("Sentencing Guidelines"). I understand that the Sentencing Guidelines apply to the charge(s) and may create a presumption of a mandatory period of incarceration. I have discussed sentencing issues with my attorney and realize that there is a substantial likelihood that I will be incarcerated. I understand that I will not be eligible for parole during any term of imprisonment imposed. I understand that the sentence will be determined presumptively from a variety of factors involved in the offense and related conduct, including my role in the offense and my prior criminal history.

I agree and stipulate that the matters set forth in all of the counts of the charging document(s) should be included as relevant conduct as defined in the sentencing guidelines.

## 2.    DISMISSAL OF COUNT(S)

If I accept responsibility for my conduct and otherwise comply with my obligations under the plea agreement, the United States will move, at sentencing that I be dismissed as a defendant in the remaining count(s) of the charging document(s). I agree that all of the matters covered by the dismissed count(s) should be included as relevant conduct as defined in the sentencing guidelines.

I also understand that the United States will enter into an agreement with co-defendant JUAN CARLOS MORENO-MARQUEZ in which that defendant will plead guilty to Count Three of the Superseding Indictment and the United States will move for the dismissal of the remaining counts, if MORENO-MARQUEZ complies with the terms of his plea agreement.

## 3.    ACCEPTANCE OF RESPONSIBILITY

I agree to accept responsibility for my conduct. If I fulfill my obligations under this plea agreement and accept responsibility for my conduct, the United States will recommend that the Court grant me a two-level reduction in my offense level, pursuant to U.S.S.G. § 3E1.1(a) and, if applicable, at sentencing, will move that I receive a one-level reduction in my offense level, pursuant to U.S.S.G. § 3E1.1(b) for acceptance of responsibility.

*Defendant's Initials:* *CDC*.

FPD-VA-441

However, I hereby agree and stipulate that if I do any of the following, I should not receive credit for acceptance of responsibility and the United States will be free to (a) make any recommendations it wishes at sentencing, (b) declare a breach of this plea agreement and/or (c) apply the remedies set forth in the "REMEDIES FOR FAILURE TO COMPLY WITH ANY PROVISION OF THE PLEA AGREEMENT" paragraph:

(1) attempt to withdraw my guilty plea, (2) deny that I committed any crime to which I have pled guilty, (3) [not used], (4) fail to testify truthfully, as to any matter, if called upon to do so (at my sentencing or any other court proceeding), (5) refuse to answer any question, (6) make a false statement, (7) fail to timely pay any of the amounts set forth in the plea agreement, (8) fail to comply with any reasonable request of the United States Attorney's Office, (9) fail a polygraph examination, (10) refuse to take a polygraph examination, (11) make or adopt any arguments or objections to the presentence investigation report that are inconsistent with this plea agreement, (12) obstruct justice, (13) commit any other crime or (14) otherwise indicate that I have not accepted responsibility for my conduct.

In addition, I understand and agree that the United States will have a continuing objection to my receiving credit for acceptance of responsibility until I have testified truthfully at my sentencing hearing. I agree that the United States will not be required to make any other notice of its objection on this basis.

4.          **SENTENCING PROVISIONS**

I understand that depending on my prior criminal history, I may be subject to sentencing as a Career Offender pursuant to Sentencing Guidelines § 4B1.1, and I consent to a determination of the applicability of this provision by the United States District Judge.

I understand that other Sentencing Guideline sections may be applicable to my case and the United States and I will be free to make arguments that these other sections should or should not apply, to the extent that the arguments are not inconsistent with the stipulations set forth in the plea agreement.

I understand that the Court is not bound by any recommendation or stipulation and may sentence me up to the statutory maximum. I understand that I will not be allowed to withdraw my plea of guilty if the Court disregards the stipulations and/or recommendations set forth in the plea agreement. I understand that the government will object to any motion for a downward departure.

5.          **MANDATORY ASSESSMENT**

I understand that persons convicted of crimes are required to pay a mandatory assessment of $100.00 per felony count of conviction. I agree that I will submit to the U.S. Clerk's Office, a certified check, money order, or attorney's trust check, made payable to the "Clerk, U.S. District Court" for the total amount due within 7 days of my plea of guilty. I understand and stipulate that if I fail to pay the special assessment within 7 days of my plea of guilty, I will not have

*Defendant's Initials:* ___CDC___

Page 3 of 8

06/25/04   14:23 FAX 276 628 7399          US ATTY OFFICE ABINGDON          ☒006

demonstrated minimal acceptance of responsibility and should not be granted any reduction in my offense level under the Sentencing Guidelines for acceptance of responsibility.

6.          **ADMISSIBILITY OF STATEMENTS**

I understand that any statements I make (including this plea agreement and my admission of guilt) during or in preparation for any guilty plea hearing, sentencing hearing, or other hearing and any statements I make or have made to law enforcement agents, in any setting, may be used against me in this or any other proceeding. I knowingly waive any right I may have under the Constitution, any statute, rule or other source of law to have such statements, or evidence derived from such statements, suppressed or excluded from being admitted into evidence.

7.          **INMATE FINANCIAL RESPONSIBILITY PROGRAM**

I agree to fully participate in inmate employment under any available or recommended programs operated by the Bureau of Prisons, and to pay any fines, assessments or restitution not paid prior to incarceration through the auspices of such a program.

8.          **WAIVER OF RIGHT TO APPEAL**

I understand that I will have a copy of my presentence report in advance of my sentencing hearing and that I will have an opportunity to go over it with my attorney and may file any objection to all or parts of it that I feel are not correct. I understand that I will have an opportunity at the sentencing hearing to bring witnesses, cross-examine the government's witnesses, and demonstrate to the Court what an appropriate sentence would be under the Guidelines. I agree that I will not appeal the conviction or sentence imposed. I am knowingly and voluntarily waiving any right to appeal and am voluntarily willing to rely on the Court in sentencing me. I understand that the United States expressly reserves all of its rights to appeal. I **agree and understand that if I file any court document (including but not limited to a notice of appeal) seeking to disturb, in any way, the judgment and/or sentence imposed in my case, the United States will be free to take whatever actions it wishes based on this failure to comply with my obligations under the plea agreement.**

9.          **WAIVER OF RIGHT TO COLLATERALLY ATTACK THE JUDGMENT AND SENTENCE IMPOSED BY THE COURT**

I agree not to collaterally attack the judgment and/or sentence imposed in this case and waive my right to collaterally attack, pursuant to Title 28, United States Code, Section 2255, the judgment and any part of the sentence imposed upon me by the Court. **I agree and understand that if I file any court document seeking to disturb, in any way, the judgment and/or sentence imposed in my case, the United States will be free to take whatever actions it wishes based on this failure to comply with my obligations under the plea agreement.**

*Defendant's Initials:* CDC

Page 4 of 8

**10.    INFORMATION ACCESS WAIVER**

I knowingly and voluntarily agree to waive all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §552a.

**11.    FORFEITURE, OFFICIAL USE OR DESTRUCTION OF ITEMS SEIZED**

I consent to the forfeiture (administrative or otherwise), official use and/or destruction of any items obtained by law enforcement agents during the course of the investigation. I will execute any documents necessary to comply with this provision of this agreement.

**12.    WAIVER OF STATUTE OF LIMITATIONS & AGREEMENT TO ALLOW GOVERNMENT TO PROCEED BY INFORMATION**

I agree that if, for any reason, my conviction is set aside, or I fail to comply with any obligation under the plea agreement, the United States may file, by indictment or information, any charges against me which were filed and/or could have been filed concerning the matters involved in the instant investigation. I hereby waive my right under Federal Rule of Criminal Procedure 7 to be proceeded against by indictment and consent to the filing of an information against me concerning any such charges. I also agree to waive any statute of limitations argument as to any such charges.

**13.    LIMITATION OF AGREEMENT**

This agreement is limited to the Western Judicial District of Virginia and does not bind other federal judicial districts, nor does it bind any state or local authorities.

**14.    EFFECT OF MY SIGNATURE**

I understand that my signature on this agreement constitutes a binding offer by me to enter into this agreement. I understand that the United States has not accepted my offer until it signs the agreement.

**15.    REMEDIES FOR FAILURE TO COMPLY WITH ANY PROVISION OF THE PLEA AGREEMENT**

I understand that if I fail to comply with any provision of this agreement, at any time, the United States Attorney's office may, at its election, pursue any or all of the following remedies: (a) declare this plea agreement void; (b) refuse to recommend that I be credited with acceptance of responsibility; (c) refuse to dismiss any charges; (d) reinstate any dismissed charges; (e) file

*Defendant's Initials:* COC

Page 5 of 8

**FPD-VA-444**                                                                      **JA 10**

06/28/04  14:24 FAX 276 628 7399      US ATTY OFFICE ABINGDON                    ☑008

new charges; (f) terminate my opportunity to perform substantial assistance, if such opportunity has been provided; (g) refuse to make a substantial assistance motion, regardless of whether substantial assistance has been performed; (h) withdraw any substantial assistance motion made, regardless of whether substantial assistance has been performed; (i) refuse to abide by any stipulations contained in this plea agreement; (j) take any other action provided for under this agreement or by statute, regulation or court rule.  The remedies set forth above are cumulative and not mutually exclusive.

16.    **EFFECTIVE REPRESENTATION**

I have discussed the terms of the foregoing plea agreement and all matters pertaining to the charges against me with my attorney and am satisfied with my attorney and my attorney's advice.  I understand that I have the right to make known to the Court, at any time, any dissatisfaction or complaint I may have with my attorney's representation.  I agree to make known to the Court no later than at the time of sentencing any dissatisfaction or complaint I may have with my attorney's representation.  I hereby waive any claim I may have for ineffective assistance of counsel known and not raised by me with the Court at the time of sentencing.

17.    **GENERAL UNDERSTANDINGS**

I understand that the Court is not bound by any recommendations or stipulations contained in this agreement and may sentence me up to the maximum provided by law.

I understand that if the sentence is more severe than I expected, I will have no right to withdraw my guilty plea.

I understand that a thorough presentence investigation will be conducted and sentencing recommendations independent of the United States Attorney's Office will be made by the presentence preparer, which the Court may adopt or take into consideration.  I understand that any calculation regarding the guidelines by the United States Attorney's Office or by my attorney is speculative and is not binding upon the Court, the Probation Office or the United States Attorney's Office.  No guarantee has been made by the United States Attorney's Office regarding the effect of the guidelines on my case.

I understand that the prosecution will be free to allocute or describe the nature of this offense and the evidence in this case and, in all likelihood, will recommend that I receive a substantial sentence.

I understand that the United States retains the right, notwithstanding any provision in this plea agreement, to inform the Probation Office and the Court of all relevant facts, to address the Court with respect to the nature and seriousness of the offense(s), to respond to any questions raised by the Court, to correct any inaccuracies or inadequacies in the presentence report and to respond to any statements made to the Court by or on behalf of the defendant.

I willingly stipulate that there is a sufficient factual basis to support each and every material factual allegation contained within the charging document(s) to which I am pleading guilty.

I understand that I have waived any right I may have to a jury determination of facts

*Defendant's Initials:* _COC_

Page 6 of 8

**FPD-VA-445**                                                                      **JA 11**

06/28/04  14:25 FAX 276 628 7399      US ATTY OFFICE ABINGDON                        ☑009

and/or factors relevant to the application of the Sentencing Guidelines and I consent to a determination of such facts and/or factors by the United States District Judge.

I understand that this agreement does not apply to any crimes that I may commit hereafter, including perjury. I understand that if I should testify falsely in this or in a related proceeding I may be prosecuted for perjury and statements I may have given authorities pursuant to this agreement may be used against me in such a proceeding.

I have not been coerced, threatened, or promised anything other than the terms of this plea agreement, described above, in exchange for my plea of guilty. I understand that my attorney will be free to argue any mitigating factors on my behalf, to the extent that they are not inconsistent with the terms of this agreement. I understand that I will have an opportunity to personally address the Court prior to sentence being imposed.

This writing sets forth the entire understanding between the parties and constitutes the complete plea agreement between the United States Attorney for the Western District of Virginia and me, and no other additional terms or agreements shall be entered except and unless those other terms or agreements are in writing and signed by the parties. This plea agreement supersedes all prior understandings, promises, agreements, or conditions, if any, between the United States and me.

I have consulted with my attorney and fully understand all my rights with respect to the offenses charged in the charging document(s). Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Guidelines. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this agreement and I voluntarily agree to it. Being aware of all of the possible consequences of my plea, I have independently decided to enter this plea of my own free will, and am affirming that agreement on this date and by my signature below.

Date: 6/29/04

CARLOS CARO, Defendant

I have fully explained to my client all rights available to my client with respect to the offenses charged in the pending indictment. I have carefully reviewed every part of this plea agreement with my client. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 6-29-04

Louis Dene
Counsel for Defendant

Defendant's Initials: CDC

Page 7 of 8

USCA4 Appeal: 16-6027    Doc: 24-3    Filed: 11/17/2016    Pg: 13 of 304
06/28/04   14:26 FAX 276 628 7399        US ATTY OFFICE ABINGDON                    ☑010

John L. Brownlee
United States Attorney

Date: 6-30-2004

Rick A. Mountcastle
Assistant United States Attorney
VSB No. 19768

Defendant's Initials: _____

Page 8 of 8

FPD-VA-447                        JA 13

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
Big Stone Gap Division

```
----------------------------x
                             :
UNITED STATES OF AMERICA,    :
                             :
      Plaintiff,             :
                             :
v.                           :   2:03CR115
                             :
CARLOS CARO,                 :
                             :
      Defendant.             :   Big Stone Gap, Virginia
                             :   August 3, 2004
----------------------------x   10:30 a.m.
```

GUILTY PLEA
BEFORE THE HONORABLE JAMES P. JONES
CHIEF UNITED STATES DISTRICT JUDGE

APPEARANCES:

RICK A. MOUNTCASTLE, Esquire
Assistant U.S. Attorney
P.O. Box 1098
Abingdon, VA 24212
    For the United States of America.

LOUIS DENE, Esquire
P.O. Box 1135
Abingdon, Virginia 24210
    Counsel for the Defendant.

Proceedings recorded by Stenography, transcript
produced by computer.

**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**P.O. BOX 398**
**ABINGDON, VIRGINIA 24212**
**(276) 628-5116**

(Proceedings commenced at 10:30 a.m.)

THE COURT: Morning, ladies and gentlemen. The clerk will call the case.

THE CLERK: *United States of America* v. *Carlos Caro*, Case Number 2:03CR10115, defendant number one.

THE COURT: Mr. Dene, I understand that your client wishes to enter a guilty plea pursuant to a written plea agreement; is that correct?

MR. DENE: That's correct, Your Honor.

THE COURT: If you and your client would come to the lectern, please? Mr. Caro, before accepting your guilty plea there are a number of questions that I must ask you to make sure that it is a valid plea. If you don't understand any of my questions, or if at any time you need to talk with your lawyer please say so since it's important that you fully understand my questions. Your answers must be under oath, and I'm going to ask the clerk to administer an oath to you, if you'll raise your right hand, please.

CARLOS CARO, DEFENDANT, SWORN

THE COURT: Do you understand that you are now under oath, and if you do not answer my questions truthfully your answers may later be used against you

in another prosecution for perjury or for making false statements?

THE DEFENDANT: Yes, sir.

THE COURT: For the record, if you'll state your name please?

THE DEFENDANT: Carlos David Caro.

THE COURT: How old are you?

THE DEFENDANT: Thirty-seven.

THE COURT: How far did you go in school?

THE DEFENDANT: Tenth grade.

THE COURT: Are you able to read and write the English language?

THE DEFENDANT: Yes, sir.

THE COURT: What sort of jobs or occupations have you followed in your lifetime?

THE DEFENDANT: Paint and body.

THE COURT: Have you ever been treated for mental illness of any type?

THE DEFENDANT: No, sir.

THE COURT: Have you been treated for substance abuse of any type?

THE DEFENDANT: No. No, sir.

THE COURT: Drug or alcohol problems?

THE DEFENDANT: No.

THE COURT: Have you taken any drugs,

medicine or pills within the last 24 hours?

THE DEFENDANT: No, sir.

THE COURT: Are you presently under the influence of alcohol?

THE DEFENDANT: No, sir.

THE COURT: Do you have any health problems at the present time?

THE DEFENDANT: No, sir.

THE COURT: Mr. Dene, do you have any doubt as to the defendant's competency?

THE DEFENDANT: No, Your Honor.

THE COURT: Mr. Caro, have you received a copy of the indictment, that is, the written charges against you in this case?

THE DEFENDANT: Yes, sir.

THE COURT: Have you had an adequate opportunity to discuss the indictment and your case in general with your lawyer?

THE DEFENDANT: Yes, sir.

THE COURT: I'm going to ask the bailiff to show you, to hand you the plea agreement, or a copy of the plea agreement that's been submitted in this case, and I want you to confirm to me that you signed that document and initialed each page.

THE DEFENDANT: Yes, sir.

THE COURT:  Thank you.  You may return it. Did you sign the plea agreement and initial each page to show that you read it?

THE DEFENDANT:  Yes, sir.

THE COURT:  And did you have an adequate opportunity to read and discuss the plea agreement with your lawyer before you signed it?

THE DEFENDANT:  Yes, sir.

THE COURT:  Are you fully satisfied with your lawyer's representation?

THE DEFENDANT:  Yes, sir.

THE COURT:  I'm going to ask Mr. Mountcastle, the Assistant United States Attorney, to summarize the terms of the plea agreement, and if you'll listen carefully to him.

MR. MOUNTCASTLE:  Your Honor, the plea agreement includes the following terms.  The defendant agrees to plead guilty to count one of the superseding indictment that charges him with conspiracy to commit murder in violation of 18 U.S.C. Section 1117, and he understands that the maximum statutory penalty includes a fine of $250,000, and/or up to life imprisonment, as well as supervised release, and a special assessment and certain fines. In exchange for his guilty plea to that count, the

United States agrees that if he accepts responsibility for his conduct, complies with his obligations under the plea agreement, at the time of his sentencing the United States will move to dismiss the remaining counts, two counts of the indictment against him.  In addition, the United States has agreed to enter into a plea agreement with co-defendant, Juan Carlos Moreno-Marquez in which Mr. Moreno-Marquez will plead guilty to count three of the superseding indictment and the United States will move for dismissal of the remaining counts of the superseding indictment against Moreno-Marquez if there is compliance with the terms of the plea agreements.  The United States has indicated that it will recommend that the defendant receive the two level reduction for offense level under sentencing guidelines section 3E1.1(a), and will move for the additional one level reduction under subsection (b) if, in fact, the defendant accepts responsibility for his conduct.  The defendant has also agreed to waive any right that he may have to a jury determination of facts relevant to his sentencing, and to the application of any sentencing guidelines, and guideline factors that may exist under the *Blakely* v. *Washington* case, and *Apprendi* v. *New Jersey* and any

future cases interpreting those decisions.  So, he has agreed to allow the court to make any factual determinations of sentencing, and waive any right to have a jury to make that, any of those determinations.  He's also agreed to, and understands that the court will have to make a determination based on his prior criminal history of whether he is a career offender as that term is used in the sentencing guidelines in Section 4B1.1.  He's agreed to the payment of the mandatory assessment of $100, has agreed to waive his right to appeal, to directly appeal his sentence and conviction, and has waived his right to collaterally attack his judgment and the sentence in this case, has waived his right to request information under the Freedom of Information Act and the Privacy Act.  He also has indicated his understanding that if he has any dissatisfaction with the representation of his counsel, he must make that dissatisfaction known to the court no later than the time of his sentencing, otherwise he would waive any claim to ineffective assistance of counsel that he is aware of and that he fails to raise with the court at the time of his sentencing.  Those are some of the terms of the plea agreement, Your Honor.

            THE COURT:  Let me ask you,

Mr. Mountcastle, to make sure that I understand the offense, the offense charged, of course, in count one is conspiracy under 18 United States Code Section 1117 to commit murder, and is it the position of the Government that the defendant is pleading guilty to murder in the second degree which provides for imprisonment for any term of years, or for life, rather than murder in the first degree which would be a mandatory life sentence?

MR. MOUNTCASTLE:  It would be conspiracy to commit murder in the second degree, Your Honor.

MR. DENE:  We would have no objection to that, Your Honor.

THE COURT:  Yes, sir.  Thank you, Mr. Mountcastle.  Mr. Caro, does the plea agreement, are those terms included in the plea agreement as you understand it, the terms recited by Mr. Mountcastle?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you understand that under the plea agreement you waive or give up your right to appeal your sentence?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you understand that under the plea agreement you waive or give up your right to collaterally attack your sentence, meaning that you

could not file a motion or petition including a petition under Section 2255 to attempt to have your sentence or conviction set aside?  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Now, has anyone made any promise to you, other than those made in the plea agreement, that caused you to want to plead guilty?

THE DEFENDANT:  No, sir.

THE COURT:  Has anyone attempted in any way to force you to plead guilty in this case?

THE DEFENDANT:  No, sir.

THE COURT:  Do you understand that the charge to which you are pleading guilty is a felony, and if your plea is accepted you will be found guilty of that charge and this may deprive you of valuable civil rights such as the right to vote, to serve on a jury, to hold public office and to possess any kind of firearm?

THE DEFENDANT:  Yes, sir.

THE COURT:  Now, the maximum possible penalty for this offense is imprisonment for up to life, plus a fine of up to $250,000, plus a special assessment of $100.  In addition, there will be a period of supervised release after any imprisonment.

Supervised release does not reduce the term of imprisonment, but rather is a term of supervision in addition to and following imprisonment. If there's a violation of a condition of supervised release the court may impose an additional prison term regardless of how much time was served before the violation. In addition, there may be a further term of supervised release following imprisonment. Do you understand the possible consequences of your plea?

THE DEFENDANT: Yes, sir.

THE COURT: This case is covered by the sentencing guidelines. Have you and your lawyer talked about the sentencing guidelines?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that the judge normally must select a sentence from within the guideline range, and that the guideline range will not be determined until after a pre-sentence report has been completed, and a sentencing hearing held?

THE DEFENDANT: Yes, sir.

THE COURT: Do you also understand that after your guideline range has been determined, the judge has the authority in some circumstances to depart from the guidelines, and impose a sentence that is more severe or less severe than the sentence

called for by the guidelines?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you also understand that under some circumstances the Government may have the right to appeal any sentence?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you understand that pursuant to your plea agreement you are waiving or giving up any rights that you might have for a jury determination of sentencing factors?  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you understand that parole has been abolished, and you will serve your full term less any good time credit earned?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you understand that the sentence imposed may be different from any estimate that your lawyer may have given you?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you understand that if I do not accept any sentencing recommendation or stipulation by the Government as set forth in your plea agreement, you will still be bound by your plea of guilty and you will have no right to withdraw it?

THE DEFENDANT: Yes, sir.

THE COURT: Please listen carefully to these rights that are given up when you plead guilty. You have a right to plead not guilty to any charge against you, and to persist in that plea. You would then have the right to trial by jury, and at trial you would be presumed to be innocent and the Government would have to prove your guilt beyond a reasonable doubt. You would also have the right to the assistance of a lawyer for your defense, and if necessary have the court appoint a lawyer, the right to see and hear all witnesses and have them cross examined in your defense, the right on your part to decline to testify unless you voluntarily elected to do so, and the right to compel the attendance of witnesses to testify for you. Should you decide not to testify or put on any evidence, that could not be used against you. Do you understand all of these rights?

THE DEFENDANT: Yes, sir.

THE COURT: Do you further understand that by entering a plea of guilty, if that plea is accepted by the court there will be no trial and you will have waived or given up your right to a trial as well as these other rights associated with the trial

that I've just described?

THE DEFENDANT:  Yes, sir.

THE COURT:  Now, let me go over with you, Mr. Caro, the charge to which you wish to plead guilty contained in count one of the indictment. Count one of the indictment charges that on or about August 29, 2003, in this judicial district this, that you and other persons entered into a conspiracy to kill another inmate at the United States Penitentiary Lee by stabbing and otherwise assaulting him in violation of law.  A conspiracy is like a partnership in crime.  If this case went to trial, the Government would be required to prove beyond a reasonable doubt that on or about that date that a conspiracy agreement or understanding as described in the indictment was entered into between two or more persons, and that at some time during the life of this conspiracy you knew the purpose of it, and deliberately joined it.  In addition, the Government would be required to prove beyond a reasonable doubt that some time during the life of the conspiracy at least one of its members performed at least one of the overt acts described in the indictment, and did so in order to further or advance the purpose of the conspiracy.  Now, I'm going to ask Mr. Mountcastle --

first, let me ask you, do you understand what the Government would be required to prove if this case went to trial, Mr. Caro?

THE DEFENDANT:  Yes, sir.

THE COURT:  I'm going to ask Mr. Mountcastle to make a representation of the facts the Government would be prepared to prove at trial, if you'll listen to him, please.

MR. MOUNTCASTLE:  Your Honor, if the case were to go to trial the Government's evidence would include the following:  On August 29, 2003 at approximately 6:15 p.m. at the United States Penitentiary in Lee County, Virginia which is within the territorial jurisdiction of the United States, defendant Carlos Caro and a co-defendant, Juan Moreno-Marquez, assaulted a fellow inmate by the name of Ricardo Benavidez with homemade knives made out of sharpened Plexiglas.  Defendant Caro had been identified by prison employees as a member of a gang called the Texas Syndicate based on certain tattoos on his body.  And in addition, upon his arrival at the prison facility, co-defendant Moreno- Marquez signed documents admitting to membership in the same organization, the Texas Syndicate.  During the assault the two defendants stabbed the victim at

least 28 times in the upper torso and head.  The assault began in a television room adjacent to what was called the passive recreation area of the prison. A prison employee will testify that he saw Benavidez leaving the television room and entering the passive recreation area with Mr. Caro and his co-defendant in pursuit, and at the same time striking him and striking at him with knives in their hands.  Video cameras also captured the two co-defendants as they pursued Mr. Benavidez across the passive recreation room until that prison employee pulled the victim into a side room and locked the door.  Once the victim was inside the locked room, the, Mr. Caro and his co-defendant retreated back toward the television room, and during that retreat one of them hesitated near a television stand in the passive recreation room appearing to place an object on it, and then the two returned to the television room for a short time. During a later search of the, of these two rooms, a homemade Plexiglas knife was recovered from the television stand in the passive recreation room, and a second homemade Plexiglas knife was recovered from the television room.  DNA testing established that the victim, Benavidez's, blood was on the clothing of both defendant Caro and his co-defendant.  After the

two defendants, as well as five other Texas Syndicate members, were placed in a special housing unit, co-defendant Moreno-Marquez spontaneously stated, "We hit him like we hit Alcantara (sic)."  The reference Alcantara was to another inmate who about a month earlier had been assaulted by members of the Texas Syndicate.  A medical examination of the victim disclosed five lacerations on the back of his head, one laceration on his face under the right eye, one laceration on the neck, 13 lacerations to the back, and eight lacerations to the chest, shoulders and arms.  That would be some of the evidence the Government would be prepared to present at a trial, Your Honor.

THE COURT:  Thank you, Mr. Mountcastle. Mr. Caro, do you dispute any of those facts?

THE DEFENDANT:  No, sir.

THE COURT:  Before I ask you to enter your plea, do you have any questions of me?

THE DEFENDANT:  No, sir.

THE COURT:  Do you need to talk further with your lawyer?

THE DEFENDANT:  No, sir.

THE COURT:  How do you now plead to the charge contained in count one of the indictment,

guilty or not guilty?

THE DEFENDANT:  Guilty.

THE COURT:  It is the finding of the court in the case of *United States of America* v. *Carlos Caro* that the defendant is fully competent and capable of entering an informed plea; that he is aware of the nature of the charge and the consequences of his plea; and that his plea of guilty is a knowing and voluntary plea supported by an independent basis in fact as to each of the essential elements of the offense.  The plea is, therefore, accepted and the defendant is now adjudged guilty of that offense.  Mr. Caro, a pre-sentence report will now be prepared by the probation office to assist me in sentencing you.  You will be asked to give information for your report, and your lawyer may be present, if you wish.  You and your lawyer have the right to read the report and file objections to it. And I remind counsel that written objections to the pre-sentence report must be made within 14 days after receiving the report.  I will accept the plea, but defer acceptance of the plea agreement until after the pre-sentence report has been prepared.  Madam Clerk, may we set a date?

THE CLERK:  Your Honor, the court has

available Monday, November 1st at any time.

MR. DENE:  That's okay with me.

MR. MOUNTCASTLE:  I believe that would be okay if we set it then.

THE COURT:  Very well.  I will set sentencing on November 1st of this year at 10:30 a.m. in this courthouse.  And the defendant will be remanded to his present custody.  And if there's nothing further, we'll take a short recess.

(Proceedings concluded at 10:50 a.m.)


CERTIFICATE


    I certify the foregoing is an accurate transcript from the record of proceedings in the above-entitled matter.



_____                    _____
Date                         Bridget A. Dickert q

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
Big Stone Gap Division

```
--------------------------x
                          :
UNITED STATES OF AMERICA,  :
                          :
     Plaintiff,            :
                          :
v.                         :   2:03CR115
                          :
CARLOS CARO,               :
                          :
     Defendant.            :   Big Stone Gap, Virginia
                          :   November 1, 2004
--------------------------x   10:55 a.m.
```

SENTENCING
BEFORE THE HONORABLE JAMES P. JONES
CHIEF UNITED STATES DISTRICT JUDGE

APPEARANCES:

> R. LUCAS HOBBS, Esquire
> Assistant U.S. Attorney
> P.O. Box 1098
> Abingdon, Virginia  24212
>     For the United States of America.

> LOUIS DENE, Esquire
> P.O. Box 1135
> Abingdon,  Virginia  24210
>     Counsel for the Defendant.

Proceedings recorded by Stenography, transcript
produced by computer.

**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**P.O. BOX 398**
**ABINGDON, VIRGINIA 24212**
**(276) 628–5116**

(Proceedings commenced at 10:55 a.m.)

THE COURT: Morning, ladies and gentlemen. The clerk will call the case.

THE CLERK: *United States of America* v. *Carlos Caro*, Case Number 2:03cr10115, defendant number one.

THE COURT: This is the date scheduled for the sentencing of the defendant, Mr. Caro. Mr. Caro, let me ask you a question, if you'll stand, please, sir. Have you had an adequate opportunity to review the pre-sentence investigation with your lawyer?

THE DEFENDANT: Yes, sir.

THE COURT: Thank you, sir. You may be seated. Mr. Dene, are there any objections on behalf of your client?

MR. DENE: We filed no objections, Your Honor.

THE COURT: Does the Government have any objections?

MR. HOBBS: No, Your Honor.

THE COURT: Very well. I will adopt the pre-sentence investigation report as my findings of fact in this case. The defendant has a total offense level of 34, and a criminal history category of six. That translates into a custody range of 262 to 327

months imprisonment, supervised release of between three to five years, a fine range of $17,500 to $175,000, and a special assessment of $100. Mr. Dene, I'll be glad to hear any argument you wish to present in regard to the appropriate sentence for your client.

MR. DENE:  Your Honor, the court fully understands in this case, this was a conspiracy involving seven inmates at the U.S. Penitentiary in Lee County, Virginia.  Five of those inmates have now been sentenced.  Mr. Caro, for all practical purposes, has taken full responsibility for this act that was committed by the seven inmates at that penitentiary.  I think the record would indicate that there was a conspiracy, what the conspiracy continued to do.  He got involved in it.  He was one of the main instigators in the conspiracy.  He was, made some acts, committed some acts that he shouldn't have committed, and from the negotiations that we entered with the Government he's taken full responsibility for his acts in that incident.  Sentencing guidelines puts him in a very high category.  I think that goes to the issue of the application of the sentencing guidelines and gets him, holds him responsible for all of the other crimes that he's committed, we

think, based upon the guidelines are a little excessive, and that's the problem with the guideline. Under the circumstances of this case, we would ask the court to consider the low end of the guidelines, or less, for his conduct.

THE COURT:  Thank you, Mr. Dene. Mr. Hobbs?

MR. HOBBS:  Yes, Your Honor.  Based upon the offense conduct here as set forth, including Mr. Caro's admission that he and his co-defendant took the sharpened Plexiglas weapons and repeatedly stabbed the victim, as well as his lengthy criminal history involving drugs, we would ask the court to sentence the defendant to the upper end of the guidelines which, I believe, is 327 months incarceration.  Thank you.

THE COURT:  Thank you.  Mr. Caro, if you'll stand, sir, please.  Mr. Caro, is there anything that you wish to say to me before I pronounce sentence in your case?

THE DEFENDANT:  No, sir.

THE COURT:  Pursuant to the Sentencing Reform Act it is the judgment of the court that the defendant, Carlos Caro, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for

a term of 327 months. Pursuant to Section 5G1.3(a) of the guidelines, the term of imprisonment imposed by this judgment shall run consecutively with the defendant's imprisonment under any previous state or federal sentence. Upon release from imprisonment, the defendant shall be placed on supervised release for a term of five years, and within 72 hours of release from custody he must report to the probation office in the district to which he is released. While on supervised release he must not commit another federal, state or local crime, must not illegally possess a controlled substance, and must comply with the standard conditions that have been adopted by the court. He must refrain from any unlawful use of any controlled substance, and must submit to one drug test within 15 days of release from imprisonment, and at least two periodic drug tests thereafter as directed by the probation officer. He must pay any monetary penalty imposed by this judgment. He must participate in a program of testing and treatment for substance abuse as directed by the probation officer until he is released from the program by the officer. He must not possess a firearm or destructive device, and shall reside in a residence free of the same. He must submit to

warrantless search and seizure of person and property

by the probation officer, or other law enforcement

officer, whenever such officer has reasonable

suspicion that he is engaged in criminal activity.

The court finds that the defendant does not have the

ability to pay a fine, and will waive the fine in

this case.  It is ordered that the defendant pay to

the United States a special assessment of $100 which

shall be due immediately.  Pursuant to the

recommendation of the Court of Appeals in the *United*

*States* v. *Hammoud* case, the court proposes an

alternative sentence in the event that the federal

sentencing guidelines are determined to be not

mandatory.  If that were the case, the court would

impose a life sentence in this case based on the

defendant's criminal record and the facts of this

offense.  I advise the defendant that he has waived

his right to appeal this sentence, and that waiver is

binding unless the sentence exceeds the statutory

maximum or is based on a constitutionally

impermissible factor.  If the right of appeal does

exist, a person who is unable to pay the costs may

apply for leave to appeal without pre-payment of such

costs.  Any notice of any appeal must be filed within

ten days of entry of judgment, or within ten days of

any notice of appeal by the Government.  If requested, the clerk will prepare a notice of appeal on behalf of the defendant.  Are there any further matters in this case.

MR. HOBBS:  Government would move to dismiss counts --

THE COURT:  Government's motion will be granted.

MR. HOBBS:  I assume all other terms with, regarding the waiving of fine and special assessment would be the same?

THE COURT:  That's correct.

MR. DENE:  We have nothing further.

THE COURT:  We'll recess court.

(Proceedings concluded at 11:05 a.m.)


CERTIFICATE


I certify the foregoing is an accurate transcript from the record of proceedings in the above-entitled matter.


_____                    /s/ Bridget A. Dickert
Date                          U.S. Court Reporter

AO 245B    (Rev. 12/03 - VAW Additions 3/04) Judgment in a Criminal Case
Sheet 1

CLERK'S OFFICE U.S. DIST COURT
AT ABINGDON, VA
FILED

# UNITED STATES DISTRICT COURT
## Western District of Virginia

NOV - 1 2004

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| V. | |

CARLOS CARO

Case Number:  2:03CR10115-001

USM Number:  37786-079

Lou Dene
_____
Defendant's Attorney

## THE DEFENDANT:

[X] pleaded guilty to count(s)    One (1s)

[ ] pleaded nolo contendere to count(s)
    which was accepted by the court.

[ ] was found guilty on count(s)
    after a plea of not guilty,

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 1117 | Conspiracy to Commit Murder | August 29, 2003 | 1s |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ] The defendant has been found not guilty on count(s)

[X] Count(s)    2s and 3s    [ ] is    [X] are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

November 1, 2004
_____
Date of Imposition of Judgment

_____
Signature of Judge

James P. Jones, Chief United States District Judge
_____
Name and Title of Judge

11/1/04
_____
Date

**JA 39**

AO 245B    (Rev. 12/03 - VAW Additions 3/04) Judgment in Criminal Case
           Sheet 2 - Imprisonment

Judgment - Page ___2___ of ___6___

DEFENDANT:     CARLOS CARO
CASE NUMBER: 2:03CR10115-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

Three hundred twenty-seven (327) months.  This term of imprisonment shall run consecutively with the defendant's imprisonment under any previous state or federal sentence.

☐  The court makes the following recommendations to the Bureau of Prisons:

☒  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

  ☐  at _____  ☐ a.m.  ☐ p.m.  on _____

  ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

  ☐  before_____ on _____

  ☐  as notified by the United States Marshal.

  ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**JA 40**

AO 245B    (Rev. 12/03 - VAW Additions 3/04) Judgment in a Criminal Case
        Sheet 3 - Supervised Release

DEFENDANT:    CARLOS CARO
CASE NUMBER: 2:03CR10115-001

Judgment-Page ___3___ of ___6___

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

Five (5) years.

## MANDATORY CONDITIONS OF SUPERVISION

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☒ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☐ The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet on this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

**JA 41**

AO 245B    (Rev. 12/03 - VAW Additions 3/04) Judgment in a Criminal Case
           Sheet 3C - Supervised Release

DEFENDANT:    CARLOS CARO                                    Judgment-Page ___4___ of ___6___
CASE NUMBER: 2:03CR10115-001

## SPECIAL CONDITIONS OF SUPERVISION

While on supervised release, the defendant:

(1) Must pay any monetary penalty that is imposed by this judgment in the manner directed by the court;

(2) Must not possess a firearm as defined in 18 U.S.C. § 921, including a destructive device, and must reside in a residence free of the same;

(3) Must submit to warrantless search and seizure of person and property by the probation officer or other law enforcement officer, whenever such officer has reasonable suspicion that the defendant is engaged in criminal activity; and

(4) Must participate in a program of testing and treatment for substance abuse as directed by the probation officer, until such time as the defendant is released from the program by the officer;

**JA 42**

AO 245B   (Rev. 12/03 - VAW Additions 3/04) Judgment in a Criminal Case
        Sheet 5 - Criminal Monetary Penalties

|  | Judgment - Page ___5___ of ___6___ |
|---|---|

DEFENDANT:    CARLOS CARO
CASE NUMBER: 2:03CR10115-001

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 100.00 | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

    If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |
| **TOTALS** | $0.00 | $0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the  ☐ fine  ☐ restitution.

    ☐ the interest requirement for the  ☐ fine  ☐ restitution is modified as follows:

*Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 13, 1996.

**JA 43**

AO 245B    (Rev. 12/03 - VAW Additions 3/04) Judgment in a Criminal Case
Sheet 6 - Schedule of Payments

|  | Judgment - Page   6   of   6 |

DEFENDANT:    CARLOS CARO
CASE NUMBER: 2:03CR10115-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**    ☒   Lump sum payment of $ 100.00 _____ due immediately, balance due

       ☐   not later than _____ , or
       ☐   in accordance      ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

**B**    ☐   Payment to begin immediately (may be combined with      ☐C,      ☐D, or      ☐F below); or

**C**    ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**    ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**    ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**    ☐   Special instructions regarding the payment of criminal monetary penalties:

Any installment schedule is subject to adjustment by the court at any time during the period of imprisonment or supervision, and the defendant shall notify the probation officer and the U.S. Attorney of any change in the defendant's economic circumstances that my affect the defendant's ability to pay.

All criminal monetary penalties shall be made payable to the Clerk, U.S. District Court, P.O. Box 1234, Roanoke, Virginia 24006, for disbursement.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.
☐    Joint and Several

     Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☐    The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

**JA 44**

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE No.:  2:03-cr-10115 |
| | ) | |
| CARLOS  CARO *et al.*, | ) | (Hon. James P. Jones) |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255

Carlos Caro, through counsel, respectfully moves this Court to vacate, set aside, or correct his sentence in the above captioned case pursuant to 28 U.S.C. § 2255 (hereinafter "2255 Motion").  This is Mr. Caro's first § 2255 motion challenging this conviction and sentence.  No appeal or collateral motions have been filed prior to this motion.

This motion is filed incidental to the filing of a § 2255 motion in the capital case of *United States v. Caro*, case no. 1:06-cr-00001 (W.D. Va.), Dkt. 780.[1]  The issue raised in this 2255 Motion is related to the capital case. The facts and law pertinent to this claim are set forth below.

### BACKGROUND INFORMATION AND PROCEDURAL HISTORY

On August 29, 2003, Ricardo Benavidez received multiple stab wounds at the federal United States Penitentiary in Lee, Virginia ("USP-Lee").  Seven inmates were implicated in the

---

[1] Undersigned counsel represent Mr. Caro in a § 2255 motion in a capital case also pending before this Court.  Case No. 06-cr-00001-JPJ (W.D. Va.).  Counsel's appointment in that case became effective on January 9, 2012, the date that the Supreme Court denied Mr. Caro's petition for writ of certiorari. *Id.*, Dkt. 768.

**JA 45**

stabbing and were indicted in this case. Dkt. 1. Two of the inmates, Mr. Caro and Juan Moreno-Marquez, were directly involved with the stabbing, while the other five defendants were similarly armed and standing nearby, but had been denied access to the recreation room where the assault occurred. *See* Caro Presentence Report ¶¶ 11-13.

On November 19, 2003, the government indicted all seven defendants, charging them with conspiracy to murder and possession of a weapon. Mr. Caro and Mr. Moreno-Marquez also were charged with assault with the intent to commit murder. Dkt. 1.

About one month after the indictment, on December 17, 2003, an inmate named Roberto Sandoval was found dead in the cell of Mr. Caro. Mr. Caro made statements to the government, in which he confessed to killing Mr. Sandoval. *See* 1:06-cr-1 (W.D. Va.), Dkt. 780 at 10. The government did not immediately prosecute Mr. Sandoval's murder.[2]

The parties proceeded towards a trial in this case. The codefendants filed pretrial motions (dkts. 44, 48, 49, 50, 52, 65, 66) and motions *in limine* (dkts. 64, 67, 71, 72). The government filed its notice of expert witness testimony. Dkt. 77. The five codefendants who were not charged with directly stabbing Mr. Benavidez then pled guilty to possession of weapons and received various sentences. *See* Dkt. 146 (Tijerina Judgment-30 months); Dkt. 152 (Escamilla Judgment-30 months); Dkt. 153 (Garza Judgment-30 months); Dkt. 154 (Enriquez Judgment-24 months); and Dkt. 159 (Altamirano-Lopez Judgment-30 months).

Mr. Caro and Mr. Moreno-Marquez continued to prepare for trial, and filed a motion for appointment of an expert witness and to take depositions of the government's expert witnesses.

---

[2] The government did not provide notice to the Court that it intended to prosecute and seek the death penalty against Mr. Caro for Mr. Sandoval's death until December 2004. Case No. 2:05-mc-00001-JPJ, Dkt. 1.

**JA 46**

Dkt. 91.  The Court set a trial date for August 3 and 4, 2004 (dkt. 107) and entered an order regarding the empanelment of the jury (dkt. 127).

The government then negotiated a deal that allowed Mr. Moreno-Marquez to plead to the lesser charge of possession of a weapon, but only if Mr. Caro pled to the more serious charge of conspiracy to murder.  Dkt. 135 at 2.

The plea deal was negotiated on Mr. Caro's behalf by his attorney, Louis Dene.  Dkt. 131.  Mr. Dene recognized that this plea agreement provided no real benefit to Mr. Caro, though it did benefit Mr. Moreno-Marquez. Ex. 3 (Dene Declaration) ¶ 5,[3]  (hereinafter "Dene Declaration"); *See also* Caro Presentence Report ¶ 63.  Mr. Caro's reason for signing this plea agreement was to help a younger man, Mr. Moreno-Marquez, leave the Bureau of Prisons ("BOP") while still relatively young.  Dene Declaration ¶ 5.  Mr. Dene advised Mr. Caro that if he pled guilty, he would likely receive a long sentence for the conspiracy to murder conviction. *Id.* ¶ 6.

This guilty plea was signed on June 29, 2004 (more than six months after the death of Roberto Sandoval).  Dkt. 131 at 7.   At that time, Mr. Dene was aware that Mr. Sandoval had been killed, and anticipated that the government would charge Mr. Caro for murder and seek the death penalty.  Dene Declaration ¶¶ 3, 4.  Mr. Dene, however, never advised Mr. Caro that the conspiracy to murder conviction and resulting sentence would likely be used against him in the later capital case and therefore he should not sign the plea agreement, but rather proceed to trial. *Id.* ¶ 6.

---

[3] The exhibits attached to this motion were also filed with the § 2255 motion in Mr. Caro's capital case, Case No. 06-cr-00001-JPJ (W.D. Va.).  To avoid confusion, the exhibits in this motion are numbered the same as they were in Mr. Caro's capital §2255 motion.

**JA 47**

Mr. Dene knew that Mr. Caro was of limited education, had not completed high school, and had limited ability to understand legal proceedings without the benefit of counsel. *Id.* ¶ 7. Mr. Dene also knew, based on the considerable time he spent with Mr. Caro, that Mr. Caro liked and trusted him. *Id.* ¶ 8. For this reason, Mr. Dene is of the opinion that had he told Mr. Caro to go to trial, Mr. Caro would have followed his advice. *Id.* ¶ 8.

On November 1, 2004, Mr. Caro was sentenced on the conspiracy to murder charge and received the highest possible sentence under the guidelines—327 months custody consecutive to his prior federal sentence of 360 months imposed in case no. 4:00-cr-179 (N.D. Tex.). Dkt. 168 at 2. For Mr. Caro, this was the equivalent of a life sentence. On November 2, 2004, the Court sentenced codefendant Moreno-Marquez to 57 months incarceration. *Id.*, Dkt. 172.

The government notified this Court of its intent to prosecute Mr. Caro for the death of Mr. Sandoval and to seek the death penalty against Mr. Caro in December 2004, and in January 2005, the Court appointed counsel to represent Mr. Caro in pre-indictment proceedings. Case No. 2:05-mc-00001-JPJ, Dkts. 4, 6.

The Department of Justice certified the case for death, and the capital trial charging Mr. Caro with the death of Mr. Sandoval began in January 2007. Case No. 1:06-cr-00001. In the subsequent capital case, the government used not only the fact of Mr. Caro's conviction in this case, but also the length of Mr. Caro's sentence, as aggravating circumstances warranting a death sentence. The government argued that given the length of Mr. Caro's sentence in this case, he would receive no punishment in the capital case unless death was imposed. *See, e.g.,* Case No. 1:06-cr-00001, Tr. 2/13/2007 at 26-27 (arguing that another life sentence would be "like water off a duck's back" and that "he'd be getting a pass" for killing Roberto Sandoval); *id.* at 42

**JA 48**

(arguing that Mr. Caro's prior sentence was the equivalent of a life sentence); *id.* at 89 (arguing that unless sentenced to death, Mr. Caro will return to prison as "a conquering hero").

That trial ended with a death verdict for Mr. Caro. The Fourth Circuit denied his appeal, and the Supreme Court denied his petition for certiorari.

### MR. CARO HAS BEEN DILIGENT IN HIS ATTEMPT TO DISCOVER THE FACTS UNDERLYING THIS MOTION

This petition is timely filed under 28 U.S.C. § 2255(f)(4), as the facts supporting this 2255 Motion were discovered within the last year.

Mr. Caro unknowingly entered into a guilty plea agreement for a conviction that the government would use against him as an aggravating circumstance in his capital prosecution. Despite entering the guilty plea in November 2004, Mr. Caro did not discover until March 2012 that his attorney, Mr. Dene, had anticipated that the government would use the conspiracy conviction against him during his capital proceedings. Mr. Caro acted diligently in filing this motion promptly after he was "in a position to realize that he ha[d] an interest in challenging the prior conviction with its potential to enhance the later sentence." *Johnson v. United States*, 544 U.S. 295, 308 (2005).

Undersigned counsel were appointed to represent Mr. Caro in his collateral proceedings related to his capital conviction effective January 9, 2012. Counsel was tasked with gathering, assembling, and reviewing over 100,000 pages related to this case. Counsel also began conducting their own investigation. This investigation included an interview with Lou Dene on March 9, 2012. During that interview, Mr. Dene stated that he knew, but had not advised Mr. Caro, that the government likely would use his conviction against him in a capital prosecution. Once counsel learned this information in March 2012, counsel continued to review the files, develop the factual basis for the claim, and investigate Mr. Caro's capital conviction. As soon as

**JA 49**

practicable, and within days of filing his 2255 motion challenging his capital conviction, Mr. Caro's attorneys filed the instant motion.

**Claim:  Trial Counsel Violated Mr. Caro's Sixth Amendment Rights By Failing to Advise Mr. Caro That He Should Not Plead Guilty to Conspiracy to Murder Because the Conviction and Sentence Would Be Used Against Him in a Later Capital Proceeding; This Failure Prejudiced Mr. Caro By Making More Likely the Imposition of a Death Sentence.**

The Supreme Court outlined the standard for determining when counsel has provided ineffective assistance in *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).  As described by the Court, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relief on as having produced a just result."  *Id.* at 686.  Under *Strickland*, counsel is ineffective if: (1) "representation fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 688, 694.  The inquiry under the first prong, deficiency, is "whether counsel's assistance was reasonable considering all the circumstances."  *Strickland*, 466 U.S. at 688.  Performance is deficient when the attorney fails to render the performance of a reasonably competent attorney.  *Id.* at 687.

> **A.    Trial Counsel's Performance Was Deficient for Failing to Warn Mr. Caro of the Severe Consequences of the Guilty Plea and Conviction.**

The enhanced risk of the death penalty was a collateral consequence that was so severe that defense counsel had a Sixth Amendment obligation to warn Mr. Caro in connection with his guilty plea.  The Supreme Court has recognized the obligation to warn of serious collateral consequences beginning with its decision in *Hill v. Lockhart,* 474 U.S. 52, 58-60 (1985).  Because death is the most serious of all collateral consequences, the failure to warn Mr. Caro of

6

**JA 50**

the consequence of the plea agreement and sentence constituted ineffective assistance of counsel within the meaning of *Strickland v. Washington,* 466 U.S. 668 (1984).

As early as 1999, the American Bar Association stated that it was a standard of practice for guilty pleas that attorneys advise clients of the collateral consequences of guilty pleas.  Am. Bar Assoc., *ABA Standards for Criminal Justice:  Pleas of Guilty*, No. 14-3.2(f) (3rd ed. 1999). This standard for professional practice was further recognized by the Supreme Court in *Padilla v. Kentucky,* 130 S. Ct. 1473, 1482-83 (2010) (citing several professional standards from the 1980s and 1990s as a basis for its *Strickland* finding that defense counsel was ineffective in failing to warn of the deportation consequences of a guilty plea).

The *Hill* and *Padilla* cases and the ABA standards which preceded them have established that severe collateral consequences, such as parole ineligibility or additional incarceration, must be warned.  Moreover, subsequent federal cases have held that the *Padilla* holding was only a clarification of the *Strickland* duties, such that it applied to cases pre-dating *Padilla*.  *See, e.g., United States v. Orocio,* 645 F.3d 630, 641 (3rd Cir. 2011).

The Court can also consider the opinion of a standard of care expert when assessing the reasonableness of counsel's actions or inactions.  *See, e.g.*, *Gray v. Branker*, 529 F.3d 220, 235 (4th Cir. 2008) (noting that petitioner presented an "expert on the practice of criminal law").  Mr. Hammond, a standard of care expert who is familiar with Mr. Caro's case, is of the opinion that Mr. Dene's failure to advise Mr. Caro to reject this plea agreement due to the severe consequences of the agreement constituted performance far below acceptable professional standards for an attorney.  *See* Exhibit 4 (Declaration of Larry A. Hammond) ¶¶ 43-45.

**JA 51**

**B.     The Failure to Warn Has Caused Mr. Caro Grave Prejudice, Including the Imposition of a Death Verdict.**

Prejudice is shown when there is a reasonable probability that, but for counsel's errors, a defendant would have gone to trial. *Hill v. Lockhart,* 474 U.S. 52, 58-59 (1985).  This holding from *Hill* is regularly followed by the Supreme Court, the Fourth Circuit and other federal courts generally.  *See, e.g., Missouri v. Frye*, 132 S. Ct. 1399, 1409-10 (2012) ("In cases where a defendant complains that ineffective assistance led him to accept a plea offer as opposed to proceeding to trial, the defendant will have to show 'a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'") (quoting *Hill,* 474 U.S. at 59); *United States v. Akinsade,* 686 F.3d 248, 253-54 (4th Cir. 2012) (applying *Hill* standard to defendant who received bad advice as to immigration consequences); *United States v. Mooney,* 497 F.3d 397, 404-05 (4th Cir. 2007) (applying *Hill* and finding prejudice where defendant pled guilty because counsel failed to advise him of a potentially successful affirmative defense); *United States v. Juarez,* 672 F.3d 381, 388-89 (5th Cir. 2012) (applying *Hill* and finding prejudice where bad immigration advice led to guilty plea); *Dando v. Yukins,* 461 F.3d 791, 800-02 (6th Cir. 2006) (applying *Hill* and finding prejudice where defendant did not receive advise as to an affirmative defense).

Mr. Dene has stated that he did not advise Mr. Caro to proceed to trial, and that if he had done so, Mr. Caro would have gone to trial.  Dene Declaration at ¶ 8.  Mr. Dene's declaration is a sufficient basis to establish prejudice under the *Hill* standard.

**C.     Conclusion.**

Mr. Dene's failure to properly advise Mr. Caro of the significant collateral consequence of his plea agreement constituted deficient performance and prejudiced Mr. Caro, and thus violates the standard of effective assistance of counsel set forth in *Strickland.*

8

**JA 52**

## PRAYER FOR RELIEF

WHEREFORE, Defendant Carlos Caro asks that this Court provide the following relief:

1.      That Defendant be permitted to file a Memorandum of Law in support of this motion in accordance with a briefing schedule established by this Court;

2.      Require Respondent to file an answer to the motion in the form prescribed by Section 2255 Rule 5, identifying all proceedings conducted in Defendant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3.      Permit Defendant to file a reply to Respondent's answer, responding to any affirmative defenses raised by the answer;

4.      Permit Defendant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his motion, and any defenses thereto raised by Respondent's answer;

5.      Permit Defendant to amend this motion to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this motion, and, to allow the amendment to relate back to the date of the filing of this motion;

6.      Conduct an evidentiary hearing to resolve any factual disputes raised by Respondent's answer to this motion, or by Defendant's response to any affirmative defenses raised by Respondent.  Because Defendant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

7.      Permit oral argument as appropriate and required;

9

**JA 53**

8.      Vacate Defendant's conviction and sentence and order that appropriate retrial and/or sentencing hearings be conducted; and

9.      Grant such further and additional relief as may be just.

## CERTIFICATION

Pursuant to Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings for the United States District Courts, undersigned counsel declare under penalty of perjury that they are attorneys appointed by the United States District Court for the Western District of Virginia to represent Carlos David Caro in his capital proceedings in Case No. 1:06-cr-0001-JPJ pursuant to 28 U.S.C. § 2255.  As such, undersigned counsel are authorized to file this motion pursuant to 28 U.S.C. § 2255 on Mr. Caro's behalf.  This motion is signed by undersigned counsel under penalty of perjury.

Respectfully submitted this 11th day of January, 2013.

s/Dale A. Baich _____
Jon M. Sands
Federal Public Defender
Dale A. Baich (Ohio Bar No. 0025070)
Karen M. Wilkinson (Arizona Bar No. 014095)
Robin C. Konrad (Alabama Bar No. 2194-N76K)
Office of the Federal Public Defender, District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona  85007
dale_baich@fd.org
karen_wilkinson@fd.org
robin_konrad@fd.org
Telephone:  602-382-2816
Facsimile:  602-889-3960

Fay F. Spence, Esquire (Virginia State Bar No. 27906)
Federal Public Defender's Office
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Telephone:  540-777-0880
Facsimile:  540-777-0890

10

**JA 54**

Brian J. Beck (Virginia Bar No. 78049)
Federal Public Defender's Office
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Telephone:  276- 619-6080

Attorneys for Defendant
Carlos David Caro

## CERTIFICATE OF SERVICE

I hereby certify that on January 11th, 2013, I filed the foregoing Defendant's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 with the Clerk of the Court through CM/ECF, and also emailed a copy to the parties listed below:


Anthony Giorno, AUSA.
Email: anthony.giorno@usdoj.gov

Rick A. Mountcastle
Email: rick.mountcastle@usdoj.gov


s/Stephanie Bame_____
Legal Assistant
Capital Habeas Unit

11

**JA 55**

# EXHIBIT 3

# EXHIBIT 3

JA 56

DECLARATION OF LOUIS DENE, ESQUIRE
PURSUANT TO 28 U.S.C. § 1746

I, Louis Dene, do make oath and swear:

1.  I am an attorney licensed by the Commonwealth of Virginia.

2.  In February 2004 I was appointed to represent Carlos Caro in Western District of Virginia Case Number 2:03cr10115.  Mr. Caro was charged with Conspiracy to Commit Murder, Assault with Intent to Commit Murder and Possession of a Prohibited Object.

3.  Prior to my appointment in February 2004, Mr. Caro had been implicated in the death of an inmate at USP Lee in December 2003.  I was aware of the homicide, but it was separate from the case in which I represented him.

4.  It was my understanding that the Government intended to proceed with a death penalty case against Mr. Caro at the conclusion of the 2:03cr10115 case.

5.  As part of my representation I worked to obtain a plea agreement with the United States Attorney's Office whereby Mr. Caro would plead guilty to the most serious offense of Conspiracy to Commit Murder and the Government would allow his co-defendant, Juan Carlos Moreno-Marquez to plead to the lesser offense of possessing a prohibited object. The plea agreement, which I understood was proposed by Mr. Moreno-Marquez, provided no real benefit to Mr. Caro; however it did benefit Mr. Moreno-Marquez.

6.  I advised Mr. Caro that the plea agreement would mean that he would receive a very long sentence.  Mr. Caro stated that "he wasn't going anywhere," so the long sentence did not matter to him.  I did not advise him of the implications that the plea agreement would have on the prison killing case.  I did not advise Mr. Caro that the Conspiracy to Commit

1

JA 57

Murder conviction would likely be used against him in a later capital case and that he should not sign the plea agreement.

7. I was aware of Mr. Caro's limited education. I know that Mr. Caro had not completed high school and that he had no ability to understand legal proceedings without the benefit of counsel.

8. I regularly advised Mr. Caro and he followed my advice.  Mr. Caro trusted me.  Mr. Caro was not afraid of going to trial and if I recommended going to trial he would have done so.

9. I was contacted by the trial attorneys who represented Mr. Caro on the capital charges. However, I was not asked about the reasons for the plea agreement, nor was I asked about my recommendations to Mr. Caro.

10. After Stephen Kalista was appointed, he visited my office to copy my file.  He copied a portion of my file, but not all of my file.

I declare under penalty for perjury that the foregoing is true and correct.


Executed on __11-9-12__.

_Louis Dene_ (signature)
Louis Dene

2

**JA 58**

# EXHIBIT 4

# EXHIBIT 4

## DECLARATION OF LARRY A. HAMMOND

I, Larry A. Hammond, declare as follows:

1.     I am a member of the law firm of Osborn Maledon, P.A.  I am a member of the Bars of the States of Arizona (1975) and California (1971; inactive).  I am a graduate of the University of Texas School of Law (1970).

2.     I was asked to review materials in connection with the post-conviction proceeding in *United States v. Carlos Caro*, Case No.06-cr-00001-JPJ (W.D.VA.), and provide this Declaration.

3.     I was retained to serve as an expert on issues relating to the effective assistance of trial counsel in Mr. Caro's case.  I am being compensated at the rate of $300.00 per hour.  My current hourly rate for criminal defense-related work at Osborn Maledon is $550 per hour.  My background is briefly summarized below.  A copy of my CV is attached.

4.     After graduation, I served as a law clerk to the Honorable Carl McGowan on the United States Court of Appeals for the D.C. Circuit in 1970-71.  I then served as the last law clerk for Justice Hugo L. Black and the first law clerk for Justice Lewis F. Powell in 1971 through 1973.  In 1973 and 1974, I served as an Assistant Watergate Special Prosecutor.  In 1974, I began practicing in Arizona at the private law firm which was the predecessor of Osborn Maledon, the firm with which I am now affiliated.

5.     During the Administration of President Jimmy Carter, I served as First Deputy Assistant Attorney General in the Office of Legal Counsel (OLC) at the Department of Justice (1977-1980).

1

4633616v1

**JA 60**

6.      Both as a Supreme Court law clerk and as a Deputy at OLC, I undertook responsibilities with respect to death penalty-related matters.

7.      In 1981, I rejoined my law firm, which is now known as Osborn Maledon in Phoenix, Arizona.  From 1981 to the present, I have been engaged in the practice of law primarily on the criminal defense side.  Throughout that time, my law firm has been engaged in death penalty work, including direct representation and policy-related work in that field.

8.      I have been a practicing lawyer for 42 years.  I have been engaged in civil litigation and criminal defense work continuously for the last 31 years.  I am a member of the American College of Trial Lawyers.

9.      From 1981 to the present, I have spent at least some portion of my time every year on capital cases.  The law firm of Osborn Maledon (and its predecessor firm) and I have been involved in capital litigation at every stage, including trial, sentencing, direct appeal, post-conviction review, federal habeas corpus, and clemency. I am one of the founders of this law firm and have been its senior criminal defense lawyer since its inception.  I have been personally involved in every capital case in which lawyers in this firm have been engaged.

10.     I have tried to verdict two Arizona capital cases and recently concluded a six-month involvement in a case in Yavapai County, Arizona, that began as a capital case but in which the prosecution elected to remove the death penalty as a possible penalty at the end of a one-month jury selection *voir dire*.

2

**JA 61**

11.    I have also served as trial court counsel in eight federal death penalty cases, two in New Mexico, one in Nevada, four in the District of Arizona, and one in the District of Southern California.  In each case, I was appointed as lead counsel pursuant to 18 U.S.C. § 3005's requirement that each defendant be assigned two attorneys, one of whom is deemed to be "learned in the law applicable to capital cases."

12.    Within the last 15 years, Osborn Maledon has consulted frequently with indigent defense offices in Arizona and in the mid-1990s I served as co-counsel in connection with two capital cases assigned to the Office of the Maricopa County Legal Defender (OLD), *State v. Pape* and *State v. Pilipow*.  Both cases required extensive development of mitigation and mental condition information.

13.    Since 1998, I have served as lead counsel in the federal capital habeas corpus proceeding arising from an Arizona capital conviction (*Atwood v. Stewart*, Case No. CIV96-116 TUC JCC).

14.    In approximately 1989, I participated in the founding of the Arizona Capital Representation Project, and I have served as a Board member and/or officer of that organization since its inception.  The Project has been involved, at one stage or another, in assisting virtually every member of Arizona's death row population.  Congress defunded all capital resource centers in 1996, but since that time the Project's activities have continued and the Project remains a resource in all phases of capital litigation – particularly at the post-conviction stages.

15.    In approximately 1994, I was asked to serve as the Chair of the Arizona State Bar's Indigent Defense Task Force (IDTF), and I have continued in that position

3

4633616v1

**JA 62**

since that time. The IDTF has been engaged in the development of rules promulgated by the Arizona Supreme Court dealing with capital defense funding and indigent defense funding generally. The IDTF has also been involved in developing and testifying in support of, or in opposition to, legislative proposals dealing with the funding of capital defense in Arizona. The Task Force participated in the development of legislation creating the standards for the appointment of counsel and for the funding of representation at the state post-conviction stage in capital cases. Among the most important undertakings of this Task Force has been the successful effort to secure an amendment to Rule 6.8 of the Arizona Rules of Criminal Procedure to require lawyers in capital cases to be guided by the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.

16.    For several years I also served on the Arizona Supreme Court's Committee for the Appointment of Counsel to represent death row inmates at the State post-conviction relief stage. I participated in the drafting, review and ultimate establishment of the rules governing the appointment of death penalty counsel under A.R.S. §13-4041 and Rule 6.8 of the Arizona Rules of Criminal Procedure.

17.    I have co-authored several articles that have appeared in the *Arizona Attorney Magazine* relating to the funding of capital defense, and I have spoken and participated in numerous seminars and programs on this subject. As an adjunct member of the ASU Law School faculty, I team-taught the Death Penalty course in the spring of 2002. During the 2003-04 and 2006-07 school years, I team-taught a 4-hour credit seminar at ASU on the causes of wrongful convictions in Arizona and nationally.

4

Included in the curriculum was the study of ineffective assistance of defense counsel. In the fall of 2008, I taught a course entitled "Criminal Justice Failures and Reforms" at Elon University School of Law in Greensboro, North Carolina. A significant element of this course was the history of the law and practical realities of systems of indigent defense in capital cases.

18.    For the last 14 years, I have served as the Chair of The Justice Project of Arizona Attorneys for Criminal Justice, and in that capacity I have been involved in the evaluation of hundreds of cases alleging ineffective assistance of counsel at trial and sentencing in non-capital cases. The U.S. Supreme Court recently ruled in favor of one of the Justice Project's federal habeas corpus cases, *Martinez v. Ryan,* 132 S.Ct. 1309 (2012), in which the Court held that the ineffective assistance of counsel at the post-conviction stage could constitute good cause to excuse a procedural default.

19.    I testified in October 2002, as an expert witness on ineffective assistance of counsel in a post-conviction relief proceeding in *Lacy v. Arizona,* Case No. CR 1995-000713. In that case, the Maricopa County Superior Court reversed a homicide and assault conviction based in part on ineffective assistance of defense counsel. I have also testified and served as an expert in the capital post-conviction proceedings in *Arizona v. Kayer,* CR 1994-0694, in the Superior Court of Yavapai County, and as an expert in the post-conviction proceeding in *Arizona v. Murdaugh,* Case No. CR 1995-006472, in the Superior Court of Maricopa County. In December 2010, I testified as an expert witness in a post-conviction proceeding in Connecticut State Court, in *State v. Wargo,* 53 Conn.App. 747, 731 A.2d 768 (1999).

5

4633616v1

**JA 64**

20. At present, I am serving as a death penalty defense standard of care expert in four post-conviction cases; three in Arizona and one in Colorado.

21. Most recently, I testified as a standard of care expert in the case of *United States v. Brandon Basham*, No. 02-cr-992-JFA (D.S.C.).

22. My opinions are based in significant part on my experiences as "learned counsel" in federal death penalty cases. In addition to my direct involvement in federal death penalty cases, I have also conferred on numerous occasions with Federal Capital Defense Resource Counsel about the duties and responsibilities of capital trial counsel. In particular, I have conferred with federal defense counsel about the Department of Justice's process for the Government's consideration of whether to seek the death penalty.

23. In the course of the federal death cases to which I have been appointed, and on other matters involving capital litigation, I have frequently been involved in the planning, development, and presentation of mitigating evidence, and the pre-trial investigation necessary in the course of developing mitigating evidence and preparing to address and respond to the Government's anticipated aggravating factors.

24. Counsel for Mr. Caro have asked me to address questions with respect to the standard of care for attorneys representing a defendant in a federal death penalty case. I have undertaken a preliminary review of materials related to the representation of Mr. Caro at the pretrial, trial, and penalty phases, as well as direct appeal. Based on that review as informed by my experience and training summarized above, I offer the following opinions and observations.

6

4633616v1

**JA 65**

25.    From the outset of the representation of a person charged with a federal death-eligible offense as was the case with Mr. Caro here, defense counsel must commence preparing for all phases of the case, including most importantly both the guilt/innocence and the penalty phases. Counsel must recognize that capital trials require a defense that is cognizant of the reality that the defendant is likely to be found guilty by the jury and that the same jury will then weigh aggravating and mitigating evidence. In this case, there was little doubt that Mr. Caro killed Mr. Sandoval. From opening statements through the conclusion of the penalty phases of the trial, the defense conceded Mr. Caro's responsibility for the killing of his cellmate.

26.    What was in doubt from the outset of the representation of Mr. Caro was both the level of his culpability for the death of Mr. Sandoval and whether that act warranted the penalty of death. The defense, from the outset, had to focus on attempting to save the client's life.

27.    Inescapably, much of the foundation for the presentation of both aggravating and mitigating evidence will have been laid during the presentation of evidence at the guilt/innocence stage. Given this reality, several key principles should have dominated the defense effort from the outset: (1) defense themes must be developed on an ongoing basis; (2) those themes must permeate all aspects of the defense work in the case; and (3) the investigation essential to the development of defense themes must commence immediately and inevitably will require time and resources.

28.    The simultaneous investigation of facts underlying the charged offense and the social history and mental health issues is always a challenging task for defense

7

4633616v1

**JA 66**

counsel and their team members. It is inconceivable that an appropriate investigation into these issues could be accomplished in as little as six months. Many jurisdictions, including Arizona, routinely contemplate that pretrial preparation will require two years and in some cases more. There are many reasons why more time is required in capital cases than might be necessary in noncapital cases, but whatever the specific needs of any cases, it is virtually certain that competent investigation and preparation cannot be realized in a matter of months. As the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases underscored in 2003, a thorough investigation of the defendant's life history and mental development is both essential and time-consuming. In recognition of the critical role of mitigation development, the ABA published Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty cases in 2008. These Guidelines are a compilation of the standards and practices that guided death penalty defense counsel at the time of the appointment of the defense team in Mr. Caro's case. Taken together, and underscored by now hundreds of reported cases, the central importance of thorough mental health development is no longer doubted.

29.    The standards of performance for defense counsel in death penalty cases are national standards. These standards are rooted in federal constitutional guarantees. Federal death penalty cases are most certainly subject to a single set of responsibilities for defense counsel. There is no basis for concluding that a defendant prosecuted in the Western District of Virginia is entitled to less time to prepare, less court-authorized financial assistance in order to prepare, or less effective defense counsel.

8

**JA 67**

30.    The defense team in this case presented no mental health/mental defect testimony at either the guilt/innocence phase or at the penalty phase. The defense did secure the appointment of an expert to conduct a neuropsychological evaluation, but ultimately presented no mental health testimony. While this investigation may well properly involve a neuropsychological evaluation, there is no substitute for a thorough mental health evaluation, which may require—as it did here—a combination of experts and consultants.

31.    Since virtually every federal death penalty case requires court-authorized funding, an important part of the obligations of defense counsel is to begin from the outset to obtain adequate resources. This process often requires helping the court to understand why an extensive background investigation of the client's life history and mental state history is necessary. This is one of the reasons why it is indisputably true that case preparation in federal death penalty cases cannot be accomplished in six months or a year. Many federal courts are unfamiliar with the unique resource requirements of death penalty cases. The need for frequent, on the record, ex parte sealed proceedings may not be entirely evident to the Court. In my experience, federal judges are usually generally familiar with typical Criminal Justice Act (CJA) funding procedures, but these typical procedures are not predictive of the needs in capital cases. This is not intended as in any way a criticism of federal judges. Rather, it is a statement of an important element of the responsibility of defense counsel. Just as defense counsel needs specialized expertise, the court and those responsible for funding capital defense need to become educated on the requirements of capital defense.

9

4633616v1

**JA 68**

32. The representation of Mr. Caro may have presented challenges in terms of securing adequate time and resources. The crime charged involved the presentation of only a few witnesses. It may well have been the case that all parties—the prosecution, defense, and the court—began by assuming that the case could be brought to trial in a matter of months. It was the duty of defense counsel, however, to work from the outset to assure that time was available, and resources secured, to undertake a thorough life history for Mr. Caro and to investigate fully his social and mental history. The need for this full development is particularly important in a case in which it is apparent from the outset that the defendant grew up in a community and society where drugs and violence were a part of everyday life.

33. Prison killing cases present special concerns. First, as was the case here, the Government's case is likely to be based on the testimony of incarcerated informants. Jailhouse or prison "snitch" testimony requires thorough investigation. It is now well established (thanks in significant part to the examination of DNA-based exonerations) that false and unreliable inmate testimony is one of the key causes of wrongful convictions. Secondly, as was also the case here, there are often other inmate witnesses who the Government does not intend to call as witnesses, but who have relevant information that may contradict an informant's testimony. Thirdly, it is important for defense counsel to thoroughly investigate whether any prison-related homicide is most properly understood as deserving of an instruction on lesser included offenses and/or on self-defense. Many prison homicide cases—and this case is one good example—might well not be genuinely regarded as premeditated first-degree murders. Defense counsel

10

JA 69

must carefully consider whether the jury could come to appreciate that an inmate-on-inmate homicide involves unique mental health and other severe stresses warranting a finding of second-degree homicide, manslaughter, or in some cases an acquittal based on self-defense.

34.    This case presented a classic case of the difficulties that can be anticipated when the Government chooses to rely on inmate testimony to support an allegation of premeditated murder. The only "eye-witness" offered in the case was Mr. Bullock, an inmate in the Special Housing Unit (SHU) who resided across the hallway from the cell in which Mr. Caro and Mr. Sandoval were housed. Given that premeditation was the central issue at trial, Mr. Bullock's various descriptions of what he observed became key. The necessary investigation and preparation for trial should have focused on the development of evidence that might undermine this inmate's testimony. It is evident that Mr. Bullock had a cellmate. What he may have observed and what Mr. Bullock may have told him about what Mr. Bullock observed would have been critically important.

35.    Prison killing cases charged as capital crimes almost inevitably will be based on a prosecution claim of future dangerousness. Defense counsel must know this and plan to respond thoroughly to this non-statutory aggravating circumstance. Competent responses to this aggravating factor require expert assistance on prison management. The federal Bureau of Prisons (BOP) is equipped to eliminate the material risk of future assaults by inmates who pose the greatest internal security risks. A thorough understanding of this topic is necessary in approaching the trial and penalty phases. While the defense team was certainly aware of the importance of this

11

4633616v1

aggravating factor, it appears that they may have failed to appreciate the extent to which jurors are affected by concerns about the ability of a prisoner to inflict injury in the future.

36.    Similarly, gang-related capital cases also present predictable areas requiring defense preparation. Very typically the Government can be expected to argue that, unless executed, the defendant will continue to communicate with and instruct other gang members to commit acts of violence both inside and outside the prison. BOP also has in place systems and procedures to deal with security threat groups (prison gangs). Defense counsel should anticipate that it will be important to the jury to know that these systems and procedures can reduce if not eliminate the risk of future dangerousness. The defense effort in this regard—relying on Messrs. Aiken and Cunningham to rebut the testimony of the Government's expert, Mr. Hershberger—was deficient. (My opinions with respect particularly to prison homicide issues are informed by my experience as court-appointed counsel for inmates seeking protective custody in the Arizona prison system and by my direct involvement as plaintiffs' counsel in jail conditions cases. My opinions in this respect are also informed by my representation of defendants in federal death penalty cases in Arizona, New Mexico and California.)

37.    Another important part of defense counsel's obligation in capital cases is to investigate and to challenge where appropriate prior convictions that may be used by the Government as aggravating factors. This is an important obligation irrespective of whether the defendant was convicted after a trial or entered a plea of guilty in prior cases. In this case, the conviction of Mr. Caro in connection with the stabbing death of inmate

4633616v1

**JA 71**

Benavidez became an important element of the Government's case in support of aggravation. Counsel had a duty to investigate and challenge that underlying conviction.

38.    I appreciate the difficulties that defense counsel in this case encountered, but I respectfully conclude that their performance fell below the standard of care for death penalty defense in the ways I have identified above. I also have the following additional concerns.

### The Department of Justice Death Penalty Certification Process

39.    It is my opinion that reasonably competent counsel in Mr. Caro's case should have aggressively pursued the opportunity afforded by the Department of Justice's Death Penalty Certification process to seek a determination that his case was not one in which the death penalty should have been pursued. My opinions on this question are informed by my participation in the process on numerous occasions and having consulted with other capital defense counsel who have been involved in making presentations to the Department of Justice's Death Penalty Review Committee.

40.    This phase of the capital defense is particularly important in cases in which the Department of Justice is necessarily considering whether this prison homicide should be treated differently from other prison-related homicides. A greater understanding of Mr. Caro's mitigating evidence, coupled with a greater appreciation of the prison environmental factors should have been presented so that the Attorney General might better evaluate both the aggravating and mitigating circumstances. Again, more time to prepare and to work with the development of the factual investigation and the penalty phase facts would have been valuable. It is apparent from a review of the documents

13

**JA 72**

from early 2005 that the defense team had only begun to develop its case when they went to Main Justice for the Committee meeting. The fact investigator appears to have been engaged only a very few months before the Main Justice meeting and the mitigation specialist had not begun to actively develop Mr. Caro's personal history.

41.    I understand the argument sometimes made that defense counsel does not want to "give away" defense strategy and themes, but that argument needs carefully to be weighed against the importance of the opportunity to achieve a "no death" decision. As with other effective presentations in capital cases, the importance of a written as well as an oral presentation should not be understated. Especially where the Death Penalty Review Committee may be composed of members some of whom will be in attendance at the oral presentation and some of whom may not, the written presentation may be only way to assure that decision makers see defense counsel's arguments. In this case, it does appear that some of the Department of Justice participants were not physically present but appeared instead by videoconference. It also appears from a review of the relevant correspondence that the defense team was aware of this possibility. Effective presentation always suffers when important communications are handled by a combination of in-room and videoconference connections, but the loss in communication effectiveness might have been ameliorated by a written presentation.

42.    It is also important for defense counsel to keep in mind that the Attorney General is the ultimate decider, and particularly in cases like this one involving important policy questions (the BOP's ability to distinguish among homicide cases occurring in its institutions, etc.), the personal consideration by the Attorney General should be

14

4633616v1

**JA 73**

anticipated. The views of counsel for Mr. Caro at this stage should not have been filtered through the Committee members. There have been dozens of homicides that have occurred in BOP. Only a very few have resulted in a decision by the Attorney General to seek the death penalty. The Justice Department claims to have a system for deciding which cases should precede as death penalty cases, *i.e.*, that the Government can differentiate whom among these defendants should be candidates for death. The defense team did develop a greater understanding of these issues as the case progressed, but at the time of the Committee presentation the defense team had not yet secured the assistance of experts and consultants to aid them in developing a theme for life.

### Advising the Client About the Consequences of a Guilty Plea

43.    It is my opinion that defense counsel representing Mr. Caro in the Benavidez prosecution fell below the standard of care in failing to properly advise Mr. Caro of the consequences of his plea in that matter.

44.    One of the aggravating circumstances alleged and established by the Government in the Sandoval case involved Mr. Caro's plea of guilty to murder in another prison killing case. It is evident that Mr. Caro's plea in that case would be used by the Government as part of its aggravation case, yet it also appears that capital defense counsel took no steps to attack that plea. Reasonably competent capital counsel must examine all criminal convictions that may be used to enhance the client's sentence— especially any conviction that may be used to support an aggravating circumstance as was the case here. A proper examination of the circumstances surrounding Mr. Caro's plea in that case would have revealed that he was not advised of the important

15

4633616v1

JA 74

consequence of his plea, *i.e.,* that it could be used in the Sandoval case as an important underpinning supporting the Government's successful effort to seek the death penalty.

45. While the United State Supreme Court has focused greater attention on the critical importance of counsel in connection with guilty pleas, competent counsel have long known and emphasized the duty fully to advise a client of all of the direct and collateral consequences of a plea. Mr. Caro was not advised by counsel in the Benavidez matter that pleading to conspiracy to commit first degree murder would have been used to support an aggravating factor in the Sandoval penalty phase.

**Development of Mitigating Evidence**

46. It is my opinion that defense counsel for Mr. Caro fell below the standard of care in failing fully to investigate and develop issues with respect to mental health issues. As noted above in this Declaration, the development of mitigating evidence with respect to a capital defendant's mental history is a critical component of the capital defense function. In this case, it appears that defense counsel first secured the appointment of an expert consultant to perform a neuropsychological evaluation. It further appears that defense counsel's plan was to defer considering other mental state experts until the neuropsychological evaluation was completed. This approach falls far short of the standard of care. All of the relevant case law and secondary literature about the development of mitigation emphasizes that defense counsel must undertake a comprehensive examination of mental health issues.

16

**JA 75**

47.    To whatever extent the failure to develop Mr. Caro's complete history was the result insufficient time, defense counsel should have been advocating the need for great time and greater resources.  There is no substitute for a thorough life history as a foundation for expert testimony.  Developing that history does take time and it takes money, but there is no reason to believe that both the time and the resources would not have been available.

48.    Defense counsel knew that Mr. Caro had brain damage.  They knew that he had a traumatic childhood.  Counsel nonetheless failed to secure the necessary experts to present this information to the jury.  The standard of care for defense counsel requires the full development and appreciation of these issues.  Had defense counsel developed the information there is no reason why they would have determined not to present it to the jury in this case.

## Failure to Conduct Appropriate Investigation

49.    It is also my opinion, as noted above, that defense counsel fell below the standard of care in failing to investigate information with respect to the testimony offered by the Government from an inmate housed directly across from Mr. Caro's cell with respect to the credibility of the incriminating testimony offered by that witness. I wish to emphasize this concern as it appears to have permeated this case from beginning to end. Exactly how the death of Mr. Sandoval occurred turned out to be the difference between a life or death sentence for Mr. Caro.  The image of the planned and violently executed strangulation dominated the Government's closing arguments.  The Government was able

17

4633616v1

**JA 76**

to weave together the circumstantial evidence and Mr. Caro's incriminating statements with Mr. Bullock's account to paint a picture that could only have propelled the jury to find as it did - that this homicide deserved the death penalty.

50.    The record in this case reveals that the chief cooperating witness for the Government may have had a motive to provide inaccurate and misleading testimony. It is also apparent that this inmate had a cellmate. Grand jury testimony makes this evident, although presumably defense counsel would have known or expected that other inmates in the Special Housing Unit at the USP Lee would have had cellmates. For the reasons described above, a thorough investigation should have been undertaken prior to trial.

### Failure to Seek removal of Juror

51.    During the trial, the Court observed that one juror appeared to be sleeping during testimony. After conferring with counsel the Court decided not to remove the juror. Attention to all testimony is central to the role of jurors as fact-finders. Any juror who cannot maintain full attention should have been removed. Here, there were four alternates. There was no material risk that removing the juror would occasion a mistrial. Defense counsel should have moved and strongly advocated for the dismissal of that juror. (My opinion on this topic is informed by my participation in several lengthy trials in which sleeping or noticeably inattentive juror behavior occurred. The defense team in these cases debated the tactical pros and cons of seeking removal; we conferred with other defense counsel who had encountered similar situations; and we ultimately concluded that the defendant's entitlement to a unanimous jury required that all jurors were engaged in the hard job of receiving testimony.)

18

4633616v1

**JA 77**

## Appellate Counsel's Duties

52.    Appellate and post-conviction defense counsel in death penalty cases have special duties not always encountered by defense counsel in noncapital cases. Most important among those duties is the duty to advocate for reconsideration and change in the law affecting the constitutionality of the death penalty. No other field of criminal defense representation has been so marked by dynamic change. The duty to advocate for reversal of the death sentence is especially important when the case is on direct appeal. The jurisprudence of the law of retroactivity has often distinguished between cases that have become "final judgments" and those that have not. New rulings may benefit those convicted defendants whose cases were on direct appeal—or who raised the same issue underlying that ruling on direct appeal.

53.    In this case, appellate counsel failed to allege that the jury was improperly instructed on the standard for weighing aggravation against mitigation. A good faith basis certainly existed in this case to claim that the jurors should have been instructed that aggravation must outweigh mitigation beyond a reasonable doubt. The jury in this case found mitigating circumstances, and they found them unanimously. Yet, the jury was never told to weigh those mitigators against the aggravators—especially future dangerousness—by any particular standard of proof. Had they been so instructed, given the relative weakness of the non-statutory aggravators, it is reasonable to conclude that the jury would not have found that this defendant deserved a sentence of death.

54.    Had the defense undertaken and presented a full mitigation case as contemplated by the ABA Guidelines, there could be little doubt that the jury would have

19

**JA 78**

found it difficult to conclude that the Government's aggravating evidence outweighed that mitigation beyond a reasonable doubt. (My opinions on this topic are informed by my experience as part of the post-conviction team that ultimately succeeded in securing the reversal of the death sentence for Timothy Ring in *Ring v. Arizona,* 536 U.S. 584 (2002). The Court's decision in that case directly overruled its own precedent regarding the role of the jury as fact-finder—a decision that was only 10 years old. My opinions are also based on the increasing frequency in the numbers of cases in which Justices of the United States Supreme Court have come over time to change their views on the application of the Eighth Amendment. Justices Blackmun, Powell and Stevens are three prominent examples of the potential that opinions on the constitutionality of the death penalty both on its face and as applied are subject to change.)

### Concluding Observation

55.    My expectation based on my experience in providing standard of care opinions in other cases is that I should form additional opinions that will be informed by a consideration of the Government's Response to Mr. Caro's Petition and a further review of Declarations that may be presented by either party and by a further review of the materials in the file in this case.

DATED this 8th day of January, 2013.

*Larry A. Hammond*
Larry A. Hammond

20

4633616v1

**JA 79**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:03CR10115** |
| | ) | |
| **CARLOS CARO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MOTION TO DISMISS**

The United States of America, by counsel and pursuant to Federal Rule of Civil

Procedure 12(b)(6), moves for the dismissal of this action because it is untimely, in that it is

barred by the one-year limitation on such motions explicitly set forth in 28 U.S.C. § 2255(f).

Defendant Carlos Caro's ("Caro") Motion to Vacate, Set Aside or Correct Sentence pursuant to

28 U.S.C. § 2255 comes more than eight years and three months after final judgment and almost

six years after Caro knew, or could have discovered through the exercise of due diligence, the

facts supporting this belated claim.

**Undisputed Facts**

These facts are undisputed for purposes of this motion to dismiss.  Caro and others were

charged with conspiracy to murder and unlawful possession of a weapon arising from the

stabbing of a fellow inmate at the United States Penitentiary-Lee County ("USP-Lee").

Defendant's § 2255 Motion, at pp. 1-2.  Because only Caro and one co-defendant, Juan Moreno-

Marquez, actually stabbed the victim, they were also charged with assault with intent to murder.

Id., at p.2.  The five co-defendants who did not actually stab the victim pleaded guilty to the

unlawful weapon charge and the conspiracy to murder charge was dismissed against them.  Id.

Caro and Moreno-Marquez, through their respective counsel, then proposed and requested a joint

**JA 80**

resolution whereby Caro would plead guilty to conspiracy to murder if the United States would agree to allow Moreno-Marquez to plead to the lesser unlawful weapon charge. Exhibit 3 to Defendant's Motion, Declaration of Louis Dene, Esquire ("Dene Declaration"), at ¶ 5. Although carefully wordsmithed, the Dene Declaration states that this joint resolution was originally proposed by Moreno-Marquez, and Caro instructed Dene to "work[] to obtain" the agreements. Id. Caro instructed Dene to work to obtain the linked plea agreements to help mitigate the sentence of a fellow Texas Syndicate gang member, even after Dene told him the agreement did not benefit him and he would receive a lengthy prison sentence as a result. Defendant's Motion, at p.3; Dene Declaration, at ¶¶ 5-6 . Not surprisingly, Caro received a lengthy 327-month prison sentence on November 1, 2004. Defendant's Motion, at p.4. On November 2, 2004, in accordance with Caro's instruction to Dene to "work[] to obtain" the linked pleas, Moreno-Marquez received a 57-month sentence as a result of his guilty plea to the unlawful weapon charge and the dismissal of the conspiracy to murder charge. Id.

While this case was pending, Caro had murdered a different inmate while confined to the USP-Lee Special Housing Unit. Id. In December 2004, after he and Moreno-Marquez were sentenced, the government notified Caro that it intended to seek the death penalty in his prosecution for the murder (the "capital case"). Id. The capital case was tried in January and February 2007, and during the trial Caro learned that the government was using his conspiracy to murder conviction and the 327-month sentence in this case as an aggravating circumstance to argue for the death penalty. Id. By February 13, 2007, Caro knew the impact of his conspiracy to murder guilty plea when the prosecution argued that his conviction and 327-month sentence in this case warranted the jury's imposition of the death penalty in the capital case. Id., at pp. 4-5.

JA 81

**Standard of Review**

To survive a motion to dismiss under Federal Rule 12(b)(6), Caro must plead sufficient factual matter which, accepted as true, "state[s] a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This plausibility standard requires Caro to demonstrate more than a "sheer possibility" that he is entitled to relief. Id. When ruling on a motion to dismiss, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). Although required to accept as true all well-pleaded factual allegations, the court need not accept legal conclusions, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

**Discussion**

Caro's § 2255 motion, on its face, clearly establishes that he is not entitled to relief because his claim is time-barred. 28 U.S.C. § 2255 imposes a definitive one-year time limit on a defendant's right to collaterally attack a criminal conviction and sentence. Generally, the limitation period is one year from the date on which the judgment of conviction becomes final. 28 U.S.C. § 2255(f)(1). There is no dispute that Caro's § 2255 motion is well beyond that time limit, since his conviction became final on or about November 15, 2004, ten business days after entry of final judgment. E.g., Yancy v. United States, Crim. No. 7:04CR00139, 2009 WL 1546288, at *2 (W.D.Va. Jun. 2, 2009) (citing Clay v. United States, 537 U.S. 522, 528 (2003)).

Caro tries to avoid this fatal flaw in his claim by invoking 28 U.S.C. § 2255(f)(4), which permits a claim to be made more than one year after final judgment under limited circumstances.

Caro submits that under § 2255(f)(4) the one year limitation for his claim did not begin to run until March 2012, the date his present counsel interviewed Dene. Caro argues that this was the first time he learned that Dene "had anticipated that the government would use the conspiracy conviction against him during his capital proceedings," but had neglected to advise Caro of this possibility. Defendant's Motion, at p.5. Caro argues that he then "acted diligently in filing this motion promptly after he was 'in a position to realize that he ha[d] an interest in challenging the prior conviction with its potential to enhance the later sentence,'" and for that reason his claim was timely filed on January 11, 2013. Caro is wrong because his argument is based on a selective and incorrect reading of § 2255(f)(4), and ignores the salient facts stated in his motion.

28 U.S.C. § 2255(f)(4) states:

The [one year] limitation period shall run from the latest of—

***

(4) the date on which the facts supporting the claim or claims presented *could have been discovered through the exercise of due diligence.*

(emphasis added). Thus, the one-year limitation under § 2255(f)(4) does not begin, as Caro argues, on the date his current counsel interviewed Dene, but on the date that he could have discovered, through the exercise of due diligence, Dene's alleged neglect in failing to advise him that his plea and conviction in this case could be used as an aggravating circumstance in his capital case.

Determining due diligence requires "a fact specific inquiry unique to each case." United States v. Crawley, Civil Action No. 3:07CR488, 2012 WL 32402, at *2 (E.D.Va. Jan. 5, 2012) (citing Wims v. United States, 225 F.3d 186, 190-91 (2d Cir. 2000)). Caro has the burden of proving that he exercised due diligence. Id. (citing DiCenzi v. Rose, 452 F.3d 465, 471 (6th Cir. 2006)). He must show that he made reasonable efforts to discover the facts supporting his claim.

**JA 83**

Id. (citations omitted).  In the context of this motion to dismiss, therefore, Caro must have made reasonable efforts to file this claim within one year after he learned the salient facts underlying it. However, he alleges no such facts, merely concluding that he "has been diligent in his attempt to discover the facts underlying this motion." Defendant's Motion, at p.5.  The court should not accept this mere conclusory statement, but must look to the facts alleged in the § 2255 motion. Iqbal, 556 U.S. at 678.  Moreover, and contrary to Caro's conclusory assertion otherwise, the facts he actually alleges establish a five-year failure of due diligence on his part.

We assume for purposes of this motion that Caro could not have discovered facts supporting his § 2255 motion through due diligence within one year after judgment became final on November 15, 2004.  Under § 2255(f)(4), the inquiry is at what time could Caro have discovered, through due diligence, the facts supporting his claim that Dene failed to advise him that his guilty plea in this case could adversely affect his defense in the capital case.  As the Supreme Court put it, a petitioner must "take prompt action as soon as he is in a position to realize that he has an interest in challenging the prior conviction with its potential to enhance the later sentence." Johnson v. United States, 544 U.S. 295, 297 (2005).  On its face, Caro's § 2255 motion unequivocally establishes that date as no later than February 13, 2007, the date he admits that he learned, during his capital murder trial in January and February 2007, that the prosecution was using his guilty plea and conviction in this case as an aggravating circumstance and a fact supporting the argument for imposition of the death penalty. Defendant's Motion, at pp. 4-5 (citing to trial transcript of February 13, 2007 and quoting from the prosecution's argument in favor of the death penalty because of Caro's conviction and sentence in this case).  Thus, it is beyond dispute that at least by February 13, 2007, Caro knew that his attempted murder conviction and sentence in this case had the potential to enhance his sentence in the capital case.

It is also beyond argument that he knew at that time that Dene had neglected to tell him, when he pleaded guilty to conspiracy to murder, that the prosecution could use that conviction and sentence as an aggravating circumstance and a basis for arguing for the death penalty in his capital case. According to the facts alleged in his § 2255 motion, by February 13, 2007, Caro knew the salient facts underlying his claim, yet he did nothing between February 13, 2007 and January 9, 2012, when his current attorneys began representing him. Caro cannot seriously argue that five years of inactivity is due diligence. Caro's motion should have been filed by February 12, 2008. It is now barred and must be dismissed because it is nearly five years late.

### Conclusion

The Court should grant dismissal under Rule 12(b)(6) because the facts alleged by Caro in his § 2255 motion clearly show that he learned of the salient facts underlying the motion on February 13, 2007, at the very latest. Further, Caro failed to take any action, much less exercise due diligence, for nearly five years thereafter. This § 2255 motion should have been filed no later than February 12, 2008, and is, therefore, barred by 28 U.S.C. § 2255(f).

Accordingly, the United States respectfully requests that this Court:

(1)     Promptly dismiss this action under Federal Rule of Civil Procedure 12(b)(6) because it fails to state a claim upon which relief can be granted; and

(2)     Find that an evidentiary hearing is unnecessary because the motion and the files and records of the case conclusively show that Caro is entitled to no relief.

**JA 85**

Respectfully submitted,

TIMOTHY J. HEAPHY
United States Attorney

Date: February 6, 2013                    /s/ Rick A. Mountcastle
                                          Rick A. Mountcastle
                                          Assistant United States Attorney
                                          Virginia State Bar No. 19768
                                          P.O. Box 1709
                                          Roanoke, VA  24008-1709
                                          Tel: (540) 857-2254; Fax: (540) 857-2283
                                          Email: rick.mountcastle@usdoj.gov


CERTIFICATE OF SERVICE


I certify that on February 6, 2013, I caused this Motion to Dismiss to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to counsel of record for the defendant.

/s/ Rick A. Mountcastle
Assistant United States Attorney

**JA 86**

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

UNITED STATES OF AMERICA    )
                            )
Plaintiff,                  )
                            )
v.                          )          CASE No.:  2:03-cr-10115
                            )
CARLOS  CARO,               )           (Hon. James P. Jones)
                            )
                            )
Defendant.                  )
                            )

## DEFENDANT'S OPPOSITION TO MOTION TO DISMISS

Carlos Caro, through counsel, hereby opposes the government's Motion to Dismiss (ECF No. 195) his Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255. Contrary to the government's argument, Mr. Caro was diligent in pursuing this § 2255 Motion and it was therefore timely filed under § 2255(f)(4).[1]  Should the Court find that it was not timely filed, the filing deadline should be equitably tolled due to the ineffective assistance of Mr. Caro's prior counsel, as well as Mr. Caro's significant and long-standing brain impairment, under which his ability to perform tasks involving the management of information is "as low as the 1st percentile," and his overall reasoning ability is equivalent to that of a 10-year-old child.

---

[1] Section 2255(f)(4) establishes a one-year limitation period that runs from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence."

**JA 87**

## I.    Factual Background.[2]

At the time this case was being prosecuted, Mr. Caro's cellmate was found dead in their cell, and Mr. Caro admitted killing him.  Mr. Caro's attorney, Louis Dene, anticipated that Mr. Caro would be prosecuted for the death of that inmate and that the government would seek the death penalty.  (Decl. of Louis Dene, 11/9/12, attached as Ex. 3 (hereinafter "Dene Decl.") ¶ 4).[3] Nevertheless, Mr. Dene did not advise Mr. Caro that signing the plea agreement offered in this case was essentially signing his death warrant in the anticipated capital case.  Mr. Dene did not advise him that a conviction in this case for attempted murder would be used against him in the capital case as an aggravator in support of a death sentence, and that for this reason, Mr. Caro should not plead guilty.  (*Id.* ¶ 6.)  The plea agreement did not provide Mr. Caro with a benefit, such as a reduced sentence, as he already was facing a long sentence and would spend the rest of his life in prison whether he was sentenced after a guilty plea or after trial.  Mr. Caro pled guilty and was sentenced on November 1, 2004, to 327 months. (ECF No. 168.)

On January 27, 2005, over two months later, the Court appointed Stephen Kalista and James Simmons to represent Mr. Caro in his capital case (hereinafter "capital counsel").  *See United States v. Caro*, No. 2:05-mc-00001-JPJ, Appt. Orders, 01/27/05, ECF Nos. 4, 6.  On January 11, 2006, the government filed its Notice of Intent to Seek Death, which stated the government's intent to use Mr. Caro's prior conviction from this case as an aggravating circumstance in the capital case.  *See United States v. Caro*, No. 1:06-cr-00001-JPJ, Notice,

---

[2] Because untimeliness of a § 2255 Motion is an affirmative defense, *United States v. Blackstock*, 513 F.3d 128, 133 (4th Cir. 2008), Mr. Caro did not—nor was he required to—provide detailed facts regarding the procedural circumstances of filing his motion.  He, therefore, does so here.

[3] Several exhibits attached to this response were also filed with the § 2255 motion filed in Mr. Caro's capital case, Case No. 1:06-cr-00001-JPJ (W.D. Va.).  To avoid confusion, the exhibits in this response are numbered the same as they were in Mr. Caro's capital § 2255 motion.

**JA 88**

01/11/06, Doc. No. 8.   At that time, capital counsel were aware that the conviction in this case would be used against Mr. Caro in securing a death verdict.

While Mr. Kalista contacted Mr. Dene, he did not ask Mr. Dene about the reasons for Mr. Caro's guilty plea or Mr. Dene's advice to Mr. Caro.  (Dene Decl. ¶ 9.)  Moreover, despite knowing the conviction in this case would be used against their client at trial, capital counsel did nothing to challenge Mr. Caro's prior conviction.  (Declaration of Stephen Kalista, 12/31/12, attached as Ex. 5 (hereinafter "Kalista Decl.") ¶ 22.)  Mr. Caro's capital case went to trial, and— as the government had indicated—it relied upon Mr. Caro's conviction and sentence in the instant case during the penalty phase to support a death verdict. *See Caro*, 1:06-cr-00001, Tr. 2/13/2007 at 26-27 (arguing that another life sentence would be "like water off a duck's back" and that "[Caro would] be getting a pass" for killing Roberto Sandoval); *id.* at 42 (arguing that Mr. Caro's prior sentence was the equivalent of a life sentence); *id.* at 89 (arguing that unless sentenced to death, Mr. Caro will return to prison as "a conquering hero").   The jury returned a verdict for death, *see Caro*, No. 1:06-cr-00001-JPJ, Special Verdict Form, 2/13/07, Doc. No. 639, and Mr. Caro was sentenced to death, *id.*, Judgment, 03/30/07, Doc. No. 694.

This Court appointed undersigned counsel to represent Mr. Caro in collateral proceedings (hereinafter "2255 counsel"), effective on January 9, 2012, the date that the Supreme Court denied Mr. Caro's petition for certiorari.  (*See* ECF No. 768; *Caro v. United States*, No. 10-8356, 132 S. Ct. 996 (mem.) (Jan. 9, 2012).)   As part of that representation, Mr. Caro's 2255 counsel filed in this case a Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 on January 11, 2013 (hereinafter "2255 Motion").

In this 2255 Motion, Mr. Caro challenges his conviction on the ground that Mr. Dene was aware of a potential death sentence yet failed to advise him of the significant collateral

3

**JA 89**

consequence of his guilty plea, and failed to advise him that rather than accept a plea, he should go to trial.

## II.    This Motion is Timely and Mr. Caro Has Been Diligent.

In its motion to dismiss, the government argues that the Court should dismiss the case on procedural grounds because Mr. Caro's motion is untimely.  (ECF No. 195 at 3.)  As the government notes, Mr. Caro's conviction and sentence in this case became final upon the conclusion of his direct review—the date upon his which his time to file an appeal expired: November 15, 2004.[4]  For purposes of its motion to dismiss, however, the government assumes that Mr. Caro could not have discovered the facts supporting this 2255 Motion within one year after his judgment became final.  (*Id.* at 5.)  Rather, the government contends that Mr. Caro discovered the facts relevant to his claim no later than February 13, 2007, the date the government at trial used his prior conviction to support its argument for death, and that this 2255 Motion should have been filed by February 12, 2008.  (*Id.* at 5-6.)  Mr. Caro, however, maintains that capital counsel should have been aware that Mr. Caro's prior conviction would be used against him as an aggravating circumstance as of January 11, 2006, when the government filed its Notice of Intent to Seek Death that discussed this case as an aggravating circumstance. *United States v. Caro*, No. 1:06-cr-00001-JPJ, Notice, 01/11/06, Doc. No. 8.

There is no need to resolve this difference in dates, though, as the government's reliance on the use of Mr. Caro's conviction in the capital case to support his death sentence is misplaced,

---

[4] The government uses November 15, 2004, as the date upon which Mr. Caro's conviction became final.  (ECF No. 195 at 3.)  This Court entered judgment in this case on November 1 (ECF No. 168), but judgment was not delivered to Mr. Caro until November 4, 2004 (ECF No. 176).  Mr. Caro had ten days after his conviction became final in which he had to file his notice of appeal. *See* Fed. R. App. P. 4(b)(1)(A) (2002); *see also United States v. Hartwell*, 448 F.3d 707, 720 (4th Cir. 2006) (Williams, J., concurring in part) (noting that Rule 4(b)(1)(A), at the time, provided that defendant must file notice of appeal within 10 days of entry of judgment). Mr. Caro did not file a notice of appeal.

**JA 90**

because this fact is not the relevant fact that triggers § 2255(f)(4). Rather, the relevant fact triggering § 2255(f)(4) is that Mr. Dene was, in fact, aware of the potential capital charges that his client faced, yet did not advise Mr. Caro not to plead guilty. As long as Mr. Caro was diligent in his discovery of that fact, he has satisfied §2254(f)(4).

The Fourth Circuit has not clearly defined "diligence" for purposes of 2255(f)(4).[5] As the Supreme Court recognized, "'due diligence' is an inexact measure of how much delay is too much." *Johnson v. United States*, 544 U.S. 295, 309 n.7 (2005). Diligence, for purposes of equitable tolling, has been described as only "reasonable diligence" and not "maximum feasible diligence." *Holland v. Florida*, 130 S. Ct. 2549, 2565 (2010). What is apparent, however, is that "the diligence inquiry is fact-specific and depends on the circumstances faced by the particular petitioner[.]" *Munchinski v. Wilson*, 694 F.3d 308, 331 (3d Cir. 2012); *see also* Govt's Mot. to Dismiss at 4 (ECF No. 195) (noting that diligence requires "a fact specific inquiry unique to each case") (citation omitted). There is no bright-line rule to determine what constitutes diligence. *Munchinski*, 694 F.3d at 331.

Under the circumstances in this case, Mr. Caro was diligent and could not have discovered the facts to support his 2255 Motion before March 2012. Capital counsel were derelict in their duty and never discovered the facts to support a collateral attack on this conviction and sentence. They never investigated the circumstances of Mr. Caro's obviously ill-advised plea. Thus, this 2255 Motion could not have been filed until 2255 counsel discovered in March 2012 that Mr. Dene was fully aware that his client was facing capital murder charges but

---

[5] Undersigned counsel found one Fourth Circuit opinion citing § 2255(f)(4). *See United States v. MacDonald*, 641 F.3d 596 (4th Cir. 2011). In that case, there was no discussion of diligence because the lower court had assumed that the petitioner was diligent. *Id.* at 610, n.7.

**JA 91**

nevertheless failed to advise Mr. Caro to plead guilty to the charge that would be used as an aggravating circumstance in the capital case. *See* 28 U.S.C. § 2255(f)(4).

Once this Court appointed undersigned 2255 counsel on January 9, 2012, counsel conducted their investigation and discovered on March 9, 2012, that Mr. Dene had failed to advise Mr. Caro of the collateral consequence of his guilty plea and that he should take the case to trial. (Declaration of Susan Richardson, 2/20/13, attached as Ex. 62.) Mr. Caro, through 2255 counsel, was diligent in both uncovering the facts giving rise to this claim and filing this 2255 Motion within one year of discovering this information, as required under § 2255(f)(4).

This Court should not adopt the reasoning of the government—that Mr. Caro personally had all of the facts necessary to file this 2255 Motion as of February 13, 2007, and should have filed the motion within one year of that date. Mr. Caro suffers from brain impairment. As a result of this impairment, Mr. Caro cannot be faulted for failing to appreciate the existence of this 2255 Motion on February 13, 2007, when the government used his prior conviction to argue for death. Nor can he be faulted for failing to independently file this 2255 Motion pro se within the following year.

Mr. Caro was examined in 2006 by a neuropsychologist, Malcolm Spica, Ph.D. The results of Dr. Spica's neuropsychological examination revealed that Mr. Caro suffered from cerebral frontal lobe dysfunction. He was unable "to sort through information provided to him" and had the reasoning ability of a 10-year-old. (Report of Malcolm Spica, attached as Ex. 10 (hereinafter "Spica Rpt.") at 7.) His general cognitive functioning ranged in 5th percentile, indicating that he functioned "below 95% of the general population for overall cognitive/adaptive functioning." (Spica Rpt. at 3.) Test results also show that Mr. Caro "performed as low as the 1st percentile on tasks requiring: management of information,

**JA 92**

maintaining cognitive set, [and] concept formation.  (Spica Rpt at 6.)  Considering Mr. Caro's failure to thrive as an infant, his developmental milestone difficulties, and his lack of major head injuries, Dr. Spica concluded that Mr. Caro's frontal lobe dysfunction was likely "life-long in nature."  (Spica Rpt at 7.)

Mr. Caro's school records also reveal a child who struggled academically, and support Dr. Spica's conclusion that Mr. Caro's impairment has been "life-long in nature."  Beginning with his first semester in kindergarten, Mr. Caro received a "non-satisfactory" in language.  The rest of Mr. Caro's school records reveal that as he advanced in grades, the gap between his learning and that of his fellow students grew.  He was placed in Special Education classes in the sixth grade.  When Mr. Caro took national educational tests in eighth grade, his reading was in the 5th percentile; he scored only slightly higher—in the 7th percentile—on the total test battery (indicating that 95% of students taking this test scored better in reading than he did and that 93% of the students received higher total test scores).  Mr. Caro dropped out of school without completing the tenth grade.  (Carlos Caro's Academic Records, attached as Exhibit 61.)

Mr. Caro was evaluated more recently in January 2013 by a psychiatrist, Donna Schwartz-Watts, M.D.   Dr. Schwartz-Watts found that Mr. Caro suffers from cognitive dysfunction consistent with Dr. Spica's test results.  (Declaration of Donna Schwartz-Watts, 1/6/13, attached as Ex. 8, (hereinafter "Schwartz-Watts Decl.") ¶ 17.)  She noted that Mr. Caro "continues to demonstrate difficulties with frontal lobe functioning."  (*Id.* ¶ 34.)

Mr. Caro's cognitive limitations are circumstances that were and are beyond his control. The evidence indicates that Mr. Caro's brain impairment has existed since the time he was born. Two mental-health professionals, a neuropsychologist and psychiatrist, have diagnosed Mr. Caro

**JA 93**

with significant brain impairment. His school records demonstrate that he struggled in school, only to falter and eventually drop out. Mr. Caro has the reasoning ability of a 10-year-old child.

Due to his brain impairment, Mr. Caro cannot anticipate or conceptualize legal arguments or prepare legal documents. The courts would not expect a 10-year-old child to have the capacity to file a § 2255 motion, nor is it reasonable to expect Mr. Caro to have that ability. Indeed, Mr. Dene avowed that Mr. Caro "had no ability to understand legal proceedings without the benefit of counsel." (*See* Dene Decl. ¶ 7.) Mr. Caro's failure to do things of which he is not capable cannot, under any common sense or legal analysis, constitute lack of diligence. Mr. Caro has been continuously represented by counsel, beginning with his capital counsel, followed immediately by his appellate counsel and ultimately 2255 counsel. By consistently and repeatedly cooperating with and reasonably relying on counsel, some of whom unfortunately failed him, Mr. Caro exhibited diligence in pursuing this case. *Cf. Bills v. Clark*, 628 F.3d 1092, 1100 (9th Cir. 2010) (establishing a test for when mental impairment can constitute equitable tolling and noting that "the petitioner must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances").

### III.    In the Alternative, Equitable Tolling Principles Warrant the Court's Consideration of the Merits of this 2255 Motion.

If the Court finds that Mr. Caro filed this 2255 Motion outside the statutory limitations period, equitable principles cry out for a consideration of the merits of this claim. As repeatedly recognized by the Supreme Court, the "right to the effective assistance of counsel at trial is a bedrock principle in our justice system." *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012). Without effective trial counsel, our adversarial system of justice fails. In *Martinez*, the Court carved out an exception to a procedural default rule in recognition of the critical need to have at

**JA 94**

least one court consider the merits of a claim of ineffective trial counsel. The same considerations apply here; at least one court should review Mr. Caro's claim of ineffective assistance by trial counsel. In fact, the need for equitable relief is especially strong in this case of ineffective assistance of trial counsel, as Mr. Caro also suffers from significant brain impairments.

The one-year filing period set forth in § 2255 is subject to equitable tolling. *Holland v. Florida*, 130 S. Ct. 2549 (2010) (holding that AEDPA's statute of limitations is not jurisdictional and that § 2244(d) is subject to equitable tolling in the appropriate case); *United States v. Sosa*, 364 F.3d 507, 512 (4th Cir. 2004). This Court's equitable powers allow it to relieve unjust hardships that can arise from a "hard and fast adherence to more absolute legal rules." *Holland*, 130 S. Ct. at 2563. As the Supreme Court reiterated in *Holland*, "the exercise of a court's equity powers must be made on a case-by-case basis." *Holland*, 130 S. Ct. at 2563 (internal quotation marks and alterations omitted). "The flexibility inherent in equitable procedure enables courts to meet new situations [that] demand equitable intervention, and to accord all the relief necessary to correct . . . particular injustices." *Id.* (internal quotation marks omitted; alterations in original). While noting that courts exercise their equitable power in light of prior cases, the Supreme Court recognized that there will be unforeseeable circumstances that "warrant special treatment in an appropriate case." *Id.* If this Court finds that Mr. Caro is untimely in filing his 2255 Motion, then equitable tolling is appropriate, as the circumstances here warrant special treatment.

To warrant equitable tolling, a petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland,* 130 S. Ct. at 2562-63. As discussed above, Mr. Caro has been diligent to the best of his abilities. Mr. Caro further asserts that two extraordinary circumstances have

9

**JA 95**

prevented him from filing this 2255 Motion at an earlier date:  his significant brain impairment, and his capital counsel's failure to pursue this motion.

A mental condition can constitute extraordinary circumstances that warrant equitable tolling.  *Sosa*, 364 F.3d at 513; *see also Riva, II v. Ficco*, 615 F.3d 35, 39-40 (1st Cir. 2010) (mental illness can warrant equitable tolling in a habeas case); *Bolarinwa v. Williams*, 593 F.3d 226, 231-32 (2d Cir. 2010) (same).  Mr. Caro has presented specific facts supporting his allegation of long-standing brain impairment that prevented him from timely filing.  As discussed above, he has the reasoning ability of a 10-year-old child and should not be held to the same standard as other prisoners without mental limitations.

In another circuit, the court has had the opportunity to create a test for considering whether mental impairment is sufficient to justify equitable tolling.  *See Bills*, 628 F.3d at 1099-1101.  In that case, the court ordered the district court to consider four factors in determining whether the petitioner was entitled to equitable tolling:  "the district court must:  (1) find the petitioner has made a non-frivolous showing that he had a severe mental impairment during the filing period that would entitle him to an evidentiary hearing; (2) determine, after considering the record, whether the petitioner satisfied his burden that he was in fact mentally impaired; (3) determine whether the petitioner's mental impairment made it impossible to timely file on his own; and (4) consider whether the circumstances demonstrate the petitioner was otherwise diligent in attempting to comply with the filing requirements."  *Id.* at 1100-01.  Here, Mr. Caro has made a non-frivolous showing that he has a severe mental impairment—brain damage— which prevented him from timely filing his 2255 Motion.  This Court should order a hearing and determine whether Mr. Caro has shown that his impairment prevented him from timely filing and whether he was otherwise diligent.

**JA 96**

Counsel's misconduct and bad advice also can constitute extraordinary circumstances that warrant equitable relief. *See, e.g., Holland*, 130 S. Ct. at 2563-2564 (holding that professional misconduct may create an extraordinary circumstance that warrants equitable tolling); *Robertson v. Simpson*, 624 F.3d 781, 784-85 (6th Cir. 2010) (holding that attorney's "misadvice" due to cocaine use may constitute extraordinary circumstances).

Here, it was obvious to capital counsel no later than January 11, 2006, that Mr. Caro's prior conviction would be used to support the death penalty. It also would have been obvious to any attorney that Mr. Caro's guilty plea had been and would continue to be extremely detrimental to him. With a capital case on the horizon, no competent attorney would ever have advised their client to enter a guilty plea for his or her only crime of violence, much less to a charge of conspiracy to murder. (*See* Declaration of Larry A. Hammond, attached as Ex. 4 (hereinafter "Hammond Decl."), ¶¶ 43-45.) Capital counsel's failure to adequately investigate possible challenges to this extremely ill-conceived plea agreement is astounding.

Capital counsel's failure to investigate and collaterally challenge this guilty plea and associated conviction is an extraordinary circumstance that prevented timely filing. Counsel had a duty to investigate aggravating evidence, including fully interviewing Mr. Dene. *See Rompilla v. Beard*, 545 U.S. 374, 383-86 (2005); ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, No. 10.7.B.1 (2003) ("ABA Guideline No. 10.7.B.1"). Capital counsel also had an obligation to move to set aside the conviction pursuant to § 2255 as invalid due to Mr. Dene's ineffectiveness. ABA Guideline No. 10.7.B.1 cmt (Counsel must "investigate prior convictions . . . that could be used as aggravating circumstances . . . . If a prior conviction is legally flawed, counsel should seek to have it set aside."); *see also* Hammond Decl., ¶¶ 44-45. Had capital counsel effectively investigated the circumstances

11

**JA 97**

surrounding Mr. Caro's prior conviction and obviously ill-advised plea agreement, they would have discovered the basis for this 2255 Motion and could have timely filed it.

Capital counsel have admitted that they had no strategic reason for their failure to challenge Mr. Caro's prior conviction. (*See* Kalsita Decl. ¶ 22.) Their failure to do so rises above simple negligence, and constitutes extraordinary circumstances that prevented Mr. Caro, who reasonably relied on his attorneys, from filing on time.

Equitable tolling is appropriate in the instant case, where Mr. Caro's brain impairment, coupled with his counsel's pure disregard in pursuing this meritorious motion, resulted in the untimely filing of his 2255 Motion. In the past several years, the Supreme Court has changed the legal landscape and no longer automatically imputes counsel's actions to prisoners for purposes of determining whether a death-sentenced prisoner diligently pursued or timely filed a legal claim. *See, e.g.*, *Holland*, 130 S. Ct. at 2563 (reversing as "too rigid" of a standard the Eleventh Circuit's holding that grossly negligent attorney conduct can never warrant equitable tolling); *Maples v. Thomas*, 132 S. Ct. 912, 924 (2012) (holding for the first time that a client cannot be held responsible for attorney's actions where attorney abandoned him); *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012) (holding for the first time that post-conviction counsel's actions can constitute cause to overcome a prisoner's failure to raise a claim). In light of these recent changes, this Court can and should find the specific facts in this case sufficient to allow Mr. Caro to litigate his 2255 Motion.

## IV.  The Court Should Consider the Merits of this 2255 Motion at the Same Time as Mr. Caro's 2255 Motion filed in Case No. 1:06CR00001-JPJ (W.D. Va.).

The factual issues relevant to Respondent's Motion to Dismiss and this response, such as Mr. Caro's mental impairments and trial counsel's egregious failures, also are raised in Mr. Caro's § 2255 motion filed in his capital case. While the government has not yet filed its answer

**JA 98**

in the capital case, Mr. Caro anticipates that the government will dispute these facts and resolution of these issues will require an evidentiary hearing. Mr. Caro also is entitled to a hearing in the instant case to determine whether he has satisfied the diligence requirement of §2255(f)(4) or can establish facts warranting equitable tolling. Mr. Caro anticipates providing additional briefing in his reply on these issues in his capital case and believes such briefing will inform the decisions required in this case. For this reason, simultaneous resolution of the 2255 motions filed in both of these cases, including this motion to dismiss, will promote judicial economy. Moreover, a slight delay in this case to accommodate simultaneous resolution of both cases will not prejudice either party.

## CONCLUSION

Mr. Caro respectfully asks the Court to deny the motion to dismiss for the reasons discussed above and consider the merits of Mr. Caro's claim of ineffective assistance of trial counsel. In the alternative, he asks the Court to conduct an evidentiary hearing on the factual issues presented in this response.

Respectfully submitted this 20th day of February, 2013.

s/Karen M. Wilkinson_____
Jon M. Sands
Federal Public Defender
Dale A. Baich (Ohio Bar No. 0025070)
Karen M. Wilkinson (Arizona Bar No. 014095)
Robin C. Konrad (Alabama Bar No. 2194-N76K)
Office of the Federal Public Defender, District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
dale_baich@fd.org
karen_wilkinson@fd.org
robin_konrad@fd.org
Telephone: 602-382-2816
Facsimile: 602-889-3960

13

**JA 99**

Fay F. Spence (Virginia State Bar No. 27906)
Federal Public Defender's Office
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Telephone:  540-777-0880
Facsimile:  540-777-0890

Brian J. Beck (Virginia Bar No. 78049)
Federal Public Defender's Office
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Telephone:  276-619-6080

Attorneys for Defendant
Carlos David Caro

**CERTIFICATE OF SERVICE**

I hereby certify that on February 20, 2013, I filed the foregoing Defendant's Response to Motion to Dismiss with the Clerk of the Court through CM/ECF.

s/Stephanie Bame_____
Legal Assistant
Capital Habeas Unit

14

**JA 100**

United States v. Carlos David Caro
Case No. 1:06-cr-00001-JPJ

Defense Exhibit List

Ex. 3        Declaration of Louis Dene, 11/09/2012

Ex. 4        Declaration of Larry A. Hammond, 01/08/2013

Ex. 5        Declaration of Stephen J. Kalista, 12/29/2012

Ex. 8        Declaration of Donna M. Schwartz-Watts, M.D., 01/07/2013

Ex. 10       Neuropsychological Examination of Carlos Caro by Malcolm Spica, June
             2006

Ex. 61       Carlos Caro Academic Records

Ex. 62       Declaration of Susan Richardson, 02/20/2013

# EXHIBIT 3

# EXHIBIT 3

DECLARATION OF LOUIS DENE, ESQUIRE
PURSUANT TO 28 U.S.C. § 1746

I, Louis Dene, do make oath and swear:

1.  I am an attorney licensed by the Commonwealth of Virginia.

2.  In February 2004 I was appointed to represent Carlos Caro in Western District of Virginia Case Number 2:03cr10115. Mr. Caro was charged with Conspiracy to Commit Murder, Assault with Intent to Commit Murder and Possession of a Prohibited Object.

3.  Prior to my appointment in February 2004, Mr. Caro had been implicated in the death of an inmate at USP Lee in December 2003. I was aware of the homicide, but it was separate from the case in which I represented him.

4.  It was my understanding that the Government intended to proceed with a death penalty case against Mr. Caro at the conclusion of the 2:03cr10115 case.

5.  As part of my representation I worked to obtain a plea agreement with the United States Attorney's Office whereby Mr. Caro would plead guilty to the most serious offense of Conspiracy to Commit Murder and the Government would allow his co-defendant, Juan Carlos Moreno-Marquez to plead to the lesser offense of possessing a prohibited object. The plea agreement, which I understood was proposed by Mr. Moreno-Marquez, provided no real benefit to Mr. Caro; however it did benefit Mr. Moreno-Marquez.

6.  I advised Mr. Caro that the plea agreement would mean that he would receive a very long sentence. Mr. Caro stated that "he wasn't going anywhere," so the long sentence did not matter to him. I did not advise him of the implications that the plea agreement would have on the prison killing case. I did not advise Mr. Caro that the Conspiracy to Commit

1

**JA 103**

Murder conviction would likely be used against him in a later capital case and that he should not sign the plea agreement.

7. I was aware of Mr. Caro's limited education. I know that Mr. Caro had not completed high school and that he had no ability to understand legal proceedings without the benefit of counsel.

8. I regularly advised Mr. Caro and he followed my advice. Mr. Caro trusted me. Mr. Caro was not afraid of going to trial and if I recommended going to trial he would have done so.

9. I was contacted by the trial attorneys who represented Mr. Caro on the capital charges. However, I was not asked about the reasons for the plea agreement, nor was I asked about my recommendations to Mr. Caro.

10. After Stephen Kalista was appointed, he visited my office to copy my file. He copied a portion of my file, but not all of my file.

I declare under penalty for perjury that the foregoing is true and correct.

Executed on _11-9-12_ .

Louis Dene

2

**JA 104**

# EXHIBIT 4

# EXHIBIT 4

## DECLARATION OF LARRY A. HAMMOND

I, Larry A. Hammond, declare as follows:

1.  I am a member of the law firm of Osborn Maledon, P.A. I am a member of the Bars of the States of Arizona (1975) and California (1971; inactive). I am a graduate of the University of Texas School of Law (1970).

2.  I was asked to review materials in connection with the post-conviction proceeding in *United States v. Carlos Caro*, Case No.06-cr-00001-JPJ (W.D.VA.), and provide this Declaration.

3.  I was retained to serve as an expert on issues relating to the effective assistance of trial counsel in Mr. Caro's case. I am being compensated at the rate of $300.00 per hour. My current hourly rate for criminal defense-related work at Osborn Maledon is $550 per hour. My background is briefly summarized below. A copy of my CV is attached.

4.  After graduation, I served as a law clerk to the Honorable Carl McGowan on the United States Court of Appeals for the D.C. Circuit in 1970-71. I then served as the last law clerk for Justice Hugo L. Black and the first law clerk for Justice Lewis F. Powell in 1971 through 1973. In 1973 and 1974, I served as an Assistant Watergate Special Prosecutor. In 1974, I began practicing in Arizona at the private law firm which was the predecessor of Osborn Maledon, the firm with which I am now affiliated.

5.  During the Administration of President Jimmy Carter, I served as First Deputy Assistant Attorney General in the Office of Legal Counsel (OLC) at the Department of Justice (1977-1980).

1

4633616v1

**JA 106**

6.    Both as a Supreme Court law clerk and as a Deputy at OLC, I undertook responsibilities with respect to death penalty-related matters.

7.    In 1981, I rejoined my law firm, which is now known as Osborn Maledon in Phoenix, Arizona. From 1981 to the present, I have been engaged in the practice of law primarily on the criminal defense side. Throughout that time, my law firm has been engaged in death penalty work, including direct representation and policy-related work in that field.

8.    I have been a practicing lawyer for 42 years. I have been engaged in civil litigation and criminal defense work continuously for the last 31 years. I am a member of the American College of Trial Lawyers.

9.    From 1981 to the present, I have spent at least some portion of my time every year on capital cases. The law firm of Osborn Maledon (and its predecessor firm) and I have been involved in capital litigation at every stage, including trial, sentencing, direct appeal, post-conviction review, federal habeas corpus, and clemency. I am one of the founders of this law firm and have been its senior criminal defense lawyer since its inception. I have been personally involved in every capital case in which lawyers in this firm have been engaged.

10.    I have tried to verdict two Arizona capital cases and recently concluded a six-month involvement in a case in Yavapai County, Arizona, that began as a capital case but in which the prosecution elected to remove the death penalty as a possible penalty at the end of a one-month jury selection *voir dire*.

2

4633616v1

**JA 107**

11. I have also served as trial court counsel in eight federal death penalty cases, two in New Mexico, one in Nevada, four in the District of Arizona, and one in the District of Southern California. In each case, I was appointed as lead counsel pursuant to 18 U.S.C. § 3005's requirement that each defendant be assigned two attorneys, one of whom is deemed to be "learned in the law applicable to capital cases."

12. Within the last 15 years, Osborn Maledon has consulted frequently with indigent defense offices in Arizona and in the mid-1990s I served as co-counsel in connection with two capital cases assigned to the Office of the Maricopa County Legal Defender (OLD), *State v. Pape* and *State v. Pilipow*. Both cases required extensive development of mitigation and mental condition information.

13. Since 1998, I have served as lead counsel in the federal capital habeas corpus proceeding arising from an Arizona capital conviction (*Atwood v. Stewart*, Case No. CIV96-116 TUC JCC).

14. In approximately 1989, I participated in the founding of the Arizona Capital Representation Project, and I have served as a Board member and/or officer of that organization since its inception. The Project has been involved, at one stage or another, in assisting virtually every member of Arizona's death row population. Congress defunded all capital resource centers in 1996, but since that time the Project's activities have continued and the Project remains a resource in all phases of capital litigation – particularly at the post-conviction stages.

15. In approximately 1994, I was asked to serve as the Chair of the Arizona State Bar's Indigent Defense Task Force (IDTF), and I have continued in that position

3

**JA 108**

since that time. The IDTF has been engaged in the development of rules promulgated by the Arizona Supreme Court dealing with capital defense funding and indigent defense funding generally. The IDTF has also been involved in developing and testifying in support of, or in opposition to, legislative proposals dealing with the funding of capital defense in Arizona. The Task Force participated in the development of legislation creating the standards for the appointment of counsel and for the funding of representation at the state post-conviction stage in capital cases. Among the most important undertakings of this Task Force has been the successful effort to secure an amendment to Rule 6.8 of the Arizona Rules of Criminal Procedure to require lawyers in capital cases to be guided by the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.

16.    For several years I also served on the Arizona Supreme Court's Committee for the Appointment of Counsel to represent death row inmates at the State post-conviction relief stage. I participated in the drafting, review and ultimate establishment of the rules governing the appointment of death penalty counsel under A.R.S. §13-4041 and Rule 6.8 of the Arizona Rules of Criminal Procedure.

17.    I have co-authored several articles that have appeared in the *Arizona Attorney Magazine* relating to the funding of capital defense, and I have spoken and participated in numerous seminars and programs on this subject. As an adjunct member of the ASU Law School faculty, I team-taught the Death Penalty course in the spring of 2002. During the 2003-04 and 2006-07 school years, I team-taught a 4-hour credit seminar at ASU on the causes of wrongful convictions in Arizona and nationally.

4

**JA 109**

Included in the curriculum was the study of ineffective assistance of defense counsel. In the fall of 2008, I taught a course entitled "Criminal Justice Failures and Reforms" at Elon University School of Law in Greensboro, North Carolina. A significant element of this course was the history of the law and practical realities of systems of indigent defense in capital cases.

18.    For the last 14 years, I have served as the Chair of The Justice Project of Arizona Attorneys for Criminal Justice, and in that capacity I have been involved in the evaluation of hundreds of cases alleging ineffective assistance of counsel at trial and sentencing in non-capital cases. The U.S. Supreme Court recently ruled in favor of one of the Justice Project's federal habeas corpus cases, *Martinez v. Ryan,* 132 S.Ct. 1309 (2012), in which the Court held that the ineffective assistance of counsel at the post-conviction stage could constitute good cause to excuse a procedural default.

19.    I testified in October 2002, as an expert witness on ineffective assistance of counsel in a post-conviction relief proceeding in *Lacy v. Arizona,* Case No. CR 1995-000713. In that case, the Maricopa County Superior Court reversed a homicide and assault conviction based in part on ineffective assistance of defense counsel. I have also testified and served as an expert in the capital post-conviction proceedings in *Arizona v. Kayer,* CR 1994-0694, in the Superior Court of Yavapai County, and as an expert in the post-conviction proceeding in *Arizona v. Murdaugh,* Case No. CR 1995-006472, in the Superior Court of Maricopa County. In December 2010, I testified as an expert witness in a post-conviction proceeding in Connecticut State Court, in *State v. Wargo,* 53 Conn.App. 747, 731 A.2d 768 (1999).

5

**JA 110**

20.    At present, I am serving as a death penalty defense standard of care expert in four post-conviction cases; three in Arizona and one in Colorado.

21.    Most recently, I testified as a standard of care expert in the case of *United States v. Brandon Basham*, No. 02-cr-992-JFA (D.S.C.).

22.    My opinions are based in significant part on my experiences as "learned counsel" in federal death penalty cases.  In addition to my direct involvement in federal death penalty cases, I have also conferred on numerous occasions with Federal Capital Defense Resource Counsel about the duties and responsibilities of capital trial counsel. In particular, I have conferred with federal defense counsel about the Department of Justice's process for the Government's consideration of whether to seek the death penalty.

23.    In the course of the federal death cases to which I have been appointed, and on other matters involving capital litigation, I have frequently been involved in the planning, development, and presentation of mitigating evidence, and the pre-trial investigation necessary in the course of developing mitigating evidence and preparing to address and respond to the Government's anticipated aggravating factors..

24.    Counsel for Mr. Caro have asked me to address questions with respect to the standard of care for attorneys representing a defendant in a federal death penalty case. I have undertaken a preliminary review of materials related to the representation of Mr. Caro at the pretrial, trial, and penalty phases, as well as direct appeal.  Based on that review as informed by my experience and training summarized above, I offer the following opinions and observations.

6

**JA 111**

25.     From the outset of the representation of a person charged with a federal death-eligible offense as was the case with Mr. Caro here, defense counsel must commence preparing for all phases of the case, including most importantly both the guilt/innocence and the penalty phases. Counsel must recognize that capital trials require a defense that is cognizant of the reality that the defendant is likely to be found guilty by the jury and that the same jury will then weigh aggravating and mitigating evidence. In this case, there was little doubt that Mr. Caro killed Mr. Sandoval. From opening statements through the conclusion of the penalty phases of the trial, the defense conceded Mr. Caro's responsibility for the killing of his cellmate.

26.     What was in doubt from the outset of the representation of Mr. Caro was both the level of his culpability for the death of Mr. Sandoval and whether that act warranted the penalty of death. The defense, from the outset, had to focus on attempting to save the client's life.

27.     Inescapably, much of the foundation for the presentation of both aggravating and mitigating evidence will have been laid during the presentation of evidence at the guilt/innocence stage. Given this reality, several key principles should have dominated the defense effort from the outset: (1) defense themes must be developed on an ongoing basis; (2) those themes must permeate all aspects of the defense work in the case; and (3) the investigation essential to the development of defense themes must commence immediately and inevitably will require time and resources.

28.     The simultaneous investigation of facts underlying the charged offense and the social history and mental health issues is always a challenging task for defense

7

4633616v1

**JA 112**

counsel and their team members. It is inconceivable that an appropriate investigation into these issues could be accomplished in as little as six months. Many jurisdictions, including Arizona, routinely contemplate that pretrial preparation will require two years and in some cases more. There are many reasons why more time is required in capital cases than might be necessary in noncapital cases, but whatever the specific needs of any cases, it is virtually certain that competent investigation and preparation cannot be realized in a matter of months. As the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases underscored in 2003, a thorough investigation of the defendant's life history and mental development is both essential and time-consuming. In recognition of the critical role of mitigation development, the ABA published Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty cases in 2008. These Guidelines are a compilation of the standards and practices that guided death penalty defense counsel at the time of the appointment of the defense team in Mr. Caro's case. Taken together, and underscored by now hundreds of reported cases, the central importance of thorough mental health development is no longer doubted.

29. The standards of performance for defense counsel in death penalty cases are national standards. These standards are rooted in federal constitutional guarantees. Federal death penalty cases are most certainly subject to a single set of responsibilities for defense counsel. There is no basis for concluding that a defendant prosecuted in the Western District of Virginia is entitled to less time to prepare, less court-authorized financial assistance in order to prepare, or less effective defense counsel.

8

4633616v1

**JA 113**

30.    The defense team in this case presented no mental health/mental defect testimony at either the guilt/innocence phase or at the penalty phase. The defense did secure the appointment of an expert to conduct a neuropsychological evaluation, but ultimately presented no mental health testimony. While this investigation may well properly involve a neuropsychological evaluation, there is no substitute for a thorough mental health evaluation, which may require—as it did here—a combination of experts and consultants.

31.    Since virtually every federal death penalty case requires court-authorized funding, an important part of the obligations of defense counsel is to begin from the outset to obtain adequate resources. This process often requires helping the court to understand why an extensive background investigation of the client's life history and mental state history is necessary. This is one of the reasons why it is indisputably true that case preparation in federal death penalty cases cannot be accomplished in six months or a year. Many federal courts are unfamiliar with the unique resource requirements of death penalty cases. The need for frequent, on the record, ex parte sealed proceedings may not be entirely evident to the Court. In my experience, federal judges are usually generally familiar with typical Criminal Justice Act (CJA) funding procedures, but these typical procedures are not predictive of the needs in capital cases. This is not intended as in any way a criticism of federal judges. Rather, it is a statement of an important element of the responsibility of defense counsel. Just as defense counsel needs specialized expertise, the court and those responsible for funding capital defense need to become educated on the requirements of capital defense.

9

4633616v1

**JA 114**

32.   The representation of Mr. Caro may have presented challenges in terms of securing adequate time and resources.  The crime charged involved the presentation of only a few witnesses.  It may well have been the case that all parties—the prosecution, defense, and the court—began by assuming that the case could be brought to trial in a matter of months.  It was the duty of defense counsel, however, to work from the outset to assure that time was available, and resources secured, to undertake a thorough life history for Mr. Caro and to investigate fully his social and mental history.  The need for this full development is particularly important in a case in which it is apparent from the outset that the defendant grew up in a community and society where drugs and violence were a part of everyday life.

33.   Prison killing cases present special concerns.  First, as was the case here, the Government's case is likely to be based on the testimony of incarcerated informants.  Jailhouse or prison "snitch" testimony requires thorough investigation. It is now well established (thanks in significant part to the examination of DNA-based exonerations) that false and unreliable inmate testimony is one of the key causes of wrongful convictions.  Secondly, as was also the case here, there are often other inmate witnesses who the Government does not intend to call as witnesses, but who have relevant information that may contradict an informant's testimony.  Thirdly, it is important for defense counsel to thoroughly investigate whether any prison-related homicide is most properly understood as deserving of an instruction on lesser included offenses and/or on self-defense.  Many prison homicide cases—and this case is one good example—might well not be genuinely regarded as premeditated first-degree murders.  Defense counsel

10

4633616v1

**JA 115**

must carefully consider whether the jury could come to appreciate that an inmate-on-inmate homicide involves unique mental health and other severe stresses warranting a finding of second-degree homicide, manslaughter, or in some cases an acquittal based on self-defense.

34.    This case presented a classic case of the difficulties that can be anticipated when the Government chooses to rely on inmate testimony to support an allegation of premeditated murder.  The only "eye-witness" offered in the case was Mr. Bullock, an inmate in the Special Housing Unit (SHU) who resided across the hallway from the cell in which Mr. Caro and Mr. Sandoval were housed.  Given that premeditation was the central issue at trial, Mr. Bullock's various descriptions of what he observed became key. The necessary investigation and preparation for trial should have focused on the development of evidence that might undermine this inmate's testimony.  It is evident that Mr. Bullock had a cellmate.  What he may have observed and what Mr. Bullock may have told him about what Mr. Bullock observed would have been critically important.

35.    Prison killing cases charged as capital crimes almost inevitably will be based on a prosecution claim of future dangerousness. Defense counsel must know this and plan to respond thoroughly to this non-statutory aggravating circumstance. Competent responses to this aggravating factor require expert assistance on prison management. The federal Bureau of Prisons (BOP) is equipped to eliminate the material risk of future assaults by inmates who pose the greatest internal security risks.  A thorough understanding of this topic is necessary in approaching the trial and penalty phases.  While the defense team was certainly aware of the importance of this

11

**JA 116**

aggravating factor, it appears that they may have failed to appreciate the extent to which jurors are affected by concerns about the ability of a prisoner to inflict injury in the future.

36.    Similarly, gang-related capital cases also present predictable areas requiring defense preparation.  Very typically the Government can be expected to argue that, unless executed, the defendant will continue to communicate with and instruct other gang members to commit acts of violence both inside and outside the prison.  BOP also has in place systems and procedures to deal with security threat groups (prison gangs).  Defense counsel should anticipate that it will be important to the jury to know that these systems and procedures can reduce if not eliminate the risk of future dangerousness.  The defense effort in this regard—relying on Messrs. Aiken and Cunningham to rebut the testimony of the Government's expert, Mr. Hershberger—was deficient.  (My opinions with respect particularly to prison homicide issues are informed by my experience as court-appointed counsel for inmates seeking protective custody in the Arizona prison system and by my direct involvement as plaintiffs' counsel in jail conditions cases.  My opinions in this respect are also informed by my representation of defendants in federal death penalty cases in Arizona, New Mexico and California.)

37.    Another important part of defense counsel's obligation in capital cases is to investigate and to challenge where appropriate prior convictions that may be used by the Government as aggravating factors.  This is an important obligation irrespective of whether the defendant was convicted after a trial or entered a plea of guilty in prior cases. In this case, the conviction of Mr. Caro in connection with the stabbing death of inmate

12

**JA 117**

Benavidez became an important element of the Government's case in support of aggravation. Counsel had a duty to investigate and challenge that underlying conviction.

38.     I appreciate the difficulties that defense counsel in this case encountered, but I respectfully conclude that their performance fell below the standard of care for death penalty defense in the ways I have identified above. I also have the following additional concerns.

### The Department of Justice Death Penalty Certification Process

39.     It is my opinion that reasonably competent counsel in Mr. Caro's case should have aggressively pursued the opportunity afforded by the Department of Justice's Death Penalty Certification process to seek a determination that his case was not one in which the death penalty should have been pursued. My opinions on this question are informed by my participation in the process on numerous occasions and having consulted with other capital defense counsel who have been involved in making presentations to the Department of Justice's Death Penalty Review Committee.

40.     This phase of the capital defense is particularly important in cases in which the Department of Justice is necessarily considering whether this prison homicide should be treated differently from other prison-related homicides. A greater understanding of Mr. Caro's mitigating evidence, coupled with a greater appreciation of the prison environmental factors should have been presented so that the Attorney General might better evaluate both the aggravating and mitigating circumstances. Again, more time to prepare and to work with the development of the factual investigation and the penalty phase facts would have been valuable. It is apparent from a review of the documents

13

JA 118

from early 2005 that the defense team had only begun to develop its case when they went to Main Justice for the Committee meeting. The fact investigator appears to have been engaged only a very few months before the Main Justice meeting and the mitigation specialist had not begun to actively develop Mr. Caro's personal history.

41. I understand the argument sometimes made that defense counsel does not want to "give away" defense strategy and themes, but that argument needs carefully to be weighed against the importance of the opportunity to achieve a "no death" decision. As with other effective presentations in capital cases, the importance of a written as well as an oral presentation should not be understated. Especially where the Death Penalty Review Committee may be composed of members some of whom will be in attendance at the oral presentation and some of whom may not, the written presentation may be only way to assure that decision makers see defense counsel's arguments. In this case, it does appear that some of the Department of Justice participants were not physically present but appeared instead by videoconference. It also appears from a review of the relevant correspondence that the defense team was aware of this possibility. Effective presentation always suffers when important communications are handled by a combination of in-room and videoconference connections, but the loss in communication effectiveness might have been ameliorated by a written presentation.

42. It is also important for defense counsel to keep in mind that the Attorney General is the ultimate decider, and particularly in cases like this one involving important policy questions (the BOP's ability to distinguish among homicide cases occurring in its institutions, etc.), the personal consideration by the Attorney General should be

14

4633616v1

**JA 119**

anticipated. The views of counsel for Mr. Caro at this stage should not have been filtered through the Committee members. There have been dozens of homicides that have occurred in BOP. Only a very few have resulted in a decision by the Attorney General to seek the death penalty. The Justice Department claims to have a system for deciding which cases should precede as death penalty cases, *i.e.*, that the Government can differentiate whom among these defendants should be candidates for death. The defense team did develop a greater understanding of these issues as the case progressed, but at the time of the Committee presentation the defense team had not yet secured the assistance of experts and consultants to aid them in developing a theme for life.

### Advising the Client About the Consequences of a Guilty Plea

43. It is my opinion that defense counsel representing Mr. Caro in the Benavidez prosecution fell below the standard of care in failing to properly advise Mr. Caro of the consequences of his plea in that matter.

44. One of the aggravating circumstances alleged and established by the Government in the Sandoval case involved Mr. Caro's plea of guilty to murder in another prison killing case. It is evident that Mr. Caro's plea in that case would be used by the Government as part of its aggravation case, yet it also appears that capital defense counsel took no steps to attack that plea. Reasonably competent capital counsel must examine all criminal convictions that may be used to enhance the client's sentence— especially any conviction that may be used to support an aggravating circumstance as was the case here. A proper examination of the circumstances surrounding Mr. Caro's plea in that case would have revealed that he was not advised of the important

15

4633616v1

**JA 120**

consequence of his plea, *i.e.,* that it could be used in the Sandoval case as an important underpinning supporting the Government's successful effort to seek the death penalty.

45.     While the United State Supreme Court has focused greater attention on the critical importance of counsel in connection with guilty pleas, competent counsel have long known and emphasized the duty fully to advise a client of all of the direct and collateral consequences of a plea. Mr. Caro was not advised by counsel in the Benavidez matter that pleading to conspiracy to commit first degree murder would have been used to support an aggravating factor in the Sandoval penalty phase.

### Development of Mitigating Evidence

46.     It is my opinion that defense counsel for Mr. Caro fell below the standard of care in failing fully to investigate and develop issues with respect to mental health issues. As noted above in this Declaration, the development of mitigating evidence with respect to a capital defendant's mental history is a critical component of the capital defense function. In this case, it appears that defense counsel first secured the appointment of an expert consultant to perform a neuropsychological evaluation. It further appears that defense counsel's plan was to defer considering other mental state experts until the neuropsychological evaluation was completed. This approach falls far short of the standard of care. All of the relevant case law and secondary literature about the development of mitigation emphasizes that defense counsel must undertake a comprehensive examination of mental health issues.

16

4633616v1

**JA 121**

47.    To whatever extent the failure to develop Mr. Caro's complete history was the result insufficient time, defense counsel should have been advocating the need for great time and greater resources. There is no substitute for a thorough life history as a foundation for expert testimony. Developing that history does take time and it takes money, but there is no reason to believe that both the time and the resources would not have been available.

48.    Defense counsel knew that Mr. Caro had brain damage. They knew that he had a traumatic childhood. Counsel nonetheless failed to secure the necessary experts to present this information to the jury. The standard of care for defense counsel requires the full development and appreciation of these issues. Had defense counsel developed the information there is no reason why they would have determined not to present it to the jury in this case.

## Failure to Conduct Appropriate Investigation

49.    It is also my opinion, as noted above, that defense counsel fell below the standard of care in failing to investigate information with respect to the testimony offered by the Government from an inmate housed directly across from Mr. Caro's cell with respect to the credibility of the incriminating testimony offered by that witness. I wish to emphasize this concern as it appears to have permeated this case from beginning to end. Exactly how the death of Mr. Sandoval occurred turned out to be the difference between a life or death sentence for Mr. Caro. The image of the planned and violently executed strangulation dominated the Government's closing arguments. The Government was able

17

4633616v1

**JA 122**

to weave together the circumstantial evidence and Mr. Caro's incriminating statements with Mr. Bullock's account to paint a picture that could only have propelled the jury to find as it did - that this homicide deserved the death penalty.

50. The record in this case reveals that the chief cooperating witness for the Government may have had a motive to provide inaccurate and misleading testimony. It is also apparent that this inmate had a cellmate. Grand jury testimony makes this evident, although presumably defense counsel would have known or expected that other inmates in the Special Housing Unit at the USP Lee would have had cellmates. For the reasons described above, a thorough investigation should have been undertaken prior to trial.

### Failure to Seek removal of Juror

51. During the trial, the Court observed that one juror appeared to be sleeping during testimony. After conferring with counsel the Court decided not to remove the juror. Attention to all testimony is central to the role of jurors as fact-finders. Any juror who cannot maintain full attention should have been removed. Here, there were four alternates. There was no material risk that removing the juror would occasion a mistrial. Defense counsel should have moved and strongly advocated for the dismissal of that juror. (My opinion on this topic is informed by my participation in several lengthy trials in which sleeping or noticeably inattentive juror behavior occurred. The defense team in these cases debated the tactical pros and cons of seeking removal; we conferred with other defense counsel who had encountered similar situations; and we ultimately concluded that the defendant's entitlement to a unanimous jury required that all jurors were engaged in the hard job of receiving testimony.)

4633616v1

**JA 123**

## Appellate Counsel's Duties

52.     Appellate and post-conviction defense counsel in death penalty cases have special duties not always encountered by defense counsel in noncapital cases.  Most important among those duties is the duty to advocate for reconsideration and change in the law affecting the constitutionality of the death penalty.  No other field of criminal defense representation has been so marked by dynamic change.  The duty to advocate for reversal of the death sentence is especially important when the case is on direct appeal.  The jurisprudence of the law of retroactivity has often distinguished between cases that have become "final judgments" and those that have not.  New rulings may benefit those convicted defendants whose cases were on direct appeal—or who raised the same issue underlying that ruling on direct appeal.

53.     In this case, appellate counsel failed to allege that the jury was improperly instructed on the standard for weighing aggravation against mitigation.  A good faith basis certainly existed in this case to claim that the jurors should have been instructed that aggravation must outweigh mitigation beyond a reasonable doubt.  The jury in this case found mitigating circumstances, and they found them unanimously.  Yet, the jury was never told to weigh those mitigators against the aggravators—especially future dangerousness—by any particular standard of proof.  Had they been so instructed, given the relative weakness of the non-statutory aggravators, it is reasonable to conclude that the jury would not have found that this defendant deserved a sentence of death.

54.     Had the defense undertaken and presented a full mitigation case as contemplated by the ABA Guidelines, there could be little doubt that the jury would have

19

**JA 124**

found it difficult to conclude that the Government's aggravating evidence outweighed that mitigation beyond a reasonable doubt. (My opinions on this topic are informed by my experience as part of the post-conviction team that ultimately succeeded in securing the reversal of the death sentence for Timothy Ring in *Ring v. Arizona,* 536 U.S. 584 (2002). The Court's decision in that case directly overruled its own precedent regarding the role of the jury as fact-finder—a decision that was only 10 years old. My opinions are also based on the increasing frequency in the numbers of cases in which Justices of the United States Supreme Court have come over time to change their views on the application of the Eighth Amendment. Justices Blackmun, Powell and Stevens are three prominent examples of the potential that opinions on the constitutionality of the death penalty both on its face and as applied are subject to change.)

### Concluding Observation

55.    My expectation based on my experience in providing standard of care opinions in other cases is that I should form additional opinions that will be informed by a consideration of the Government's Response to Mr. Caro's Petition and a further review of Declarations that may be presented by either party and by a further review of the materials in the file in this case.

DATED this 8th day of January, 2013.

*Larry A. Hammond*
Larry A. Hammond

20

4633616v1

**JA 125**



# Larry A. Hammond

Phone: (602) 640-9361  |  Email: lhammond@omlaw.com



Larry has spent over 30 years practicing in the private sector, but regards his two tours with the Department of Justice as among his most satisfying professional experiences. He served as an Assistant Watergate Special Prosecutor in 1973-1974 and then returned to Justice during the Carter Administration where he worked in the Office of Legal Counsel as the First Deputy Assistant Attorney General under both Attorneys General Griffin Bell and Ben Civiletti.

## Education

- J.D., University of Texas, 1970; *Texas Law Review*, Editor-in-Chief, 1969-1970; Order of the Coif
- B.A., University of Texas, 1967

## Bar Admissions

- Arizona, 1975
- California, 1971

2929 North Central Avenue
Twenty-First Floor
Phoenix, AZ 85012-2793

## Court Admissions

- U.S. Court of Appeals, Tenth Circuit, 2004
- U.S. Court of Appeals, Ninth Circuit, 1984
- U.S. Court of Appeals, Sixth Circuit, 1984
- U.S. Supreme Court, 1977
- Arizona Supreme Court, 1975
- California Supreme Court, 1971

## Clerkships

- U.S. Supreme Court, Justice Lewis F. Powell, Jr., 1971 - 1973
- U.S. Supreme Court, Justice Hugo L. Black, 1971
- U.S. Court of Appeals, District of Columbia Circuit, Judge Carl McGowan, 1970 - 1971

## Practice Areas

- Commercial Litigation
- Criminal Defense
- Internal and Governmental Investigations

## Representative Matters

- *State ex rel. Napolitano v. Gravano*, 204 Ariz. 106, 60 P.3d 246 (App. 2002)

## Awards & Recognition

- 23 Osborn Maledon, P.A. Lawyers Named 'Best' in National Publication
  Twenty-three of the 51 attorneys in the Phoenix law firm of Osborn Maledon, P.A. have been singled out for national recognition in the new 2012 edition of Best Lawyers®, the oldest peer-review publication in the legal profession.
- Osborn Maledon, P.A. Attorneys Named to *Super Lawyers* List
  Fourteen of the 49 attorneys at Osborn Maledon, P.A., a Phoenix law firm, have been named to the *Southwest Super Lawyers 2011* list.
- Osborn Maledon, P.A. Practice Groups and Attorneys Ranked as Tops in Chambers Guide
  Three practice areas in the Phoenix law firm of Osborn Maledon, P.A. received the highest possible ranking among Arizona law firms for the seventh year in a row in the 2011 ranking by the prestigious legal resource guide, Chambers USA.

**JA 126**

© Copyright Osborn Maledon, P.A., All Rights Reserved



OSBORN
MALEDON

*Order of the Samaritan for Public Service and Criminal Justice*, University of Alabama School of Law, March 2011

*The International Who's Who of Business Crime Defense Lawyers*, 2011

Morris Dees Justice Award, 2010

Larry Hammond Endowed Criminal Law Scholarship at the James R. Rogers College of Law at the University of Arizona, established in 2008

Justice Award, The American Judicature Society, 2008

John Flynn Award, Arizona Attorneys for Criminal Justice, 2008

Maricopa County Hall of Fame, 2008

Distinguished Honorary Alumnus Award, University of Arizona Law School, May, 2004

Judge Learned Hand Award for Community Service, Arizona Chapter of American Jewish Committee, March, 2003

Arizona State Bar Foundation Walter E. Craig Award for Career Service, 2001

President's Commendation, Arizona Attorneys for Criminal Justice, January, 1997 and 1999

Civil Libertarian of the Year, Arizona Civil Liberties Union, 1993, 2000

Pro Bono Service Award, State Bar of Arizona, 1991

Exceptional Service Award, U.S. Justice Department, 1980

Federal Younger Lawyer of the Year, 1980

Chambers USA, *America's Leading Lawyers for Business*, Litigation: White-Collar Crime & Government Investigations, 2004-2011

*The Best Lawyers in America®*, Appellate Law, Bet-the-Company Litigation, Commercial Litigation, White-Collar Criminal Defense, editions 1995-2012

Best of the Bar, *Business Journal*, Pro Bono, 2005

*Southwest Super Lawyers*, Top 50 Arizona Attorneys, 2007-2010

*Southwest Super Lawyers*, Criminal Defense: White Collar, 2007-2012

*Arizona's Finest Lawyers*

## Professional Activities

American College of Trial Lawyers, Fellow, 2011

American Judicature Society, President and member of Executive Committee, 2003-2005, Board of Directors, 1995-2007, Criminal Justice Reform Committee, Chair 1992-present

Arizona Attorneys for Criminal Justice, Justice Project Chair, 1998-present

American Bar Association, Biological Evidence Task Force, 2003-2005

American Bar Association, Task Force on War Crimes in the Former Yugoslavia, 1993-1995

**JA 127**

© Copyright Osborn Maledon, P.A., All Rights Reserved



Arizona Capital Representation Project, of Directors, 1988-present, Vice President, 1988-present

Arizona State Bar Association, Indigent Defense Task Force, 1995-present

Human Rights First, Lawyer Steering Committee (formerly known as the Lawyers' Committee for Human Rights)

Elon University College of Law (Visiting Professor; Advanced Criminal Procedure) 2008

Sandra Day O'Connor College of Law at Arizona State University (Adjunct Professor of Law:  Advanced Criminal Procedure, Death Penalty, Presidential Powers,  Advanced Civil Discovery, and Ethics)

University of Arizona College of Law (Adjunct Professor of Law:  Presidential Powers), 1995

Arizona State University Undergraduate School (Guest Faculty Member:  Death Penalty, Practicum re: The Justice Project)

Birmingham City University, School of Law, United Kingdom, (Visiting Professor; Center for American Legal Studies)

St. John's College, Santa Fe, New Mexico (Tutor:  Seventeenth Century Literature - 1983)

University of New Mexico School of Law (Trial Practice - 1983)

## Publications

- Sentence Must be Fair: Death-Penalty Defendants Need Competent Attorneys
  The Arizona Republic, May 12, 2012
- Capital Case Crisis in Maricopa County, Arizona: A response from the Defense
  Judicature, March / April 2012
- Innocent Until Interrogated
  Law Journal for Social Justice, May 2, 2011
- John Sears, John J. Flynn Lifetime Achievement Award 2011
  The Defender, April 21, 2011
- Why Should You Oppose the Death Penalty?
  The Arizona Republic, April 15, 2011
- Opinion: What Did Jeffrey Landrigan's Execution Teach Us About Respect?
  Maricopa Lawyer, November 6, 2010
- Protecting Moscow from the Soviets – Book Review
  Experience, 2009
- Napolitano will Defend State Death Penalty Law before Supreme Court
  The Arizona Republic, April 21, 2002

Opinion, *Ariz. case to test rights of convicted in Supreme Court*, The Arizona Republic, October 4, 2011

Viewpoint, *The failure of forensic science reform in Arizona*, Judicature, May-June 2010

*Sotomayor is Newest Face in a Long Line of Heroes*, The Arizona Republic, August 10, 2009 (author)

Editorial for Judicature, *Setting Forensic Science on a New Path*, March-April 2009 (unsigned editorial co-authored with Dr. Barry Fisher of the Los Angeles County Crime Laboratory)

*Counsel for The Indigent Accused in Death Penalty Cases*, The Defender (Winter 2006), co-author

Presentation:  Speech to the Harris County Bar *The Landscape of Criminal Justice:  Texas and Beyond*, May 21, 2004

© Copyright Osborn Maledon, P.A., All Rights Reserved



Justice Project Editorial, *Why Gideon Mattered to Hugo Black*, The Champion, January/February 2003 (reprinted in The Defender, April 2003)

Editorial, *Justice Project: 5 Year Report*, The Defender, January 2003

Editorial, *Restoring Confidence in the Criminal Justice System*, Judicature, 2002 (unsigned)

*Justice Project: Status Report and Update*, The Defender, July 2002

*Scrutiny a Must in Criminal Cases*, The Arizona Republic, January 2002 (Co-author)

*Capital Punishment in Arizona and The "New" Death Penalty Debate,* The Defender, June 2001 (Co-author)

*Popular Culture and The Death Penalty*, The Defender, July 2000 (Co-author)

*Aiding the Incarcerated*, Litigation Magazine, Winter 2000 (Co-author)

*Aryan Brother's legacy is safer prison system*, The Arizona Republic, February 6, 2000 (Co-author)

*The Justice Project: Y2 OK!*, The Defender, January 2000 (Co-author)

*Worldwide Concern: We Should Offer Global Support to Those Fighting for Human Rights Anywhere*, Arizona Journal, August 9, 1999 (Co-author)

Editorial on Felony Murder: *Bad Law Needs Reining in for Sake of Fairness*, Arizona Republic, May 14, 1999

*May God Have Mercy: A True Story of Crime and Punishment*, Judicature, November-December 1998

*U.S. Has Everything to Gain From an International Criminal Court*, Nov. 9, 1998 Arizona Journal (reprinted in the Colorado Journal, Nevada Journal, and Washington Journal)

*Prisons Lack Commitment to Safety*, Arizona Republic, April 12, 1998 (Co-author)

*Arizona's Crisis in Indigent Capital Representation*, Arizona Attorney, March 1998 (Co-author)

*Observations on the Mock Impeachment Trial of Abraham Lincoln*, 40 Ariz.L.Rev. 351 (1998)

Editorial on Capital Execution: *Jose Ceja Didn't Deserve to Die*, Arizona Republic, January 25, 1998

*New Rules, on Indigent Representations*, Arizona Attorney, February, 1997 (Co-author)

© Copyright Osborn Maledon. P.A., All Rights Reserved

**JA 129**

# EXHIBIT 5

# EXHIBIT 5

**JA 130**

## DECLARATION OF STEPHEN J. KALISTA

I, Stephen J. Kalista, declare under penalty of perjury the following:

1. I am an attorney and had licenses to practice in Virginia and Georgia. I am currently retired but practiced law from June, 1976 to December, 2007.

2. I, along with James Simmons, represented Carlos Caro in his capital murder case, No. 06-cr-00001-JPJ-1, in the United States District Court for the Western District of Virginia.

3. When I was appointed to represent Mr. Caro, I had represented four capital defendants who were prosecuted by the state of Virginia and one capital defendant who was prosecuted by the Federal Government.

4. I was appointed to represent Mr. Caro in January 2005, in the case involving the death of Roberto Sandoval. At that time, the Government had not yet indicted Mr. Caro nor had it received death certification from the Department of Justice (DOJ).

5. After Mr. Simmons and I were appointed, we sought and received funding so that investigation related to mitigation could begin.

6. Mr. Simmons and I did not present anything in writing to the DOJ but attended in person the meeting in June 2005.

7. In October 2005, we learned from the Government that the DOJ had authorized death.

8. In January 2006, Mr. Caro was indicted and charged with first-degree premeditated murder, as well as three statutory aggravating factors. At that time, a trial date was set for July 2006. I felt that was sufficient time to prepare for trial.

9. From the beginning, Mr. Simmons and I believed this would be a penalty-phase case and that our best result would be a life sentence. We did not divide the responsibilities in the case in a certain manner. We both worked on all aspects of the case.

JA 131

10. We also knew from the beginning that this case involved gang activity and that the Government would be presenting information regarding this. We were aware that the Government would argue that Mr. Caro posed a future threat at least in part because of his gang activity and would use his prior actions in prison against him.

11. We attempted to present an argument during the guilt/innocence phase that Mr. Caro did not act with premeditation but rather acted in the heat of passion. I do not recall considering a self-defense argument.

12. Hans Selvog, Ph.D., ended up working as the mitigation specialist on Mr. Caro's case. Mr. Simmons recommended that we use Dr. Selvog after Lee Norton indicated that she would not be able to work under the court's hold-back provision. While Mr. Simmons and I relied upon Dr. Selvog for recommendations related to mitigation experts, I believe that I initially located neuropsychologist Malcolm Spica, Ph.D., before Dr. Selvog was retained.

13. Dr. Spica conducted neuropsychological testing of Mr. Caro. Dr. Spica provided a report that indicated Mr. Caro had brain impairment and suggested that we consult with forensic psychiatrist Keith Caruso, M.D.

14. Dr. Selvog may have recommended that we consult with a neonatologist. I do not recall speaking with a neonatologist.

15. We hired Dr. Caruso, who evaluated Mr. Caro. When Dr. Caruso was retained, we had not determined whether testimony from a mental health expert would be introduced during the guilt/innocence or the penalty phase or both. Therefore, Dr. Caruso interviewed Mr. Caro about the crime, and he learned information that was not helpful to the defense. We did not ask to hire another psychiatrist to specifically testify at the penalty phase. We did not ask to hire a consulting expert.

16. After Dr. Caruso's examination of Mr. Caro, we provided notice that we would introduce a mental health defense during both the guilt/innocence phase and the penalty phase. Shortly thereafter, we withdrew our notice of

JA 132

the intent to introduce a mental health defense during the guilt/innocence phase.

17. We learned that the Government would be using Dr. Robert Phillips as its expert. We immediately sought information on Dr. Phillips, and found out that he had a good reputation and was known to present well on the stand.

18. At some point during trial, we decided that we were not going to present mental health testimony during the penalty phase. We did not review Dr. Phillips's report. We made this decision based on the reputation of Dr. Phillips, his anticipated testimony, and a feeling that we could not rebut that testimony.

19. We went to the penalty phase of Mr. Caro's trial without any expert mental health witnesses. I handled the opening statement for the penalty phase. I also handled the examination of several witnesses.

20. This was a difficult case. There was not much in Mr. Caro's personal life that we felt we could present to a jury to humanize Mr. Caro. He cheated on his wife; he was not a good father; he was a three-time loser as far as drugs; and he had difficulty while incarcerated. I think we did the best we could under the circumstances, although in the end, I don't think we were able to sufficiently humanize him.

21. I was aware that the Government was going to introduce testimony from Sean Bullock, who was housed across from Mr. Caro at the time Roberto Sandoval was killed. I received a copy of the grand jury transcript where Mr. Bullock testified. I reviewed the housing unit logs from USP Lee. I overlooked the fact that Mr. Bullock had a cellmate at the time of Mr. Sandoval's death. There was no strategic reason for not interviewing Mr. Bullock's cellmate.

22. I knew that Mr. Caro's other convictions and sentences would be used as both statutory and non-statutory aggravating circumstances. I did not pursue any collateral challenges to any of Mr. Caro's previous convictions and sentences. I had no strategic reason for failing to do so.

JA 133

23. I recall that Mr. Caro pled guilty to conspiracy to commit murder of inmate Benevidez as part of a plea agreement but that an equally culpable co-defendant received a much lesser sentence. I was also aware that the principal co-defendant involved in planning the attack on Mr. Benevidez, and all other co-defendants in that case, pled guilty and received substantially lower sentences.

24. Prior to signing this declaration, I spoke with Mr. Caro's current counsel and reviewed various portions of his case file they provided to me. This declaration is not meant to be a complete description of every aspect of my representation of Mr. Caro.

I declare under penalty of perjury that the foregoing is true and correct.

Stephen J. Kalista

12/29/2012
Date

Page 4 of 4

**JA 134**

# EXHIBIT 8

# EXHIBIT 8

## Declaration of Donna Marie Schwartz-Watts, M.D.

I, Donna Marie Schwartz-Watts, M.D., declare under penalty of perjury:

### Professional Background

1.    I am a physician licensed to practice medicine.

2.    I completed medical school in 1989, and graduated from the University of South Carolina School of Medicine.

3.    I am Board Certified in General Psychiatry and have Added Qualifications in Forensic Psychiatry. My curriculum vitae is attached to my declaration as Exhibit A.

4.    From June 1997 until June 2010, I was an Associate Professor and then Professor of Clinical Psychiatry and the Director of Forensic Services in the Department of Neuropsychiatry at the University of South Carolina School of Medicine. During my tenure at the University, I taught residents as well as treated patients. I conducted research and presented and published papers.

5.    I am presently employed at Bryan Psychiatric Hospital as a Senior Psychiatrist. I treat people with post-traumatic stress disorder (PTSD) on a frequent basis. The treatment team I work with routinely screen all patients we treat for PTSD with a questionnaire. Many of our patients would not be diagnosed were it not for this specified form of screening. I remain a Department of Mental health Professor of Psychiatry at the University of South Carolina School of Medicine and a Clinical professor of Forensic Psychiatry at the Medical University of South Carolina. I continue to train medical students and residents in Forensic Psychiatry.

6.    I also conduct psychiatric evaluations at the request of clients, attorneys, and courts in both criminal and civil cases. Throughout my career, I have conducted thousands of forensic evaluations. From November 1998 until June 2009, I served as a court-appointed psychiatrist (through a contract with the Department of Mental Health) under the South Carolina Sexually Violent Predator Statute. I

Page 1 of 10

JA 136

have been qualified as an expert in both state and federal court approximately 750 times.

**Involvement in Carlos David Caro's Case**

7.  I was contacted by Assistant Federal Public Defender Robin Konrad and retained in *United States v. Caro*, 06-cr-00001. I was retained to review the prior evaluations conducted in preparation for Mr. Caro's trial, and to review information regarding Mr. Caro's background that was collected and prepared by defense counsel in preparation for trial as well as information presented during his trial. Upon Ms. Konrad's request, I evaluated her client Carlos David Caro, reviewed documents that I have been provided, and am now offering my opinion.

8.  I evaluated Mr. Caro on January 3, 2013. I met with Mr. Caro for approximately two hours at USP-Terre Haute, where most federal death row inmates are housed. This was a contact interview conducted at a table separating the two of us in a legal visitation room. Mr. Caro was restrained in handcuffs, a waist chain, and ankle restraints, consistent with the policies of the United States Bureau of Prisons. My initial evaluation consisted of an interview and mental status examination.

9.  In addition to my evaluation of Mr. Caro, I have reviewed records related to Mr. Caro including, but not limited to:
    *   Neuropsychological Consultation, by D. Malcolm Spica, Ph.D., 06/19/2006 and 06/16/2006;
    *   DVD of evaluation of Mr. Caro on 11/30/2006, by Dr. Robert Phillips, M.D., Ph.D., D.F.A.P.A.;
    *   Report of Forensic Evaluation, by Robert Phillips, M.D., Ph.D., D.F.A.P.A., and Paul Montalbano, Ph.D., 01/29/2007;
    *   Letter from Dr. Phillips to Honorable James Jones, 11/29/2006;
    *   Declaration of Hans Selvog, Ph.D., L.C.S.W., 12/11/2006;
    *   Testimony of Susannah Rodriguez, 02/07/2007 Trial Transcript pp. 69-115;
    *   Testimony of Yomedia Martinez, Delia Contreras and Diamantina Razo, 02/07/2007 Trial Transcript pp. 123-171;

JA 137

- Testimony of Laura Perez and Lou Yveth Caro, 02/08/2007 Trial Transcript pp. 2-63;
- Defense Trial Exhibit No. 8, Carlos Caro School Records;
- Defense Trial Exhibit No. 9, Letter from Brooks County ISD Director of Special Education to Dr. Hans Selvog;
- Time-line Narrative Chronological Critical Incidents and Developmental History of Carlos Caro.

10. I have not reviewed all of the documents that Dr. Phillips indicated in his report he reviewed. It is my understanding from counsel that Dr. Phillips has destroyed those records.

11. After conducting an evaluation and reviewing the records listed above, I offer the following information and opinions. I reserve the right to supplement this declaration and my opinions expressed here should I receive additional information.

**Background Information and Summary of Diagnoses**

12. After my initial evaluation of Mr. Caro and my review of his records, it is my professional opinion that Mr. Caro meets the criteria for the following disorders based on the Diagnostic and Statistic Manual of Mental Disorders (DSM-IV-TR).

| | |
|---|---|
| Axis I) | Anxiety Disorder NOS (PTSD), 300.00 |
| | Cognitive Disorder NOS, 294.9 |
| | Adult Antisocial Behavior, V71.01 |
| Axis II) | No diagnosis |
| Axis III) | No diagnosis |
| Axis IV) | Incarceration |
| Axis V) | 55 |

13. I also informed Ms. Konrad that it is my opinion that Mr. Caro should be given a more complete neuropsychological evaluation, a Positron Emission Tomography (PET), and a repeated Electrocephalography (EEG), to determine his present cognitive functioning. He has long term and short term memory deficits. He performed poorly on tasks of verbal fluency and visuospatial design. He had a history of impairments and a prior abnormal EEG, which may have been of poor quality according to Dr. Phillips report. His family reports he had a history of staring off into space when he was younger. Mr. Caro could

Page 3 of 10

JA 138

benefit from neuroimaging. Neuroimaging (PET) delineates brain function, whereas the MRI that Mr. Caro had delineates brain structure. Since he does give up on tasks due to frustration, the neuroimaging will complement his neuropsychological testing. Having a normal MRI means that Mr. Caro's brain structure is intact, but it is not a study of brain function.

14. During my mental status examination of Mr. Caro, he was reserved and only answered questions asked of him. He rarely offered spontaneous speech. He did not appear anxious, although when he became frustrated at a task, he would smile inappropriately. His affect was generally constricted, although he smiled appropriately a few times and on one occasion appeared sad when discussing the death of his mother. He also smiled inappropriately when performing cognitive tasks that were difficult. Mr. Caro was not psychotic, suicidal, or homicidal, although he has a foreshortened sense of the future. He was able to maintain eye contact.

15. On the cognitive screening testing I conducted, Mr. Caro was alert and oriented to all but the date, which he missed by one day. He had difficulty performing a task of abstraction. He could not explain how a car and train were alike. Only when prompted, Mr. Caro was able to respond, "they move." He was unable to abstract the similarity between a fly and a tree. Mr. Caro registered three items but was only able to recall two after five and ten minutes. He was not able to recall the third object with a clue and forced choice. He was unable to name three wishes when asked. He did answer "freedom."

16. On further cognitive testing, Mr. Caro performed poorly on a test of verbal fluency. He was asked to provide as many words as possible beginning with the letter "D." Mr. Caro was only able to provide four words before becoming anxious and repeatedly saying, "I don't know," not realizing that "don't" begins with a "D." He gave up on this one-minute task after 40 seconds. Mr. Caro also had difficulty reproducing a visual spatial design. Although, Mr. Caro was handcuffed he did not appear mechanically limited when completing the task. When reproducing two intersecting pentagons, he did not complete angles, and he overshot angles.

Page 4 of 10

**JA 139**

17. Mr. Caro's performance on cognitive testing is indicative of dysfunction based on his age, lack of head injury, and his reported abstinence from alcohol since his confinement. His performance is consistent with the more sensitive testing performed by Dr. Spica. There was no evidence that he was intentionally trying to perform poorly. He would give up on more difficult tasks after an initial good effort.

18. In his mental status examination, Dr. Phillips does not report doing verbal fluency cognitive screening tests. Dr. Phillips did not note short term memory impairment. The cognitive screening testing, however, is only screening; it is not intended to be used for the purpose of determining the extent of cognitive deficits.

19. Mr. Caro's history is significant in regards to the trauma he experienced and was exposed to during his developmental and formative years. Furthermore, the developmental delays which were reported by various family members prior to and during his trial are multifactorial. Developmental delays can be seen in children with cognitive impairments and in children who are exposed to trauma.

20. The reports prepared by prior evaluators that I have reviewed fail to discuss a complete trauma history for Mr. Caro. Some evaluators noted his exposure to abuse but did not record or review any symptoms of post-traumatic stress disorder or other anxiety disorders. If they had taken a complete trauma history, they would have identified several symptoms of PTSD that were reported and/or exhibited. For instance, Mr. Caro has difficulty recalling specific details of traumas he witnessed; he has a poor memory of his childhood. Mr. Caro avoids discussing witnessing his mother's physical abuse and avoids describing his own abuse at the hands of his brother. He denies having a startle response but admits being hyper alert when he is in the general prison population, which he refers to as the compound. Mr. Caro has noted a decrease in his alertness since he takes recreation alone due to his status.

21. Mr. Caro was born in Falfurrias, TX on February 9, 1967, to Jose Maria Caro Jr. and Virginia Rodriguez Caro. Mr. Caro was the second born of four children. All four children born to Jose Jr. and Virginia were boys. According to several family members, Mr. Caro

Page 5 of 10

JA 140

was a sickly infant who vomited frequently. He was unable to hold down milk or formula. After some time, the family realized that Mr. Caro was able to keep goats milk down. In addition to Mr. Caro being a sickly infant his mother was suffering from postpartum depression after giving birth to him. Mr. Caro did not walk until he was almost two years old. Family members reported that Mr. Caro stayed to himself and that he was known as "El Mudo," which means The Mute.

22. Mr. Caro's father was an abusive alcoholic with a criminal history who eventually died in 1987 from cirrhosis of the liver. Prior to his father's death, Mr. Caro endured a childhood filled with witnessing his father beat his mother. It was not uncommon for Mr. Caro's father to come home drunk to their small, one bedroom home and beat his mother severely. His father would beat his mother on a daily basis because he was drunk on a daily basis. Mr. Caro's siblings recall their father beating their mother and giving her black eyes.

23. It did not take long for Mr. Caro's older brother, Jose III, to learn from their father's physical abuse. Mr. Caro would often be punched or hit by his older brother Jose III. Mr. Caro never knew why his brother would beat him, but he recalls it happening frequently. He reports that he does not recall fighting back. As a child, not knowing when or why the beatings would come caused Mr. Caro great anxiety.

24. Not only was Mr. Caro's father physically abusive towards Mr. Caro's mother, but he had an extramarital affair. The affair ended with Mr. Caro's father being shot in the chest by his mistress, which almost caused his death. Mr. Caro's older brother, Jose III, witnessed their father being shot. Upon being asked, Mr. Caro said when he was a child he knew of his father's unfaithful behavior, as did his mother.

25. When Mr. Caro's mother was angry at his father she would abandon her children in order to go out to dance. According to family members, Mr. Caro's mother neglected her children because she did not provide the attention her boys needed. Mr. Caro's mother was not the type of mother who would help him get ready for school, make sure he got to school, or help with his homework. When Mr. Caro was little he would get dressed the best way he could and walk to a family member's house to get something to eat before school. Mr.

Page 6 of 10

**JA 141**

Caro's aunt reported that, at nine-years-old, Mr. Caro could not tie his shoes or tell time.

26. Mr. Caro struggled in school. Mr. Caro was given the Otis-Lennon Mental Abilities Test which yielded an IQ of 87 in the second grade, an 84 in fourth grade, and an 83 in 8th grade. According to his school records, when he was given the California Achievement Test in the sixth grade, he was functioning at a third grade level when it came to his vocabulary and comprehension. By sixth grade, Mr. Caro was placed in special education classes. He dropped out of high school before completing the tenth grade.

27. Mr. Caro was 17-years-old at the time of his father's death, but when asked, he was unable to recall his age. According to reports from his aunt, Mr. Caro was in the hospital room at the time of his father's death. Mr. Caro has no specific memory of his father taking his last dying breath.

28. Mr. Caro's mother passed away while he was incarcerated and he was unable to attend her funeral. He admitted to having one period of depression after the death of his mother. He stated he was "messed up" for a couple of months afterwards.

29. I reviewed the trial testimony describing Mr. Caro's childhood family home as reported by Mr. Caro's three aunts and one cousin. I also reviewed the Time-line Narrative of Chronological Critical Incidents and Developmental History of Carlos Caro, which I have been told was prepared by the mitigation specialist before Mr. Caro's trial. While Mr. Caro's extended family members reported some of the traumatic events that occurred in Mr. Caro's family, witnesses such as Mr. Caro's brothers would have been able to describe the violence they each endured and/or witnessed in their childhood family home. They have been described as more verbal and social than Mr. Caro.

## Discussion of Diagnoses

30. I have diagnosed Mr. Caro with Anxiety Disorder NOS (not otherwise specified), and determined that he meets some of the criteria for PTSD. As previously mentioned, Mr. Caro's family told prior counsel information which was consistent with symptoms of PTSD

JA 142

such as his cousin describing Mr. Caro as being a reserved and quiet child who didn't volunteer information which is consistent with being avoidant; his maternal uncle Daniel noting that Mr. Caro stayed to himself and avoided groups; paternal aunts Delia and Veronica noting that Mr. Caro never talked to anyone. In addition, Mr. Caro's brother Noe stated that Mr. Caro liked to stay alone and be by himself.

31. Individuals who suffer from PTSD often have constricted affect. This means that they do not outwardly express emotions with a full range. In other words, their outward expression of emotions does not reflect their inner feelings. For example, when discussing the death of his mother, Mr. Caro remained reserved and reported feeling sad, but his outward expression of emotion did not reflect the sadness he reported.

32. In Dr. Phillip's report Caro, he mentioned that Mr. Caro saw his father beat his mother up during his childhood, but Dr. Phillips never addressed the trauma and the effect it had on Mr. Caro. Dr. Phillips noted Mr. Caro's potential for violence should decrease based on actuarial scales but that Mr. Caro felt disrespected and retaliated against. One of the major symptoms of PTSD is that the individual often re-experiences the traumatic events. While Mr. Caro denies that he has recurrent intrusive thoughts about childhood events, he does avoid thinking about traumatic events. In a letter Mr. Caro wrote to his wife, he prayed that other inmates would "stay the fuck away from him," which is indicative of the avoidance symptom of PTSD.

33. I have also diagnosed Mr. Caro with Cognitive Disorder NOS. He has problems with verbal fluency, short term memory, long term memory and reproducing a visuospatial design.

34. Dr. Spica conducted a neuropsychological evaluation of Mr. Caro prior to his trial and reported frontal lobe dysfunction. Dr. Spica tested Mr. Caro in the 1st percentile on management of information, maintaining cognitive set and concept formation. Mr. Caro scored in the 1st percentile on the Wisconsin Card Sorting – Categories Achieved. He scored in the 7th percent in Booklet Category Test. Dr. Spica ultimately diagnosed him with Cognitive Disorder, Not Otherwise Specified. On his present mental status examination, Mr. Caro continues to demonstrate difficulties with frontal lobe functioning. Neuropsychological testing is a more sensitive method to

JA 143

delineate brain functioning compared to mental status examination and neurological evaluation.

35.   On the Validity Indicator Profile (VIP) Dr. Spica found that Mr. Caro did not sustain consistent effort as the items got harder. He did poorly on Trails B which is another indicator of cognitive impairment.

36.   I have also diagnosed Mr. Caro with Adult Antisocial Behavior. In reaching this diagnosis, it should be noted that he only meets the criteria for adult antisocial behavior because his current conviction consists of an act that imposed physical or psychological harm on another person. Mr. Caro does not have a life-long history or childhood history of engaging in such aggressive behavior. This diagnosis is different from a diagnosis of Antisocial Personality Disorder. Adult Antisocial Behavior is another condition that is the focus of clinical attention but is not indicative of mental illness. To be clear, this diagnosis is not a personality disorder, and was incorrectly coded on Axis II by Dr. Phillips.

37.   Because Mr. Caro's mother is deceased, I did not have the opportunity to question her directly regarding her ability to parent her sons while dealing with a physically abusive alcoholic spouse. As discussed in paragraph 25 above, there are indications that Mr. Caro's mother was neglectful of her duties as a parent due, in part, to the abusive relationship she had with her husband. There is evidence that Mr. Caro failed to take initiative and respond to social interactions in an appropriate developmental way. He had symptoms of "frozen watchfulness," which is a lack of attachment that can be associated with pathological care. (DSM-TR p. 127). In other words, this behavior could be a direct result of his mother's neglect. His deficits may have also been indicative of a pervasive developmental disorder; however this is less likely since the symptoms of muteness and staring off into space have not persisted into adulthood.

38.   As Dr. Phillips noted in his report, Mr. Caro has had no criminal history prior to the age of 20 years old despite his siblings and other family members having strong histories of criminal activity.

39.   Mr. Caro also has a strong family history for substance abuse. Mr. Caro as well was a former substance abuser. I agree with Dr.

JA 144

Phillips's diagnosis of Polysubstance Dependence By History. Mr. Caro presently denies using any substances since his confinement at Terre Haute.

40.   In general, Mr. Caro is a reserved individual who tends to avoid conflicts and unnecessary interactions with others, although he is able to adapt. He was reared in an environment where domestic violence was common, and he was a victim of domestic violence. There is no evidence that Mr. Caro has been a follower or a leader. He describes himself as a loner and demonstrates avoidant characteristics. Being avoidant is one of the symptoms of PTSD. Mr. Caro was raised in poverty and became involved in transporting drugs as a means of financial security. He also had a comorbid substance abuse, which is often associated with exposure to trauma.

41.   As a result of Mr. Caro's brain impairment and anxiety disorder likely arising from his traumatic history, he tends to become more increasingly anxious and unable to use all of the cognitive strategies available to him. His baseline cognitive impairments are further exacerbated by his anxiety disorder. What this means is that when Mr. Caro becomes anxious, he is more likely to exercise poor judgment.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 7ᵗʰ day of January 2013, in the State of South Carolina.

Donna Marie Schwartz-Watts, M.D.

Page 10 of 10

JA 145

## Curriculum Vitae
### *DONNA MARIE SCHWARTZ-WATTS, M.D.*
donnawattsmd@gmail.com

**PRESENT POSITIONS:**

**Senior Psychiatrist (certified)**
Bryan Psychiatric Hospital

**DMH Clinical Professor of Psychiatry**
University of South Carolina School of Medicine
Department of Neuropsychiatry and Behavioral Science

**Clinical Professor, Forensic Psychiatry Program**
Medical University of South Carolina
Department of Psychiatry and Behavioral Sciences

**PROFESSIONAL LICENSURE:**

Diplomate, Psychiatry, (Board Certification #40726), January 1995,
recertified 7/05
Added Qualifications in Forensic Psychiatry, July 1996 #471, recertified 7/06
South Carolina Medical License # 16574

**EDUCATION:**

1981 - 1985      B.A. Psychology
Furman University
Greenville, South Carolina

1985 - 1989      Doctor of Medicine
University of South Carolina School of Medicine
Columbia, South Carolina

**JA 146**

Donna Schwartz-Watts, MD
Curriculum Vitae

9/1995-5/1997          Forensic Residency Training Director
                      University of South Carolina School of Medicine

7 /1996 – 6/1997       Psychiatrist C   William S. Hall Psychiatric Institute
                      Residential Treatment Director of NGRI Unit

1/1995 – 6/1996        Teaching Psychiatrist II   William S. Hall Psychiatric Institute
                      Out-patient Forensic Psychiatrist

1/1995 – 12/1997       Assistant Professor University of South Carolina School of Medicine
                      Department of Neuropsychiatry

7/1994 –6/1995         Instructor University of South Carolina School of Medicine
                      Department of Neuropsychiatry

7/1994 – 12/1994       Teaching Psychiatrist I   William S. Hall Psychiatric Institute
                      In-patient and Out-patient Forensic Psychiatrist

## MEDICAL STAFF APPOINTMENTS:

Bryan Psychiatric Hospital (current)
South Carolina Department of Corrections (courtesy)
South Carolina Department of Juvenile Justice (inactive 7/2010)
William S. Hall Psychiatric Institute
Palmetto Health Richland Memorial Hospital (courtesy)
Palmetto Health Baptist Medical Center (courtesy)
Providence Hospital (pending)

## UNIVERSITY/ MEDICAL STAFF COMMITTEES:

2007-2010          Member, Appointments and Promotions Committee
2002- 2009         Member, Alumni Committee, USC School of Medicine
1996- 2010         Member, Residency Selection Committee
1995- 2010         Member, Residency Training Committee
2002- 2003         Member, Search Committee, Chairman of Neuropsychiatry
2000-2001          Member, Committee on Women USC
1997               Member, Traditions Committee USCSM
1997               Member, Search Committee, Director Rehabilitation Counseling
1997               Physician Advisor, Environment of Care
1996               Member, Search Committee Chair of Department of Neuropsychiatry and
                   Director of Hall Institute
1996               Member, Finance Committee, University Specialty Clinics
1994-1996          Member, Infection Control Committee
1993-1994          Member, Research Committee

3

JA 147

Donna Schwartz-Watts, MD
Curriculum Vitae

Schwartz-Watts DM, Frierson RL: "20: Crisis Stabilization in Correctional Settings." in <u>Clinical Practice in Correctional Medicine</u> , Second Edition, edited by Michael Puisis, D.O., S.C. Mosby, Inc affiliate of Elsevier, Inc   2005.

Schwartz-Watts DM. "Asperger's Disorder and Murder." Analysis & Commentary <u>The Journal of the American Academy of Psychiatry and the Law</u> 33:390-3, 2005.

Schwartz-Watts DM, Rowell CN. "Commentary: Update on Assessing Risk for Violence Among Stalkers." <u>The Journal of the American Academy of Psychiatry and the Law</u> 31:440-3, 2003.

Giorgi-Guarnieri D, Zonana HV, Schwartz-Watts DM. "Practice Guideline: Forensic Psychiatric Evaluation of Defendants Raising the Insanity Defense." Supplement to <u>The Journal of the American Academy of Psychiatry and the Law</u>  30:2, 2002.

Frierson R, Schwartz-Watts D, Malone T, Morgan D. "Capital Versus Noncapital Murderers" in revision <u>The Journal of the American Academy of Psychiatry and the Law,</u> 1998.

Schwartz-Watts D, Morgan D.  "Violent Versus Nonviolent Stalkers," accepted, <u>The Journal of the American Academy of Psychiatry and the Law,</u> 1998.

Schwartz-Watts D, Morgan D, Barnes C.  "Stalkers:  The South Carolina Experience," <u>The Journal of the American Academy of Psychiatry and the Law,</u>1997, 24:541-545.

Schwartz-Watts D, Montgomery L, Morgan D.  "Seroprevalence of Human Immunodeficiency Virus Among Pre-Trial Detainees," <u>The Bulletin of the American Academy of Psychiatry and the Law,</u> 1995, 23:285-289.

## POSTERS:

Internet Chat Rooms: Who Solicits Children? R. Gregg Dwyer, MD, EdD, Donna Schwartz-Watts MD , William Burke, PhD, American Academy of Psychiatry and the Law 39th Annual Meeting, Seattle, WA October , 2008

## PRESENTATIONS:

"Predators Among Us" University of South Carolina 2012 Mini Med School, October 2, 2012, Columbia, South Carolina

"How Death is Different-Using ABA Guidelines to Meet the Standard of Care in Death Penalty Cases and Social History Investigations: The team Approach" with Joe VonKallist, Capital Case Workshop, September 19, 2012, Wilmington, North Carolina

5

**JA 148**

Donna Schwartz-Watts, MD
Curriculum Vitae

University of South Carolina School of Medicine Founder's Day Speaker for Woman in Medicine, Columbia, South Carolina, April 2007.

"Autistic Spectrum Disorders and Mitigation," Washington DC March 2007

"Sex Crimes and their Aftermath II" Panel Discussion and Presentation, Jack Swerling Moderator, South Carolina Bar Association Conference, Charleston, SC, January 25, 2007

"Psychiatry for the Brilliant Fact Finders" Invited Speaker, South Carolina Judges Conference, Greenville, SC,  May 12, 2006.

"Sex Crimes and their Aftermath" Panel Discussion and Presentation, Jack Swerling Moderator, South Carolina Bar Association Conference, Charleston, SC January 27, 2006.

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice National Institute of Trial Advocacy,  Atlanta Georgia , June 4-5, 2005

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice National Institute of Trial Advocacy,  Atlanta Georgia , June 5-6, 2004

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice National Institute of Trial Advocacy,  New York, New York, June 20-21,2003

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice, New York, New York. June 20-22,2002.

South Carolina Probation, Paroles and Pardons Annual Conference.  "A State of Mind". Myrtle Beach, SC. November 11, 2002.

American Academy of Psychiatry and the Law, "Difficult Case? Consult your Colleagues." Newport Beach, California. October 26, 2002

South Carolina Public Defender's Conference, "Issues and Concerns Regarding the Sexually Violent Predator Statue" Litchfield Beach, South Carolina, September 30, 2002

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice, New York, New York, June 28-30-2002.

American Academy of Psychiatry and the Law, "Death Penalty"  Boston, MA, October 28, 2001

American Academy of Psychiatry and the Law, "Ask the Expert" and "The Difficult Case" Panel Discussions.  Boston, MA, October 28, 2001

7

**JA 149**

Donna Schwartz-Watts, MD
Curriculum Vitae

William S. Hall Psychiatric Institute Forensic Forum, 1996 "Evaluation and Treatment of Sexual Offenders."

Georgia Regional Forensic Forum, 1996 "Evaluation and Treatment of Sexual Offenders."

American Academy of Psychiatry and the Law, Seattle, Washington, 1995 "Stalkers: The South Carolina Experience"

South Carolina Psychiatric Association, Hilton Head Symposium, 1995 "What General Psychiatrists Need to Know About Forensic Psychiatry."

American Academy of Psychiatry and the Law Annual Conference, San Antonio, Texas  1993 "Seroprevalence of HIV Among Inpatient Pre-trial Detainees"

American Medical Association, North Carolina  1990 "Tertiary Metastases Presenting As Panhypopituitarism"

## PRESENT RESEARCH:

Schwartz-Watts D. "Death Penalty"

Schwartz-Watts D, Barth E, Morgan D. "Harassing Telephone Callers"

Schwartz-Watts D, Morgan D. "Psychotic Versus Nonpsychotic Stalkers"

Schwartz-Watts D, Morgan D. "Comparing Stalkers to the Criminally Domestic Violent."

Schwartz-Watts D, Bloom J, Sloan C. "Psychiatric and Legal Perspectives of Stalking."

## PRESENT GRANTS:

Internet Crimes Against Children: Development of a Typology of Offenders for Use in Prevention, Investigations and Treatment; U.S. Department of Justice Office of Justice Programs Grant; 2010-MC-CX-003; Principle Investigator: RG Dwyer; Co-Principal Investigator: D DeHart; Co-Investigators/Consultants: R Moran, DM Schwartz-Watts, W Burke, DL Laufersweiler-Dwyer; 2010 - 2013

Internet Chat Room Solicitation of Children: A Study of Psychosocial and Criminal Justice Factors as They Relate to Public Safety Risk; American Academy of Psychiatry and the Law Institute for Education and Research (AIER) Grant; Principal Investigator: RG Dwyer; Co-investigators: D DeHart, DM Schwartz-Watts, W Burke & R Moran; 2009 - 2010

Co-author w Alicia Hall, PhD, Harry Wright, MD Autistic Spectrum Disorders and Corrections
(Revised 1/6/13)

9

**JA 150**

# Exhibit 10

# Exhibit 10

JA 151

D. MALCOLM SPICA, PH. D.
Licensed Clinical Psychologist
Neuropsychologist

## NEUROPSYCHOLOGICAL CONSULTATION

| | |
|---|---|
| Examinee: | **Carlos David CARO** |
| Laboratory Number: | 264841 |
| Age: | 39 |
| Date of Birth: | 2/9/1967 |
| Handedness: | Right |
| Education: | 9° |
| Date of Examination: | 6/9/06; 6/16/06 |
| Examiner: | D. Malcolm Spica, Ph.D. |

REFERRAL QUESTION:

Mr. Carlos David Caro is a 39-year-old, right-handed male referred for neuropsychological examination by attorneys Stephen Kalista and Jim Simmons. Attorneys Kalista and Simmons asked that I assess Mr. Caro's neurobehavioral status. This assessment is intended to serve as a contributing component to the broader evaluation of Mr. Caro's psychiatric, developmental, and adaptive functioning being conducted by Mr. Caro's defense team.

Mr. Caro is completing the evaluation at the request of his attorneys. No doctor/patient relationship was established, nor were there any expectations or guarantees of future contact or relationship. The limits of confidentiality were explained to Mr. Caro, and he stated that he understood those limits and consented to complete the testing. All testing and interviewing was conducted with the examinee at the United States Penitentiary - Lee in Jonesville, Virginia.

HISTORICAL INFORMATION:

In preparation for the evaluation, I reviewed Mr. Caro's medical record provided by attorney Kalista's office. Mr. Caro's history is summarized by other examiners, and will not be repeated here. On the days of the examination, Mr. Caro reported that he was in good health, adequately rested, and adequately fed. He stated that he is taking no medications.

He stated that he is not experiencing insomnia. Mr. Caro's appetite is reportedly normal. When asked about his mood, he stated, "It's good." He stated that he has not suffered any significant head injuries of which he was aware. He reported no history of serious illness, losses of consciousness, prolonged high fevers, seizures, or sensory disturbances. He reported that his family history is significant for diabetes in his mother, brother, and maternal uncle. Mr. Caro reported that he was a "sickly" child, but had trouble elaborating other than he was told that he was 'slow' to develop. He also reported that he "might have" had difficulty with developmental milestones; when asked at what age he learned to walk and talk, he stated, "I think it was a little later." When asked at what age he learned to tie his shoes, he stated, "That was later."

Mr. Caro stated that he spoke both English and Spanish in his home of origin. He was educated in English. He stated that he had no learning problems during his development; however, the record reflects that Mr. Caro demonstrated significant problems in spelling and writing since the first grade. Likewise,

220 Fort Sanders West Boulevard, MOB 2          Suite 300, Knoxville, Tennessee 37922
Tel. 865.531.9088          Fax: 865.531.9089

**JA 152**

RE: Carlos David CARO, page 2

his performances in courses such as geography were problematic since the fourth grade. Conversely, he obtained mainly A and B grades in arithmetic. During the fourth grade, an Otis-Lennon Mental Abilities test yielded an intelligence quotient of 84 (14th percentile). A Gates-MacGinitie reading test administered during the fourth grade yielded a 2.3 grade equivalent comprehension score. Achievement testing (California Achievement Test) during the sixth grade yielded scores at the 3rd grade equivalent for vocabulary and comprehension. Language mechanics and expression scales yielded grade equivalent scores of 2.6 and 2.7, respectively. Mathematics continued to be his strength. Achievement testing during the seventh grade yielded a mathematics grade equivalent score of 6.0. Overall, Mr. Caro's academic record reflects long-standing difficulties in linguistic abilities, while his arithmetic skill is within normal limits. Mr. Caro reported to me that he dropped out of school after the ninth grade. When asked why he dropped out, he stated, "I don't know."

Mr. Caro's occupational history reportedly includes, "I worked a little here and there." He stated that he delivered appliances for approximately one year, and that his favorite job was working in an automotive paint and body shop, where he was employed "a couple of months, on and off." Please refer to the examinee's extensive documentation for a more complete account of his history.

BEHAVIORAL OBSERVATIONS:

Mr. Caro presented as an adequately-groomed man in his United States Penitentiary - Lee uniform, and he appeared his age. Hygiene appeared adequate. Mood appeared generally euthymic with a broad range of appropriate affect. Spontaneous speech was normal in tone and prosody (with relatively low volume), and receptive language abilities appeared intact. The examinee's eye contact was initially minimal, although he appeared to engage more with the examiner as the testing sessions continued. Mr. Caro rarely spoke, aside from answering direct questions. Mr. Caro's interpersonal behavior --with shy and polite manner-- was highly consistent between both testing sessions.

Mr. Caro appeared to engage easily with me, and displayed a cooperative and considerate attitude (e.g., returned tests stimuli to my side of the table to assist me, listened to all instructions before beginning tasks, etc.). He did not decline to answer any questions and he worked without complaint during the testing sessions. He appeared to give his best effort on all tasks. The findings are considered a valid measure of his current cognitive/adaptive abilities.

EXAMINATION FINDINGS:

The face-to-face testing was conducted during one 4-hour session (6/9/06) and one 3.5-hour session (6/16/06). During the course of the examination, the following tests and procedures were administered:

21-Item Word Memory Test
Beck Anxiety Inventory
Beck Depression Inventory-II
Benton Facial Recognition Test
Boston Diagnostic Aphasia Examination: Commands; Complex Ideational Material
California Verbal Learning Test - II
Category Fluency Test
Controlled Oral Word Association Test
Finger Tapping Test
Grooved Pegboard Test
Halstead-Reitan Booklet Category Test
Judgment of Line Orientation Test
Nelson-Denny Reading Test
Repeatable Battery for the Assessment of Neuropsychological Status
Rey-Osterrieth Complex Figure Test
Ruff Figural Fluency Test

JA 153

RE: Carlos David CARO, page 3

Symptom Checklist-90-Revised
Test of Memory Malingering
Trailmaking Test A & B
Wechsler Adult Intelligence Scale-III
Wechsler Test of Adult Reading
Wide Range Achievement Test-3
Wisconsin Card Sorting Test
Woodcock-Johnson Psychoeducational Battery: Analysis-Synthesis, Concept Formation

Validity/Motivation:  Considering the Mr. Caro's bilingual background, his comprehension of English was assessed.  His vocabulary score on the Nelson-Denny Reading Test ranked in the upper half of the Average range (64th percentile).  Mr. Caro's vocabulary score on the WAIS-III was also Average (25th percentile).  He provided perfect performances on comprehension subtests of the Boston Diagnostic Aphasia Examination: Commands = 15/15; Complex Ideational Material = 12/12.  These scores suggest that language barriers did not hinder Mr. Caro's performances on the current examination.

Mr. Caro was administered both verbal and visual tests of validity/effort (one on each day of the testing sessions).  He did not appear to withhold effort during his evaluation.  Further, his performance of 14/21 on the 21-Item Word Test - Forced Recall ranked well within normal limits.  Likewise, Mr. Caro provided a perfect performance on the Test of Memory Malingering:

Trial 1     = 50/50
Trial 2     = 50/50
Retention = 50/50

Both symptom validity measures suggested Mr. Caro did not engage in impression management, symptom exaggeration, or other dissimulation efforts.

General Cognitive Functioning:  Mr. Caro was administered the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) as a general measure of cognitive functioning.  His Total Index of 75 ranked in the Borderline-Impaired range for overall neurocognitive function.  This score places him below 95% of the general population for overall cognitive/adaptive functioning.

| Index | Standard Score | Percentile |
|---|---|---|
| Immediate Memory | 83 | 13th |
| Visuospatial/Constructional | 72 | 3rd |
| Language | 87 | 19th |
| Attention | 75 | 5th |
| Delayed Memory | 83 | 13th |
| Total | 75 | 5th |

This Total Index score compares unfavorably to statistical premorbid estimates that place Mr. Caro in the Average range: for example, his performance on the Wechsler Test of Adult Reading provided Predicted Full Scale IQ = 90 (25th percentile).  Similarly, Mr. Caro's Barona Formula Premorbid IQ Estimate ranked in the Low Average range: Premorbid Full Scale IQ = 83 (13th percentile).  However, considering the examinee's complex history of maladaptive behavior, it appears probable that these performances reflect long-standing deficits (rather than implicating a dementing process).

Intellectual Functioning:  To further assess cognitive functioning, Mr. Caro was administered the Wechsler Adult Intelligence Scale-III (WAIS-III).  Mr. Caro performed at the lower extreme of the Average range for overall intellectual functioning (Full Scale IQ = 91) with particular weaknesses in verbal processing (Verbal IQ = 87) ranking below 81% of the general population.

JA 154

RE: Carlos David CARO, page 4

Full Scale IQ = 91          Verbal IQ = 87          Performance IQ = 98

| Subtest | Age Scale | Percentile | Subtest | Age Scale | Percentile |
|---|---|---|---|---|---|
| Information | 8 | 25th | Picture Completion | 11 | 63rd |
| Digit Span | 8 | 25th | Picture Arrangement | 7 | 16th |
| Vocabulary | 8 | 25th | Block Design | 11 | 63rd |
| Arithmetic | 8 | 25th | Digit Symbol | 11 | 63rd |
| Comprehension | 8 | 25th | Matrix Reasoning | 9 | 37th |
| Similarities | 7 | 16th | Symbol Search | 10 | 50th |
| Letter-Number Sequencing | 5 | 5th | | | |

Academic Skills:  The examinee demonstrated spelling abilities at the 5th grade level on the Wide Range Achievement Test-3 (3rd percentile).  Word recognition skills appeared in the Low Average range (21st percentile; high school level), and written arithmetic ranked at the 6th grade level (7th percentile; Borderline-Impaired).

Testing of reading proficiency revealed that the examinee is average for reading speed: Nelson Denny Reading Test - Rate, 39th percentile.  Mr. Caro comprehended the material to a 5th grade level (10th percentile).

Attention and Executive Functioning:  The examinee appeared alert throughout both testing sessions.  He performed in the Low Average range on the Attention Index of the Wechsler Memory Scale-Revised; Standard Score = 83, 13th percentile.  Visual scanning was Average: Trail Making Test-A 70th percentile; visual scanning combined with mental tracking was also Average:  Trail Making Test - B, 32nd percentile.

During the WAIS-III, Mr. Caro demonstrated difficulty with the neuropsychological domain of executive functioning; he had difficulty organizing information he attempted to encode or express.  This lack of organization or strategy resulted in relative weaknesses on tasks of working memory or processing that required mental organization: e.g., Working Memory Index = 82, 12th percentile.  The examinee exhibited difficulty using social conventions to sequence pictorial stimuli in temporal order (Picture Arrangement, 16th percentile).  Sequencing difficulties were found also in the verbal domain: Letter-Number Sequencing, 5th percentile.  Such sequencing functions are believed to be mediated by the frontal territories of the cerebral cortex.

Additional signs of executive control dysfunction were seen on multiple tasks.  For example, the examinee performed in the severely impaired range on a task requiring hypothesis testing and mental organization to solve a complex problem: Wisconsin Card Sorting Test-Categories Achieved, 1st percentile.  During this task, Mr. Caro frequently lost track of his own method for solving the problem: Failure to Maintain Set, <1st percentile.

Higher-Order Reasoning:  On the relatively unstructured Halstead-Reitan Booklet Category Test, Mr. Caro exhibited deficient concept formation abilities (73 errors; 7th percentile).  He appeared to feel pressured during this task, and he exhibited increasing discomfort as he repeatedly made errors (and was provided corrective feedback).  Overall, it appears that his abstract reasoning abilities are variable, depending on his level of distress while attempting a task. He actually performed within the Low Average range on a separate task of abstract reasoning that required only brief responses:  Similarities, 16th percentile.

On additional tasks of higher-order reasoning, Mr. Caro again exhibited deficits.  He performed at the second-grade level on the Analysis-Synthesis subtest of the Woodcock-Johnson Psychoeducational Battery; this performance corresponds to an age equivalent of 8 years old.  Similarly, on the Concept

**JA 155**

RE: Carlos David CARO, page 5

Formation subtest, which also requires higher order reasoning, the examinee performed at the level of a 14-year-old (9.2 grade equivalent). His Fluid Reasoning Index ultimately ranked at the 5.2-grade level, comparable to a person 10 years old.

Overall, it appears most accurate to describe Mr. Caro's judgment and reasoning abilities as unstable. Such instability of judgment/reasoning is often associated with frontal cerebral lobe dysfunction.

Language Functioning: Mr. Caro's vocabulary ranked in the average range: Nelson-Denny Reading Test, 64th percentile WAIS-III Vocabulary, 25th percentile. Expressive language abilities also ranked in the average range: e.g., WAIS-III Comprehension, 25th percentile. His semantic access abilities for generating words within a semantic category (i.e., exemplars of animals) ranked in the Average range: Category Fluency Test, 33rd percentile. However, verbal fluency for generating words within phonemic categories (i.e., beginning with a specified letter) ranked in the impaired range: Controlled Oral Word Association Test, 3rd percentile. This pattern of performance (phonemic fluency inferior to semantic fluency) is typically associated with frontal lobe dysfunction. Frontal lobe dysfunction could also account for the examinee's instability of concept-formation/reasoning skill, noted above.

The fact that Mr. Caro exhibited relatively normal verbal expression skills (e.g. Verbal Comprehension Index, 21st percentile) raises the probability that persons engaging in casual conversation with the examinee will overestimate his level of cognitive functioning. That is, simple discourse with Mr. Caro is likely to tap only his strengths, and may not reveal his deficits in executive functioning, reasoning, or his problems with discriminating information (a deficit described below).

Sensory-Motor Functioning: Mr. Caro reported being right-handed. Simple repetitive motor speed was normal, bilaterally: Finger Tapping-right hand, 58th percentile; left hand, 37th percentile. Mr. Caro also provided normal scores with each hand on a task requiring fine motor dexterity for placing pegs into a board: Grooved Pegboard Test-right hand, 20th percentile; left hand, 63rd percentile.

Visuoanalytic Functioning: The examinee demonstrated normal abilities for interpreting spatial relations in visual stimuli. For example, he performed in the average range on a test requiring recognition of faces portrayed in photographs: Benton Facial Recognition Test, 45/54. With more simplistic stimuli, he performed well within normal limits (e.g., Judgment of Line Orientation Test, 56th percentile). His visual spatial skills again appeared intact during subtest of the WAIS-III: Perceptual Organization Index = 101, 53rd percentile.

Memory and Learning Functioning: As noted above, Mr. Caro performed in the Low Average range on the Immediate Memory Index of the Repeatable Battery for the Assessment of Neuropsychological Status: Standard Score = 83, 13th percentile. The examinee's recall of the material after a delay also ranked in the Low Average range: Delayed Memory Index = 83, 13th percentile.

Mr. Caro was also administered the Wechsler Memory Scale-Revised. He demonstrated a disparity between his verbal and visual skills: Verbal Memory Index = 75, 5th percentile vs. Visual Memory Index = 114, 83rd percentile. During this task, Mr. Caro exhibited disorganization in his approach to memorizing the verbal material: e.g. Verbal Paired Associates, 3rd percentile (impaired). The examinee appeared to lack structure or method in his approach to encoding the material. This was less apparent on tasks involving visual material, as the requirement for mental organization was lower: e.g., Visual Paired Associates, 63rd percentile.

Verbal learning abilities were assessed additionally with the California Verbal Learning Test-II, which places demands on independent organization of encoding and retrieval strategies when dealing with a large amount of verbal material. During this task, the examinee demonstrated a deficit in discriminating between actual target words to which he had been exposed and plausible alternatives. Mr. Caro exhibited a problematic response bias in that he endorsed most material presented to him as seeming familiar. Consequently, he performed in the severely impaired range when asked to decide whether or not he had previously heard, and

**JA 156**

RE: Carlos David CARO, page 6

was asked to memorize, individual words in a list (when he had been exposed to only a subset of the words previously): Response Bias, 2nd percentile. This deficit is likely impairing in the examinee's daily life, as it makes him highly suggestible, believing that information presented to him is familiar. He likely has difficulty discriminating between actual facts and information that is close but distorted.

Psychological/Mood Status: Mr. Caro reported no problems with mood, or vegetative signs of mood disruption (such as sleep or appetite disturbance). He was administered multiple scales of mood status. According to his responses, he ranked in the normal range for depression (e.g., Beck Depression Inventory-II, 4/63) and anxiety (e.g., Beck Anxiety Inventory, 0/63).
To assess a broader range of symptomology, Mr. Caro was also administered the quantitative Symptom Checklist-90-Revised. He endorsed no items, yielding to normal scores on every scale:

| Scale | Raw Score |
|---|---|
| Somatization | 0 |
| Obsessive-Compulsive | 0 |
| Interpersonal Sensitivity | 0 |
| Depression | 0 |
| Anxiety | 0 |
| Paranoid Ideation | 0 |
| Psychoticism | 0 |

On interview, the examinee denied psychotic features such as hallucinations, delusions, or ideas of reference.

## SUMMARY & CONCLUSIONS:

This 39-year-old man participated in a comprehensive neuropsychological examination to evaluate his neurobehavioral status. This assessment is intended to serve as a contributing component to the broader evaluation of Mr. Caro's psychiatric, developmental, and adaptive functioning being conducted by his defense team. Formal symptom validity/effort measures indicated that Mr. Caro provided his full effort on the neuropsychological measures and did not engage in symptom exaggeration, impression management, or other dissimulation.

The neuropsychological test results revealed converging signs of frontal lobe dysfunction. He performed as low as the 1st percentile on tasks requiring:
- Management of information
- Maintaining cognitive set
- Concept formation

His difficulty with managing information causes him to mistake actual information to which he has been exposed and plausible alternatives. This deficit is likely impairing in Mr. Caro's daily life, as it makes him highly suggestible, believing that information presented to him is familiar. He likely has difficulty discriminating between actual facts and information that is close but distorted.

His problems with maintaining cognitive set limit his ability to learn from his mistakes (gaining from experience). Mr. Caro appears to easily lose track of what he's doing and misunderstand why his behavior results in a certain outcome. For example, while attempting a task requiring him to sort cards according to an over arching rule, he repeatedly lost track of the rule (e.g., sorting by color) and was puzzled by the feedback that he was getting items wrong: Wisconsin Card Sorting Test - Categories Achieved, 1st percentile.

Persons with frontal lobe dysfunction tend to respond impulsively, without planning, and without proper consideration of competing information. Mr. Caro's difficulty with concept formation (Booklet Category Test, 7th percentile) results in poor understanding of cause-and-effect relationships.

**JA 157**

RE: Carlos David CARO, page 7

Each of the above three neurocognitive activities fall under the general domain of Executive Control. Executive control has been found to be mediated by the cerebral frontal lobes throughout neuropsychological scientific literature. From my understanding of Mr. Caro's history, his frontal lobe dysfunction is likely life-long in nature; he reportedly demonstrated failure to thrive as an infant, and developmental milestone difficulties (e.g., speech fluency and motor programming such as tying his shoes), and he has had no clear cerebral insults later in life (e.g., no major head injuries).

Please note that these findings of frontal lobe dysfunction are not easily explained by external issues such as effort or mood disruption, as Mr. Caro demonstrated strong effort on formal symptom validity testing and ranked well within the normal range on tests of mood status.

During the current examination, Mr. Caro demonstrated verbal expressive abilities within normal limits. While these skills are likely beneficial to Mr. Caro, they may also cause persons who only interact with him verbally to overestimate his cognitive abilities.

I speculate that the cognitive deficits that cause the greatest maladjustment in the examinee's daily life are:
    a) instability of reasoning (disordered thinking when under pressure)
    b) deficits in discriminating between actual information and distorted approximations

Mr. Caro appears to be a man of only modest internal/intellectual resources, with unreliable judgment skills, and an inability to sort through information provided to him. His objective test scores revealed that his reasoning ability under calm, controlled conditions ranks at the level of a 10-year-old; when under pressure he performed much lower (impaired range). The examinee is likely easily overwhelmed by multiple sources of information, ambiguous signals, and any perceived pressure/threat.

DIAGNOSTIC IMPRESSION:

   Cognitive Disorder-NOS: see list above (DSM-IV Code 294.9)

RECOMMENDATIONS:

Considering the findings of cerebral frontal lobe dysfunction noted above, I recommend consultation with a forensic psychiatrist to integrate these findings with an assessment of Mr. Caro's psychiatric, neurocognitive, and adaptive functioning relative to the facts and legal issues regarding Mr. Caro's current criminal charges. I have found forensic psychiatrist Keith Caruso, M.D. to be particularly helpful in this regard (615-236-1119; 9005 Overlook Boulevard, Brentwood, TN 37027). Please feel free to contact me if I can further facilitate a referral.

It was a pleasure working with this examinee. If I can be of any further assistance to Mr. Caro, please do not hesitate to contact me.

D. Malcolm Spica, Ph.D.
Licensed Clinical Psychologist

# EXHIBIT 61

# EXHIBIT 61

JA 159

USCA4 Appeal: 16-6027    Doc: 24-3    Filed: 11/17/2016    Pg: 160 of 304
Case 2:03-cr-10115-JPJ    Document 196-1    Filed 02/20/13    Page 60 of 72    Pageid#: 484

JA 160

# Pupil's Cumulative Record — Elementary School

FORM NO. 3669

| | (Last Name) | (First) | (Middle) | Birthplace Country or U. S. State | Race | Speaks English | Education | Occupation of Parents or Guardian |
|---|---|---|---|---|---|---|---|---|
| **PUPIL** | Caro, Carlos David | | | | | | | |
| **FATHER** | Caro, Jose Maria Jr. | | | | | | | Johnson Tool |
| **MOTHER** | Caro, Virginia Rodriguez | | | | | | | |
| **LEGAL GUARDIAN** | | | | | | | | |

Boy Girl

NAME OF

COMMENTS ON HOME AND FAMILY

Birthdate: 2 — 9 — 19 67
Mo.    Day    Year

Birthdate Based on:

Age at Entrance: _____ Years _____ Mos.

School Last Attended:

## RECORD OF ATTENDANCE, SCHOLARSHIP, AND RESIDENCE

| School Year | Semester Ending | Date of Entrance | Grade | Days Absent | Days Times Tardy Period | Language | Spanish | Literature | Reading | Spelling | Writing | Citizenship | Government | History | Geography | Agriculture | Homemaking | Shop Work | Physical Ed. | Health | Music | Art or Drawing | Arithmetic | Gen. Math. | Science | | | Effort | Study Habits | Retained or Promoted to | Withdrawn Date and Reason | Name of Teacher | School or Building | County, Parish or City | Residence Street Name and Number or District Number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1972-73 | 1-12-73 | 8-21-72 | K | 4 | 87 | N | | | | | | N | | | | | | | S | S | S | S | N | | | | | | N | | | Edna E. Balderas | Lasater | Brooks | 603 Palo Blanco |
| 1973 | 5-23-73 | | K | 2 | 86 | S | | | | | | N | | | | | | | S | S | S | S | B | | | | | | N | P | | Edna E. Balderas | Lasater | Brooks | |
| 1973 | 1-17 | 8-27 | 1 | 13 | 78 | D | | | C | D | C | B | | | | | | | ✓ | ✓ | ✓ | ✓ | B | | ✓ | | | | | | | Juanita Ayers | " | " | " |
| 1974 | 5-29 | | 1 | 4 | 85 | C | | | D | S | C | C | | | | | | | ✓ | ✓ | ✓ | ✓ | B | | ✓ | | | | | P-2 | | Juanita Ayers | " | " | |
| 1975 | 1-16 | 8-22 | 2 | 1 | 89 | D | | | D | D | C | B | | | | | | | ✓ | ✓ | ✓ | ✓ | D | | ✓ | | | | | | | Fidela Trevino | " | " | 603 Palo Blanco |
| | 5-28 | | | 1 | 89 | D | | | D | D | C | C | | | | | | | ✓ | ✓ | ✓ | ✓ | L | | ✓ | | | | | 3rd. | | Fidela Trevino | " | " | " |
| -76 | 11-14-75 | 8-21 | 3 | 0 | 60 | B | | | C | B | C | B | | C | | | | | ✓ | ✓ | ✓ | ✓ | A | | ✓ | | | | | | | J. Cunningham | F.E. | " | " |
| 25-76 | 2-24-76 | | 3 | 0 | 60 | C | | | B | D | C | B | | C | | | | | ✓ | ✓ | ✓ | ✓ | A | | ✓ | | | | | | | " | " | " | " |
| -76 | 5-27-76 | | 3 | 2 | 58 | C | | | B | B | C | C | | B | | | | | ✓ | ✓ | ✓ | ✓ | B | | ✓ | | | | | P-4 | | " | " | " | " |
| 6-77 | 11-12 | 8-19 | 4 | 0 | 60 | C | | | D | D | C | B | | D | | | | | ✓ | ✓ | ✓ | ✓ | B | | ✓ | | | | | | | Mary L. Salinas | " | " | " |
| 6-77 | 2-24 | 11-16 | 4 | 4 | 56 | C | | | C | D | C | B | | D | | | | | ✓ | ✓ | ✓ | ✓ | | | ✓ | | | | | | | " | " | " | " |
| 1977 | 5-25 | | 4 | 2 | 56 | C | | | B | B | C | B | | D | | | | | ✓ | ✓ | ✓ | ✓ | B | | ✓ | | | | | P-5 | | Mary L. Salinas | " | " | " |

Previous Record:

Notes on Transportation:

| | | | | | | |
|---|---|---|---|---|---|---|
| Grade | Grade | Grade | Grade | Grade | Grade | Grade |

COMMENTS ON BEHAVIOR OR SOCIAL ADJUSTMENT

## Elementary School Record (Continued)

DATE OF BIRTH _2-9-67_

TELEPHONE NO. (In Pencil)

### EDUCATIONAL TEST RECORD

| Grade | Age | Name of Test | Score | T. A.* | Remarks |
|-------|-----|--------------|-------|--------|---------|
| K | | Mty. Read. Form B (4-73) | 28 | | Little Catirg D |
| 1 | | Gates Mac Ginitie Read Primary A Form1 (4-74) | | | Vac 1.3   Comp 1.3 |
| 2 | | Gates Mac Ginitie Read Prim B Form 2 (4-75) | | | Voc. 1.4   Comp. 1.4 |
| 2 | | Otis-Lennon Mental Ability Test Elem. 1 Form K (2-75) | | | I.Q 81 |
| 2 | | Med. Achieve. Test Prim. 2 (3-75) | | | G.E. 1.8 |
| 3 | | Gates-Mac Ginitie Read. Prim C Form 1 | 4-76 | | Voc. 2.6   Comp 2.4 |

*T. A. = Test Age; the Score in Chronological Age, Mental Age, or Achievement Age. Use %ile if preferred.

### RECORD OF SPECIAL EDUCATION AND PHYSICAL DEFECTS

| Grade | *Item | Condition | Action Taken | Year-End Results |
|-------|-------|-----------|--------------|------------------|
| | | | | |

*1. Deficient Vision  2. Deficient Hearing  3. Orthopedic Handicaps  4. Speech Disorders  5. Lowered Vitality  6. Nervous Disorders  7. Teeth  8. Lungs  9. Tonsils  10. Adenoids  11. Skin  12. Feet  13. Posture  14. Heart  15. Mentally Retarded  16.          17.

### GROWTH, HEALTH, AND IMMUNIZATION RECORD

| Date | Hgt. | Wgt. | Notes on Health, Diseases, and Vaccination |
|------|------|------|--------------------------------------------|
| | | | |

| Grade | Interests, Distinctions, and Memberships |
|-------|------------------------------------------|
| | |

| Date | Final Recommendation and Comments |
|------|-----------------------------------|
| | |

(Position)

Signed by:

USCA4 Appeal: 16-6027      Doc: 24-3      Filed: 11/17/2016      Pg: 161 of 304

JA 161

Falfurrias Elementary School

Dear Parent(s)/Guardian(s):

Recently the Supreme Court ruled in the Lau vs. Nichols decision that schools must report what language(s) is spoken by children and their families in their home. Clearly you are most qualified to provide us with this information. By sharing this important information with us, you will help us provide the best education for your children attending our schools.

Your participation is very important. Please take the time to answer several questions about the language(s) spoken in your home. With your help, we can work together to give your children the very best that our schools can offer.

Please answer the questions on this questionnaire and return to your children's teacher. Do not hesitate to call the school if you have any questions. Once again, we deeply appreciate your cooperation in helping us to provide a better education for your children.

Please check only ONE category which best describes your children's racial/ethnic background.

_____ BLACK (Black, Negro, Afro-American, African descent, Trinidadian, Jamaican, West Indian)

_____ ASIAN (Asian-American, Japanese, Chinese or Korean descent)

✓ SPANISH ORIGIN/LATINO (Chicano, Mexican, Puerto Rican, Latin American or Spanish descent)

_____ NATIVE AMERICAN (American Indian)

_____ WHITE (White, Anglo, Pakistani, East Indian, European descent)

_____ FILIPINO (Filipino-American, Filipino descent)

_____ OTHER (Aleut, Eskimo, Malayan, Thai, other nonwhite not specified above)

_____ INDOCHINESE (Vietnamese, Cambodian, Laotian)

_____ DECLINE TO STATE

1. Student's name: _Caro, Carla O_ Grade _5_ Teacher _Silherieen_
   Last name, First name, Initial
2. Father's full name: _Caro, Joel_
   Last        First        Initial
3. Mother's full name: _Caro, Virginia_
   Last        First        Initial
4. Does your child have the advantage of hearing a language other than English spoken when he is not in school? Yes ✓  No _____
5. If so, which language? _Spanish_
6. Does he hear the language:
   ✓ most of the time?
   _____ some of the time?
   _____ not very often?
7. Is the other language spoken by:
   ✓ Father    _____ other
   ✓ Mother    specify _____
   ✓ Grandparent(s)
8. When another language is spoken, does your child:
   ✓ Understand most of what is said?
   _____ Understand some of what is said?
   _____ Understand very little of what is said?
9. Does your child speak the other language:
   ✓ most of the time?
   _____ some of the time?
   _____ not very often?
   _____ Never?
10. If the answer to No. 4 is "No", would you be interested in having a second language taught to your children as part of the school studies? Yes _____ No _____ If "Yes", which language? _____  603 Palo Blanco

Parents were contacted but child still did not bring survey form. BH

New Caro 4th Transferred
Jor Caro 7th Information

JA 162

JA 163

# Student's Cumulative Record—Grades 7-12

| NAME OF | Boy Girl | (Last Name) | (First) | (Middle) | Birthplace Country or U.S. State | Speaks English | Education | Occupation of Parents or Guardian | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | STUDENT | | | | | | | | Birthdate _____, 19___ | Birthdate Based on: | Identification Picture, Fingerprint, or Description |
| | FATHER | | | | | | | | Age at Entrance: | | Color Eyes |
| | MOTHER | | | | | | | | Previous School Record: | | Color Hair |
| | LEGAL GUARDIAN | | | | | | | | | | Other: |

## RECORD OF ATTENDANCE, SCHOLARSHIP, AND RESIDENCE

| 7TH GRADE SUBJECTS | Year Studied | 1st | 2nd | 3rd | 4th | Average |
|---|---|---|---|---|---|---|
| Language Arts Resource | 79-80 | 50 | 71 | | | 61 |
| Social Studies | | 36 | 31 | | | 34 |
| Mathematics | | 46 | 50 | | | 48 |
| Science | | 57 | 63 | | | 60 |
| Reading | | 72 | 70 | | | 71 |
| Choir | | 83 | 84 | | | 84 |
| 4PE | | 95 | 77 | | | 86 |
| Citizenship | | 81 | 85 | | | 83 |
| P-8 | | | | | | |

| 8TH GRADE SUBJECTS | Year Studied | 1st | 2nd | 3rd | 4th | Average |
|---|---|---|---|---|---|---|
| Language Arts | 80-81 | 32 | 50 | | | 50 |
| Social Studies Resource | | 86 | 83 | | | 85 |
| Mathematics | | 58 | 62 | | | 60 |
| Science | | 62 | 45 | | | 54 |
| Comp. Reading | | 54 | 76 | | | 65 |
| Shop | | 69 | 68 | | | 69 |
| Choir | | 77 | 78 | | | 78 |
| Citizenship | | 87 | 85 | | | 86 |
| P-9 | | | | | | |

| 9TH GRADE SUBJECTS | Year Studied | No. Weeks Studied | No. Periods per Week | Minutes per Period | 1st | 2nd | 3rd | 4th | Average | Units Earned |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| 10TH GRADE SUBJECTS | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| 11TH GRADE SUBJECTS | Year Studied | No. Weeks Studied | No. Periods per Week | Minutes per Period | 1st | 2nd | 3rd | 4th | Average | Units Earned |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| 12TH GRADE SUBJECTS | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| COMMENTS ON STUDENT'S DEVELOPMENT | Year | School | City or County | Student's Address | Date of Entrance | Cause if Late | Days Present | Days Absent | Times Tardy | Date and Reason for Withdrawal |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Total Credits Required for Graduation_____ Date of Graduation_____ Transcript sent to_____

USCA4 Appeal: 16-6027 Doc: 24-3 Filed: 11/17/2016 Pg: 163 of 304 Pageid#: 487
Case 2:03-cr-10115-JPJ Document 196-1 Filed 02/20/13 Page 63 of 72

USCA4 Appeal: 16-6027   Doc: 24-3   Filed: 11/17/2016   Pg: 164 of 304

Case 2:03-cr-10115-JPJ   Document 196-1   Filed 02/20/13   Page 64 of 72   Pageid#: 488

NAME  Caro, Carlos David

Reorder Form 7103-12 • Steck-Vaughn Company

# Student's Cumulative Record — Grades K-6

| NAME OF | Boy Girl | (Last Name) | (First) | (Middle) | Birthplace Country or U.S. State | Speaks English | Education | Occupation of Parents or Guardian | Birthdate |
|---|---|---|---|---|---|---|---|---|---|
| | STUDENT | | | | | | | | Birthdate B |
| | FATHER | | | | | | | | Age at Entr |
| | MOTHER | | | | | | | | School Last |
| | LEGAL GUARDIAN | | | | | | | | |

## RECORD OF ATTENDANCE, SCHOLARSHIP, AND RESIDENCE

| Grade | School Year | Term Ending | Date of Entrance | Grade | Days Present | Days Absent | Times Tardy | Language | Spanish | Literature | Reading | Spelling | Writing | Citizenship | Government | History | Geography | Agriculture | Homemaking | Shop Work | Physical Ed. | Health | Music | Art or Drawing | Arithmetic-Mathematics | Science | E. Research | Study Habits | Comp. Reading | Retained or Promoted to | Withdrawn Date and Reason | Name of Teacher | School or Building | City | Street Name and Number or District Number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| K | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 4 | 76-77 | 11-11 | 8-14 | 4 | 60 | | | C | | D | D | C | B | | | D | | | | | ✓ | ✓ | ✓ | ✓ | B | ✓ | | | | | | M. L. Salinas | | | |
| | 1977 | 2-24 | | | 56 | 4 | | C | | C | D | C | B | | | D | | | | | ✓ | ✓ | ✓ | ✓ | C | ✓ | | | | | " " | | | |
| | 1977 | 5-26 | | 4 | 56 | 2 | | C | | B | D | C | B | | | D | | | | | ✓ | ✓ | ✓ | ✓ | B | ✓ | | | | 5 | | M. L. Salinas | | | |
| 5 | 77-78 | 11-11 | 8-22 | 5 | 54 | 3 | | C | | C | D | C | A | | | F | | | | | ✓ | ✓ | ✓ | ✓ | C | ✓ | | | | | | J.A. Silberisen | | | |
| | 78 | 2/24 | — | 5 | 53 | 6 | | B | | C | F | C | B | | | F | | | | | ✓ | ✓ | ✓ | ✓ | B | ✓ | | | | | | " " | | | |
| | 78 | 5/26 | — | 5 | 56 | 3 | | F | | D | D | C | A | | | F | | | | | ✓ | ✓ | ✓ | ✓ | C | ✓ | | | | P-6 | | " " | | | |
| 6 | 78-79 | 5-24 | 8-28 | 6 | 169 | 10 | | 73 | | | 66 | | 83 | | | | | | | | 90 | 73 | 73 | 64 | | 94 | | 79 | | P-7 | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| COMMENTS ON HOME, FAMILY, BEHAVIOR, AND SOCIAL ADJUSTMENTS | Kindergarten | Grade 1 | Grade 2 | Grade 3 | Grade 4 | Grade 5 |
| | | | | | | Grade 6 |

## Cumulative Record — Grades K-6 (continued)

DATE OF BIRTH

TELEPHONE NO. (In Pencil)

USCA4 Appeal: 16-6027      Doc: 24-3      Filed: 11/17/2016      Pg: 165 of 304

### EDUCATIONAL TEST RECORD

| Grade | Age | Name of Test | Score | T.A.* | Remarks |
|---|---|---|---|---|---|
| 4 | | Otis-Lennon M.A. Elem. II Form J | 2-77 | | I.Q. 84 |
| 4 | | Met. Math Elem. Form G | 3-77 | | G.E. 3.0 |
| 4 | | Gates-McGinitie Read D-1 | 3-77 | | Voc. 2.0 -- Comp. 2.3 |
| 5 | | Gates-McGinitie Read D-2 | 4-78 | | Voc. 3.1   Comp. 2.8 |

### GROWTH, HEALTH, AND IMMUNIZATION RECORD

| Date | Hgt. | Wgt. | Notes on Health, Diseases, and Vaccination |
|---|---|---|---|

| NORM TYPE SCORE | DATE 3/79 | GRADE 6 | FM J | TEST OLMAT | BAT ELM 2 | OTHER INFO. |
|---|---|---|---|---|---|---|

| | CA | | AGE NMS | | GR NMS | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | SCORE | PR S | SCORE | PR S | SCORE | PR S | SCORE | PR S | SCORE | PR S |

CARO          CARL

| | YRS MO | | IQ | | RS | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12 14 01 | | 80 | | 26 | 72 | | | | | CA SUSPECT |

NAME: CARO CARLOS
283B-001-001
81210

CAT C AND D
LEVEL/FORM 16C
GRADE 06.6
DATE 03/79

N = NO TEST AT LEVEL
A = NO VALID ATTEMPT

| | | PHON ANL | STRUC AN | READING VOCAB | COMPR | TOTAL | SPELL | MECH | LANGUAGE EXPRES | TOTAL | COMPUT | MATHEMATICS CON/APP | TOTAL | TOTAL BATTERY | REF SKL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GE | | N | N | 3.0 | 3.0 | 2.8 | 5.1 | 2.6 | 2.7 | 2.7 | 4.0 | 3.7 | 3.8 | 3.3 | 2.9 |
| NP | | N | N | 4 | 5 | 3 | 34 | 6 | 8 | 5 | 6 | 8 | 6 | 4 | 5 |
| RS | | N | N | 7 | 9 | 16 | 11 | 6 | 14 | 20 | 9 | 11 | 20 | 67 | 6 |
| OMS | | N | N | 0/3 | 0/6 | | 0/3 | 0/5 | 0/7 | | 0/4 | 0/7 | | | 0/5 |

NAME: CARO CARLOS
1D33-002-001
81210

CAT C AND D
LEVEL/FORM 17C
GRADE 07.7
DATE 04/80

N = NO TEST AT LEVEL
A = NO VALID ATTEMPT

| | | PHON ANL | STRUC AN | READING VOCAB | COMPR | TOTAL | SPELL | MECH | LANGUAGE EXPRES | TOTAL | COMPUT | MATHEMATICS CON/APP | TOTAL | TOTAL BATTERY | REF SKL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GE | | N | N | 5.4 | 3.1 | 4.2 | 3.2 | 2.0 | 5.9 | 3.7 | 5.6 | 6.4 | 6.0 | 4.5 | A |
| NP | | N | N | 21 | 4 | 9 | 6 | 1 | 33 | 12 | 18 | 33 | 26 | 11 | A |
| RS | | N | N | 11 | 7 | 18 | 5 | 3 | 20 | 23 | 10 | 17 | 27 | 73 | A |
| OMS | | N | N | 0/3 | 0/6 | | 0/3 | 0/5 | 0/7 | | 0/4 | 0/7 | | | A |
| | | N | N | | | | | | | | | | | | A |

CARO          CARLOS D                              08
FALFURRIAS JUNIOR HIGH                    02/81
OTIS LENNON MENTAL ABILITY TEST INT. J
        MENTL
        ABLTY
IQ      83
PA%    14%
PA9      3
PG%    13%
PG9      3

CARO CARLO                              08
FALFURRIAS JUNIOR HIGH                    04/81
CALIFORNIA ACHIEVEMENT TEST C LEVEL 18

| | N% | GE | | N% | GE |
|---|---|---|---|---|---|
| READ VOCAB | 5% | 4.0 | READ COMP | 9% | 4.4 |
| TOTAL READ | 5% | 4.1 | SPELLING | 27% | 5.9 |
| LANG MECH | 8% | 3.4 | LANG EXPR | 3% | 2.5 |
| TOTAL LANG | 3% | 2.9 | MATH COMP | 11% | 5.7 |
| MATH C & A | 38% | 8.0 | TOTAL MATH | 23% | 6.9 |
| TOTAL BATT | 7% | 4.9 | REF SKILLS | 1% | 2.0 |

| Date | Final Recommendation and Comments |
|---|---|

(Position)

*1. Deficient Vision   2. Deficient Hearing   3. Orthopedic Handicaps   4. Speech Disorders   5. Lowered Vitality   6. Nervous Disorders
7. Teeth   8. Lungs   9. Tonsils   10. Adenoids   11. Skin   12. Feet   13. Posture   14. Heart   15.          16.          17.          18.

Signed by:

JA 165

**LAS® II**
**LANGUAGE ASSESSMENT SCALES©**
Student Score Sheet
English — Level 2

Date of Test _9-13-78_

Name _CARO, CARLOS O._ Sex _M_ Date of Birth _2-9-67_ Age _11_

District_____ School_____ Teacher_____

Grade _6-1_ Home Language_____ Ethnic Group_____

Examiner _DAVID Benavides_ Test Language_____

## I. PAIRS

1. _·_ them—them
2. _·_ pet—pat
3. _✓_ very—berry
4. _·_ yellow—yellow
5. _·_ hit—hit
6. _✓_ hop—up
7. _✓_ specially—especially
8. _·_ back—back
9. ___ deep—dip
10. ___ rot—rat
11. ___ rang—rang
12. ___ thumb—thump
13. ___ thin—tin
14. ___ chain—chain
15. _·_ rice—rise
16. ___ set—set
17. ___ mold—mold
18. _✓_ fussy—fuzzy
19. _✓_ shop—chop
20. ___ send—sent
21. _√_ whether—weather
22. ___ rain—ray
23. ___ sun—some
24. ___ cold—gold

## II. LEXICAL

25. ___ table
26. ___ train
27. ___ dog
28. ___ apple
29. ___ sofa (couch, etc.)
30. ___ bicycle
31. ___ elephant
32. ___ banana
33. ___ knife
34. ___ space ship (rocket)
35. ___ chicken
36. ___ bread
37. ___ hammer
38. ___ submarine
39. ___ dinosaur
40. ___ watermelon (melon)
41. ___ candle
42. ___ airplane
43. ___ camel
44. ___ cheese

## III. PHONEMES

45. ___ this
46. _✓_ father/further
47. ___ very
48. ___ rivers/moving
49. ___ yoga
50. ___ yard/yellow
51. ___ hat
52. ___ ham/hot
53. _✓_ luck
54. _·_ hugged/bum
55. ___ bad
56. ___ sat/mat
57. ___ strum
58. ___ smiled/split
59. ___ thing
60. _√_ Kathy/thin
61. ___ chew
62. _√_ chocolates/cheap
63. _·_ please
64. ___ bees/busy
65. ___ pet
66. _·_ let/men
67. ___ toad
68. ___ food/good
69. ___ big
70. _√_ bit/mitt
71. ___ rib
72. ___ crab/tub
73. ___ bag
74. ___ girl/gone
75. ___ from
76. ___ room/warm
77. ___ popcorn
78. ___ peppers/pickled
79. ___ while
80. ___ white/wheat

## IV. COMPREHENSION

81. ___
82. ___
83. _·_
84. _·_
85. ___
86. _·_
87. _✓_
88. _√_
89. _√_
90. ___

## V. PRODUCTION
(scored on reverse side of this sheet)

## SCORING CALCULATIONS

| | Prs. | | Lex. | | Phon. | | Comp. | | Prod. | | Sub-Total | | Total | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *18* | .094 | + | .125 | + | .108 | + | .088 | + | .400 | = | 87 | × 100 = | 87 | 4 |
| | 1 | | 2 | | 3 | | 4 | | 5 | | 6 | | 7 | 8 |

*20* *31* *7* *4*

| Obs. | Wr. Prod. |
|---|---|
| | |
| 9 | |

JA166

Copyright© 1977, 1978 Linguametrics Group

Name _____   Date of Test _____

V    Production — Storytelling

Student Instructions: Now we're going to have a story. See these drawings? Well, these drawings tell a story and I'm going to play the story for you now. After the story is over I'd like you to tell me the story, as closely as you can remember it, exactly the way it was on the tape. So you'll have to listen very carefully. Let's see how much you can remember. Ready?
(After playing tape): Okay. Can you tell me the story exactly the way you heard it?

Teacher Instructions: Arrange Manual so 4 pictures can be seen simultaneously as student listens to tape. After hearing tape, ask student to retell story. BE SURE TO WRITE DOWN EVERY WORD OF STUDENT RESPONSE EXACTLY AS GIVEN. If student does not produce at least 50 words, try probe questions such as examples given below. Again, write down response exactly as spoken.

Probe questions to be used if necessary:

1. What was the town like where the kids lived?

2. Tell me about the kind of people who lived in the town.

3. What did the young people decide to do?

4. Tell me about the kid who played the flute.

5. How about the red-haired girl? What did she play?

6. Tell me about the lead singer.

7. How did the group earn its money?

8. What did they do with the money they earned?

*There was some boys that wanted to make a rock group so they could get out of town. There was a fat boy that played the flute, a skinny girl that played the guitar, a man with white and black stripen shirt sang, and a little boy who played the drums. They sang rock at stadiums. They played rock at weddings and then they made some money and they bought a wild van and was could tell they who gang for*

OBSERVATIONS

Based on your observations, please give your assessment of this student's use of the English language. Rate the student's probability of success in the following situations.

(fail)   1 — 2 — 3 — 4 — 5   (Succeed fully)
(Circle One)

1. Asking for directions in English to an unfamiliar part of the school.
   1 — 2 — 3 — 4 — 5

2. Telling a joke in English to monolingual peers.
   1 — 2 — 3 — 4 — 5

3. Describing his/her family composition in English to a monolingual peer or teacher.
   1 — 2 — 3 — 4 — 5

4. Explaining to a teacher in English why s/he had been absent from class.
   1 — 2 — 3 — 4 — 5

5. Describing a science experiment in English.
   1 — 2 — 3 — 4 — 5

total ÷ 5 = AV.

JA 167

USCA4 Appeal: 16-6027 Doc: 24-3 Filed: 11/17/2016 Pg: 168 of 304

Case 2:03-cr-10115-JPJ Document 196-1 Filed 02/20/13 Page 68 of 72 Pageid#: 492



| | | |
|---|---|---|
| CARO CARLO | STUDENT NUMBER | 08 FALFURRIAS JUNIOR HIGH |
| STUDENT NAME | | GRADE SCHOOL NAME |

CALIFORNIA ACHIEVEMENT TEST C LEVEL 18
TEST NAME

NATIONAL 04/81
TYPE OF NORMS DATE TESTED

| TEST PART | PERCENTILES |
|---|---|
| READ VOCAB | 5 |
| READ COMP | 9 |
| TOTAL READ | 5 |
| SPELLING | 27 |
| LANG MECH | 8 |
| LANG EXPR | 3 |
| TOTAL LANG | 3 |
| MATH COMP | 11 |
| MATH C & A | 38 |
| TOTAL MATH | 23 |
| TOTAL BATT | 7 |
| REF SKILLS | 1 |

STANINES: 1 2 3 4 5 6 7 8 9

BELOW AVERAGE — AVERAGE — ABOVE AVERAGE

INDIVIDUAL TEST PROFILE

**JA 168**

Your scores on the test you recently took have been placed on this chart. The chart shows you how well you did on the test in comparison with other boys and girls in your grade throughout the country who have taken the same test.

The test has several parts. You have a score for each part and may have a total score for the test. Your chart shows you the areas in which you are the strongest and the areas in which you are the weakest. Your teacher will discuss these areas with you.

ABOUT YOUR SCORES

Your percentile score shows what percent of the boys and girls in your grade across the country scored no higher than you scored. For example, if one of your percentile scores is 60, it shows that you scored better than 60 percent of the students in your grade throughout the country taking this test. In other words, you scored better than 60 out of every 100 pupils taking the test.

Your stanine score tells you your level of performance. If you have a 4th, 5th, or 6th stanine score, you are within the average range of scores for this test. Stanines 1, 2, and 3 indicate your level of performance was weak. Stanines 7, 8, and 9 indicate a stronger level of performance, or above average performance.

Your scores may be based on local norms. This means that your score will show how you performed within your own school district. For example, if your local percentile score is 60, it means you scored better than 60 percent of the boys and girls in your grade within your school district.

**JA 169**

USCA4 Appeal: 16-6027   Doc: 24-3   Filed: 11/17/2016   Pg: 170 of 304

# FALFURRIAS HIGH SCHOOL RECORD

Name __CARO, CARLOS D.__  Parent or Guardian __Caro, Jose M., Jr.__

Address __X 607 N. Oleander__  __Falfurrias, Texas__  Birth Date __2/9/67__

Entered from what school __FALFURRIAS JR. HIGH__

Credits required for Graduation __20__

Grading System   A 90-100   B 80-89   C 70-79   D 60-69   F Below 60   Grade Average __7 Sem.__   Class Rank _____

| School Year | Semester | Days Attended | Days Absent | Agriculture | Algebra | Art | Band | Bookkeeping | Biology | Business Law | Building Trades | Chemistry | Civics | Drafting | Drama | Driver Education | English | General Metals | Power Mechanics | Gen. Woodworking | Geography, World | Geometry | Physical Educ. | Health | History, Am. | History, World | Crafts | Home Economics | Home & Fam. Liv. | Journalism | Psychology | Physics | Fundamental Math | Science | Shorthand | Spanish | Speech | Trig./El. Analysis | Typing | V.O.E./D.E./C.V.A.E. | Introduction Algebra | Consumers Math | Farm Power | Total Credits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1981 | 1 | | 0 | | . | | . | | | | | | | | | | F 79 | | | | | | 79 31 | | | | | | | | | | | F 60 40 | | | | | | | | | | | ½ |
| 1982 | 2 | | N/9 | 5/14/82 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DATE | 1 | | N/9 | 10/29/92 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 2 | | W/9 | 4/20/83 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DATE | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DATE | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DATE | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| Yr. | Summer School | 1 | 2 | 3 | Yr. | Summer School | 1 | 2 | 3 | Transcript To: |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |

Graduated _____

Date _____   Principal _____

JA 170

USCA4 Appeal: 16-6027    Doc: 24-3    Filed: 11/17/2016    Pg: 171 of 304

# Exhibit 62

# Exhibit 62

## DECLARATION OF SUSAN RICHARDSON

I, Susan Richardson, declare under penalty of perjury the following:

1.  I am an investigator in the Federal Public Defender's Office in the Western District of Virginia and have been assigned to work on the case of *United States v. Caro*, Case No. 1:06-cr-0001-JPJ (W.D. Va.).

2.  As part of my investigation in that case, I looked into Mr. Caro's prior conviction from another case, *United States v. Caro*, Case No. 2:03-cr-10115-JPJ (W.D. Va.). I learned that attorney Louis Dene had represented Mr. Caro in that case and that Mr. Caro had entered a plea of guilty. I interviewed Mr. Dene on March 9, 2012. During this meeting, I first learned that Mr. Dene did not discourage Mr. Caro from entering the plea agreement. I also learned that Mr. Dene did not advise Mr. Caro about the consequences that his plea would have on the anticipated capital case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 20, 2013.

Susan Richardson
Susan Richardson

2-20-13
Date

Page 1 of 1

**JA 172**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 2:03CR10115 |
| | ) | |
| CARLOS CARO, | ) | |
| | ) | |
| Defendant. | ) | |

REPLY TO DEFENDANT'S OPPOSITION
TO MOTION TO DISMISS

The United States of America, by counsel, replies to Defendant's opposition to its motion to dismiss. This action must be dismissed as untimely because (1) Caro failed to raise his claim within one year of the date that "the facts supporting the claim . . . **could have been discovered** through the exercise of due diligence," 28 U.S.C. § 2255(f)(4) (emphasis added); and (2) Caro failed to establish an extraordinary circumstance that prevented him from filing a timely petition.

A.  **Caro Does Not Dispute That He Failed to Take Any Action For More Than Five Years After the Facts Supporting His Claim Could Have Been Discovered**

Caro's opposition to this motion does not dispute that he failed to take any action for more than five years after the facts supporting his claim could have been discovered.[1] It is undisputed that by February 13, 2007, Caro had personal knowledge of the Government's use of his guilty plea in the death penalty case and Dene's failure to advise him of that likelihood. Caro incorrectly argues that his obligation to exercise diligence was not triggered until he actually confirmed that Dene had also anticipated the Government's use of the guilty plea in the capital case. As this Court has previously held, the operative question is whether Caro could have

---

[1] Although Caro suggests that he actually could have discovered the salient facts even earlier, when the United States filed its Notice of Intent to Seek Death on January 11, 2006, there is no dispute that Caro learned firsthand, on February 13, 2007, of the Government's use of his guilty plea in the penalty phase of his death penalty trial.

Page **1** of **8**

JA 173

discovered this fact had he exercised due diligence.  Yancy v. United States, Criminal No.

7:04CR00139, 2009 WL 1546288 *2 (W.D.Va. Jun. 2, 2009).

Caro argues that his inaction for more than five years should be excused because Dene

and his capital case lawyers were ineffective.  This argument fails because by August 2007,

Dene and the capital case lawyers no longer represented Caro.  The public record[2] shows that on

August 10, 2007, just six months after Caro learned the salient facts underlying this action,

lawyers from the Federal Public Defender, the same agency that represents him in this action,

moved for appointment and substitution as Caro's counsel in the direct appeal of his death

penalty case to the Fourth Circuit Court of Appeals.  United States v. Caro, Appeal No. 07-5,

Dkt. No. 27, Motion for Appointment and Substitution of Counsel.  The Fourth Circuit granted

the motion, and on August 22, 2007, the Federal Public Defender began representing Caro in

various legal proceedings related to this case and the death penalty case.  Id., Dkt. No. 31, Order

granting Motion for Substitution of Counsel.  That representation has been continuous to the

present.  Deft's Opposition, at 8.

Thus, Caro had ample opportunity after February 13, 2007, to learn of Dene's expectation

that his guilty plea would be used in the death penalty case simply by asking Dene or asking his

capital case counsel to ask Dene.  Moreover, after August 22, 2007, Caro, freed from the

hindrance of ineffective counsel, could have asked the Federal Public Defender to inquire about

Dene's expectation.  Indeed, the public record makes it clear that between August 22, 2007 and

March 17, 2010, Caro and the Federal Public Defender studied and discussed all issues related to

his death sentence, including the aggravating factors and the prosecution's argument, because the

---

[2] This Court may take judicial notice of matters of public record for purposes of a motion to dismiss.
Sec'y of State for Defense v. Trimble Navigation, Ltd., 484 F.3d 700, 705 (4th Cir. 2007) (citing Hall v.
Virginia, 385 F.3d 421, 424 (4th Cir. 2004) (In reviewing the dismissal of a complaint, the court "may
properly take judicial notice of matters of public record.")).

**JA 174**

Federal Public Defender extensively briefed and argued sentencing issues in Caro's appeal to the Fourth Circuit. United States v. Caro, 597 F.3d 608, 624-27 (4th Cir. 2010) (in its March 17, 2010 decision, the court analyzed Caro's challenge to the death sentence, including his claim that the Government's argument was improper). Caro and his counsel did nothing between August 22, 2007 and March 9, 2012, despite knowing that the guilty plea in this case was an issue in the death penalty sentencing, despite knowing that Dene had failed to advise Caro of that likelihood, and despite extensively reviewing the record, briefing, and arguing death penalty sentencing issues during the direct appeal. Inaction under these circumstances is certainly not due diligence and Caro's argument to the contrary is spurious.

**B.** **Caro's Alleged Brain Impairment Is Not an Extraordinary Circumstance that Prevented Him From Filing a Timely Petition**

Apparently recognizing the speculative nature of his due diligence argument, Caro seeks to salvage this extraordinarily dilatory petition by arguing for equitable tolling because he has a "significant brain impairment." Defendant's Opposition, at 10. This argument is specious. In general, "the federal courts will apply equitable tolling because of a petitioner's mental condition only in cases of profound mental incapacity." United States v. Sosa, 364 F.3d 507, 513 (4th Cir. 2004). It is clear that equitable tolling is an extraordinary remedy, available only in "those rare instances where . . . it would be unconscionable to enforce the limitation period against the party and gross injustice would result." Rouse v. Lee, 339 F.3d 238, 246 (4th Cir. 2003) (en banc) (internal quotation marks omitted) (citing Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000). Alleging even a serious mental illness is not sufficient "unless petitioner also demonstrates how [this] condition constituted an extraordinary circumstance that prevented him from filing a timely petition." Sosa, 364 F.3d at 512-13. In Sosa, the Fourth Circuit cited to Grant v. McDonnell Douglas Corp., 163 F.3d 1136, 1138 (9th Cir. 1998), which found equitable

**JA 175**

tolling based on mental condition to be appropriate "only in exceptional circumstances such as institutionalization or adjudged mental incompetence." Thus, equitable tolling is appropriate only if Caro can show that he suffered from a mental incapacity so severe that institutionalization or judicial finding of mental incompetency was warranted, and that this mental incapacity prevented him from filing a timely petition. Sosa, 364 F.3d at 513. Caro's equitable tolling argument falls far short of this standard.

Caro relies exclusively on Malcom Spica's 2006 report of neuropsychological examination and Donna Schwartz-Watts' January 2013 report for his mental incapacity claim. Both reports fail to establish the required mental impairment. Spica, who assessed "Caro's neurobehavioral status," test[ed] him in a variety of reading and math comprehension skills, and found that these tests "revealed converging signs of frontal lobe dysfunction, opined that Caro "likely has difficulty between actual facts and information that is close but distorted . . . His problems with maintaining cognitive set limit his ability to learn from his mistakes . . . [and his] difficulty with concept formation . . . results in poor understanding of cause-and-effect relationships." Deft's Ex. 10, Doc. 196-1, at p. 52 of 72. Spica also reported that Caro "demonstrated verbal expressive abilities within normal limits," speculated that the cognitive defects causing the greatest maladjustment in Caro's daily life were "instability of reasoning . . . [and] deficits in discriminating between actual information and distorted approximations," stated that his test scores revealed his reasoning ability at the level of a 10-year old," and rendered a diagnostic impression of "Cognitive Disorder-NOS." Id., at p. 58 of 72. But, Spica never diagnosed Caro with any serious mental disorder, never suggested that Caro suffered a mental impairment requiring institutionalization or a determination of incompetence, and never opined

that Caro had such a profound mental impairment that he was incapable of timely pursuing a legal claim while represented and assisted by the Federal Public Defender.

Schwartz-Watts' report is similarly deficient. She diagnosed anxiety disorder NOS (PTSD), cognitive disorder NOS, and adult antisocial behavior, but opined that he should be administered a more complete neuropsychological examination and additional testing. Deft's Ex. 8, Doc. No. 196-1, at p. 38 of 72. Her diagnoses were based on Caro's dysfunctional childhood, his "problems with verbal fluency, short term memory, long term memory and reproducing a visuospatial design," and the same frontal lobe dysfunction discussed by Spica. Id., at pp. 42-43 of 72. It is clear that Schwartz-Watts, like Spica, noted mental conditions that were the focus of clinical attention, but "not indicative of mental illness." Id., at p. 44 of 72. Schwartz-Watts concluded that as a result of his "brain impairment and anxiety disorder . . . [Caro] tends to become more increasing anxious and unable to use all of the cognitive strategies available to him . . . What this means is that when [he] becomes anxious, he is more likely to exercise poor judgment." Id., p. 45 of 72. But, like Spica, Schwartz-Watts never diagnosed Caro with any serious mental disorder, never suggested that Caro suffered a mental impairment requiring institutionalization or a determination of incompetence, and never opined that Caro had such a profound mental impairment that he was incapable of timely pursuing a legal claim while represented and assisted by the Federal Public Defender.

At best, these neuropsychological examinations reveal social and intellectual deficits, but do not come close to establishing the kind of profound mental impairment, requiring institutionalization or an incompetency determination, that would be an extraordinary circumstance supporting equitable tolling.

Moreover, Caro's own conduct, both in this action and in other matters of public record, clearly support the absence of a profound mental impairment. Caro does not dispute that he directed Dene to "work[] to obtain" his plea agreement to leverage a more favorable disposition for his co-defendant and fellow Texas Syndicate gang member, Moreno-Marquez, even after Dene told him the agreement did not benefit him and he would receive a lengthy prison sentence as a result. Defendant's Motion, at p.3; Dene Declaration, at ¶¶ 5-6 . Caro demonstrated knowledge of the legal system and had the mental acumen to direct his attorney to strike a sophisticated bargain linking together the plea agreements of two co-defendants to achieve a desired purpose, clearly contradicting any suggestion of a profound mental impairment paralyzing his ability to timely pursue legal claims.

Not only does Caro not have a profound mental impairment justifying equitable tolling, but he failed to establish that his neuropsychological condition prevented him from timely filing this petition, particularly when he "has been continuously represented by counsel." Deft's Opposition, at 8.

C. **The Alleged Ineffective Assistance in Caro's Capital Murder Case is Not an Extraordinary Circumstance Preventing a Timely Petition in this Case**

Caro's argument that the incompetency of his capital case counsel constitutes an extraordinary circumstance warranting equitable tolling is equally without merit. As noted above, the allegedly ineffective capital case counsel stopped representing him in August 2007, when the Federal Public Defender took over as his counsel. Accordingly, after August 22, 2007, Caro was no longer hindered in pursuing this petition by his capital case counsel's ineffectiveness. Since Caro makes no ineffective assistance claim against the Federal Public Defender who represented him in his direct appeal from August 22, 2007 through at least March 17, 2010, Caro's equitable tolling claim based in ineffective counsel must fail.

**JA 178**

## Conclusion

Caro filed this petition far beyond the time limitation mandated by 28 U.S.C. § 2255(f) because it was filed more than eight years after final judgment and more than five years after Caro learned the salient facts underlying his claim. Caro failed to take any action to timely pursue this claim despite being continuously represented by counsel, including attorneys employed by the same agency that is representing him in this matter. Equitable tolling is not appropriate because there is no evidence that Caro suffered the type of profound mental impairment that would be an extraordinary circumstance and there is no evidence that his diagnosed social disorders prevented him from timely filing this petition, especially since he has been continuously represented by counsel. Finally, the ineffectiveness of his capital case counsel is not a basis for equitable tolling because the Federal Public Defender replaced the allegedly incompetent capital case attorneys in August 2007 and have continuously represented Caro since.

Caro's petition is clearly late and fails to "state[s] a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Accordingly, the United States respectfully requests that this Court:

(1)    Promptly dismiss this action under Federal Rule of Civil Procedure 12(b)(6); and

(2)    Find that an evidentiary hearing is unnecessary because the motion and the files and records of the case conclusively show that Caro is entitled to no relief.

JA 179

Respectfully submitted,

TIMOTHY J. HEAPHY
United States Attorney

Date:  March 5, 2013                          /s/ Rick A. Mountcastle
                                              Rick A. Mountcastle
                                              Assistant United States Attorney
                                              Virginia State Bar No. 19768
                                              P.O. Box 1709
                                              Roanoke, VA  24008-1709
                                              Tel: (540) 857-2254; Fax: (540) 857-2283
                                              Email: rick.mountcastle@usdoj.gov


CERTIFICATE OF SERVICE


        I certify that on March 5, 2013, I caused this Reply to Defendant's Opposition to Motion
to Dismiss to be filed with the Clerk of the Court using the CM/ECF system, which will send
notification of this filing to counsel of record.

                                              /s/ Rick A. Mountcastle
                                              Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
Abingdon Division

```
--------------------------x
                          :
UNITED STATES OF AMERICA,  :
                          :
       Plaintiff,          :
                          :
v.                         :    1:06CR1/2:03CR10115
                          :
CARLOS D. CARO,            :
                          :
       Defendant.          :    Abingdon, Virginia
                          :    November 25, 2013
--------------------------x    1:30 p.m.
```

TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE JAMES P. JONES
UNITED STATES DISTRICT JUDGE.

APPEARANCES:

ANTHONY P. GIORNO, Esquire
RICK A. MOUNTCASTLE, Esquire
Asst. United States Attorneys
P.O. Box 1709
Roanoke, VA 24008
    For the United States of America.

KAREN A. WILKINSON, Esquire
ROBIN KONRAD, Esquire
Assistant Federal Public Defenders
850 West Adams, Suite 2012
Phoenix, Arizona
    Counsel for the Defendant.

Proceedings recorded by Stenography, transcript
produced by computer.

**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**180 WEST MAIN STREET, ROOM 104**
**ABINGDON, VIRGINIA 24210**
**(276) 628-5116**

**JA 181**

2

APPEARANCES (Cont.)

    FAY F. SPENCE, Esquire
    Assistant Federal Public Defender
    210 First Street, S.W.
    Roanoke, Virginia  24011
    and
    BRIAN J. BECK, Esquire
    Assistant Federal Public Defender
    201 Abingdon Place
    Abingdon, Virginia  24211
        Counsel for the Defendant

(Proceedings commenced at 1:30 p.m.)

THE COURT: Good afternoon, ladies and gentlemen. The clerk will call the cases.

THE CLERK: *United States of America* v. *Carlos Caro*, Criminal Action Numbers 1:06CR10 and 2:03CR10115.

THE COURT: We're here today for oral argument in the Government's motions to dismiss in these 2255 cases. I'd be grateful if counsel would enter their appearances so I know who's here, and indicate who is going to be arguing. First, from the Government.

MR. GIORNO: Your Honor, for the United States Tony Giorno. I will be arguing the substantive motions to dismiss, the 2255s, with the exception of the one that was filed by Mr. Mountcastle in which I believe he's responding He'll be arguing that.

MS. WILKINSON: Good afternoon, Your Honor. Karen Wilkinson on behalf of Carlos Caro who is not present but is in custody. With me is Fay Spence, Brian Beck and Susan Richardson, and on video is Robin Konrad appearing from Phoenix. I will be arguing the two, the responses to the Government's motions to dismiss both of them. I guess if the court is having oral argument also on our discovery motion --

THE COURT: Yes, ma'am, I am, and I neglected to mention that, but that's true.

**JA 183**

MS. WILKINSON: Then Ms. Spence will be arguing that motion.

THE COURT: All right. Well, thank you. We, we have, in terms of time for argument, until 4:00. I'm going to allow the Government to open, and give them 45 minutes, and then the defendant 90 minutes, and then the Government 45 minutes to respond.

Now, obviously, counsel does not need to take all of that time if they don't wish to, but that's our outside limitation. And in terms of, of the issues, and there are the two cases, of course, plus the motion seeking, a motion seeking an order of discovery, I'll allow counsel to divide that time up and argument within these time limits as indicated.

I understand that the defendant has moved to, for discovery, but I want to include their time in the response time of 90 minutes. So, is that clear to everyone?

MR. GIORNO: Yes, sir.

THE COURT: Very well. We can proceed.

MR. MOUNTCASTLE: Good afternoon, Your Honor. Rick Mountcastle. I'll be arguing the motion to dismiss in case number 2:03CR10115 which, I think at times, has been referred to as the Benavidez case, and basically I think the pleadings set forth the essence of our argument.

The 2255 motion comes way out of time, some seven or

**JA 184**

eight years, eight years or so past the judgment date, and there is no showing of any basis for an equitable, inequitable tolling in this case.

I think the primary thing since 2007, Mr. Caro, regardless of his mental condition, his ability to understand legal proceedings, and, and not withstanding an allegation that he was represented by ineffective or incompetent counsel up to that point has continuously been represented by counsel in this particular case, the Public Defender's Office in one capacity or another since 2007, and there does not appear to be any basis for him not taking advantage of a perceived issue with Mr. Dene's representation in this case prior to 2012 when the motion was filed.

So, I'm happy to answer any question the court may have with respect to our arguments, but I think they are fairly clearly set forth in the pleadings.

THE COURT: All right. I have no questions. Thank you. Mr. Giorno?

MR. GIORNO: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. GIORNO: Your Honor, there are, of course, in regard to the pleadings in connection with the capital case, the Sandoval case, I count 16 separate claims governing every possible phase of the proceedings beginning with

**JA 185**

pretrial, in connection with the Benavidez case. We have filed a fairly lengthy reply to the petition citing facts as well as the law in the Government's motions to dismiss. I don't know if the court has any particular issues that you have concerns about, or questions about. I'm happy to, to begin to discuss those cases.

Obviously, ones that are, I have most concerns about are the ones in which they claim the Government did something wrong. I have a vested interest in those. And I have outlined those first.

If the court feels like there's something else, if you would rather pose questions to me as we go along, however the court wants to do it, I'm certainly willing to do, but I do have an outline and am prepared to proceed as the court wishes.

THE COURT: I don't mean to place any particular emphasis on one ground over another. But I think there are some things that I'm certainly interested in, in the Government speaking to, and certainly the Government has filed a lengthy and complete response.

But just in terms of jumping in at someplace, what about the argument that the, the Sandoval case was delayed so the Government could obtain a lengthy sentence in the Benavidez case?

MR. GIORNO: That's claim number one, Your Honor.

**JA 186**

I believe it comes up later on in claim 6A concerning the penalty phase in the case. Essentially, our response is we recognize the case law is in certain cases pre-indictment delay where the Government does gain some tactical advantage with reckless disregard to the impact on the defendant can state a due process claim. We don't have that here, Your Honor.

The first point we'd make is that the delay between the time of the murder and the request for appointment of counsel was 13 months which, in the context of a capital case, is not a disproportionately long delay.

We have, of course, this was a capital case, there is a duty to investigate, there's a duty to make certain threshold determinations concerning whether to seek the death penalty, or not. My concern is, my belief is if we had tried to move quicker we'd certainly be open to a claim that the Government made a rush to judgment in this case.

In this case there were certain things that had to be done to determine whether to proceed with the Sandoval case. In addition to that there is no proof, nothing that would suggest that that delay was done because the Government had some, some reason to try to gain a tactical advantage.

Other than the delay, itself, and the fact that Mr. Caro was given a rather lengthy sentence in the Benavidez case, with regard to the lengthy sentence in the

**JA 187**

Benavidez case what the defense has submitted is the affidavit that was part of the pleadings in this case. In paragraphs five and six of Mr. Dene's affidavit he makes it very clear that the decision to plead out Mr. Caro in the Benavidez case had nothing to do with the Government. The Government didn't insist on this plea, or anything like that. According to Mr. Dene, Mr. Dene said that the plea agreement in that particular Benavidez case was proposed by Mr. Moreno-Marquez. As the court will recall from the Moreno-Marquez case, Mr. Moreno-Marquez was the TS member who, along with Caro, actually made it into the room where Benavidez was stabbed. He was the one, along with Mr. Caro, who committed the, physically committed the assault on Mr. Benavidez. It would have been of benefit to Mr. Moreno-Marquez, and lesser benefit to Mr. Caro, and was proposed by Mr. Marquez. According to Mr. Dene, he said, "I advised Mr. Caro the plea agreement would mean he would receive a very long sentence. Mr. Caro stated he wasn't going anywhere so the long sentence didn't matter to him."

So, what you have here is a plea agreement that was proposed in the first instance not by the Government, but by Moreno-Marquez, and Mr. Caro coming along saying, just as he did in Louisiana in Oakdale, "I'm already serving a very long sentence. I'm going to be in here for a long, long time, so it doesn't matter to me." That's how the plea

agreement came to be.

On that particular set of facts, Your Honor, there is absolutely no indication that the Government was somehow complicit in setting this up, or that somehow Mr. Caro would be set up to have a long sentence in connection with the Sandoval prosecution. In any event, Your Honor, let's --

THE COURT: Well, the Government, I guess, knew, understood that a conviction of Mr. Caro in that case would assist it in the capital case in obtaining not the ultimate penalty, but some significant penalty.

MR. GIORNO: Correct.

THE COURT: I guess the question is what, what, what did the Government do wrong, if anything?

MR. GIORNO: Well, that's, nothing, Your Honor. The, if you look at the -- I mean, this is a plea with Mr. Mountcastle, a separate Assistant U.S. Attorney. I understand it's the Government, but there's no evidence that Mr. Mountcastle sat down with the Sandoval prosecution team and said, "Hey, look, we need to make sure we delay the Benavidez case."

THE COURT: Except the defendant would like, in his motion for discovery, for you to disclose any e-mails, communications, as I understand, about that decision, the decisions in those cases.

MR. GIORNO: They have to provide a basis for it,

**JA 189**

Your Honor.  They can't just go fishing around and think there might be something out there.  I notice in their discovery request they asked for e-mails asking for, about his prior deal, and there's simply nothing.  They can't even make a threshold showing.

In addition to that we have the prejudice part of it. Let's suppose, hypothetically, there had never been a plea deal in the Benavidez case.  The Government's argument, which we made, is he's a violent guy, in which case we've brought in the evidence of him going into a room with, along with Moreno-Marquez, and stabbing Benavidez, which certainly goes to show he's a future danger, and he was serving the functional equivalent of life.

When you look at the sentence he had coming out of FCI Oakdale, he had well over 30 years of time to serve.  He already -- it would not have materially changed the Government's argument to future danger or basically he had nothing to lose, and there would be no effective punishment if he didn't get the death penalty which were the two main prongs of the Government's case.

Even assuming the Government did something wrong, which we do not concede, and assuming we would have been successful in getting a lesser sentence on that evidence in Benavidez, there still would have been no prejudice.

THE COURT:  Or going to trial.

**JA 190**

MR. GIORNO: Or even going to trial. I mean, you know, what's his defense? He's on tape stabbing this guy violently. I just don't see where that would have made a material difference.

From our standpoint, the case against Mr. Caro, capital case, much like the Benavidez case, you didn't have to be Clarence Darrow from a prosecution standpoint to prosecute those cases. The evidence was very clear cut, and it didn't require some trickery or gamesmanship by the Government to try to gain an advantage when the advantages were already there.

So, we would submit that there is, that particular claim of Government misconduct is a non starter. If the court doesn't have further questions about it, I can turn to some other claims in which there is, the court might have some concerns about.

THE COURT: Let me ask you, and again I'm, I'm hopping around a little bit, and I apologize if I've thrown you off your notes, but, and obviously I'm going to let you say whatever you'd like within the time permitted, what about the, there is another claim directed at Government, the Government, the Government's argument, of course, which was very powerful in the capital case that, of future dangerousness, and the fact that there couldn't be any clear assurance that Mr. Caro wouldn't murder again in prison, and

**JA 191**

the whole evidence about what would happen to him in the maximum security, and the defendant has now presented some allegations that, in fact, the Government's testimony was incorrect about the length of time that people stay in the maximum security facility.  What about that?

MR. GIORNO:  Your Honor, that is, if my notes serve me correctly, claim seven.  There was a Brady violation by withholding ADX information showing inmates were there for more than three years.

THE COURT:  Yes, sir.

MR. GIORNO:  In that regard I looked at the testimony of Hershberger.  Hershberger was a former warden at ADX in Florence, and he testified about the step down procedure, who goes to AdMax, and what they did there.  He talked about how they step you down from the control unit to ultimately the general population, and he talked about how less than one percent of the inmates actually stay at ADX. And in his testimony, although he described in general terms the step down procedure, had said it was the goal of BOP to matriculate out of ADX back into BOP.  He never once testified, "Oh, after three to five years they'll be gone for sure."  In fact, his testimony on cross examination, one of the last things he said, and this was a question by Mr. Simmons, and just for reference of the court, this is Mr. Hershberger's testimony at page 203 of the trial

**JA 192**

transcript -- pardon me -- 206 of the trial transcript, question by Mr. Simmons, "If he, Mr. Caro, doesn't meet the criteria to where the Bureau of Prisons believes that there's another appropriate placement other than ADX he will remain there?" Mr. Hershberger's answer was, "That's correct, yes."

The Government has never said that, "Oh, no one stays in ADX for more than three to five years." In fact, Connie Hamm (phonetic) testified when he did his visit to ADX he met an inmate who had been there since 1994, since the place opened. There was never a representation by the Government, evidence from the Government, "Oh, if you put Mr. Caro there, guarantee he'll be there." Everyone agreed that the placement at ADX is temporary, and as a general rule that's what happens. You can't keep everybody there. That was the gist of the Government's testimony.

So, the fact that there is evidence from ADX, "Oh, there have been inmates there more than three years, more than five years, more than nine years," the Government never disputed that. We didn't claim, "Oh, everyone is there and gets matriculated out." That's not the case. Some people are, a very select few are there longer. We never disputed that.

So, we do not feel that, in and of itself, would have been dispositive or otherwise rebuttal to the Government's

evidence in the case.

THE COURT:  Let me ask you about the issue of Mr. Bland, Joseph Bland.  That's the cellmate, allegedly, of Mr. Bullock who has filed a declaration in the case.  And again, the defendant points a finger at the Government here and claims that the Government hid the ball on whether Mr. Bullock had a cellmate, although of course it did come out at trial.  Mr. Bullock testified that he had a cellmate, but that the, the information that he had one was not provided to defense counsel adequately and/or in time for them to make, make an investigation of that person, who it is alleged now was Mr. Bland, who has made a declaration that, it is argued it is contrary to Mr. Bullock's testimony.  So, what's the Government's response there?

MR. GIORNO:  Let me start, first of all, with the allegation that we somehow hid the ball, lulled them, led them down the primrose path on that.  That's claim five. From my notes it looks like Mr. Caro made discovery requests on March 27, 2006.  He asked for a list of the inmates in the SHU with cell assignments for December 16th and 17th of 2003.  At the time when he made this request, the Government checked and there was no such list, per se.  There wasn't anything showing that the list, the inmates in the SHU for those dates.  But we did have a roster for December 20th, which at that time didn't show that Bullock had any

cellmate. That's as of December 20th. We did, however, turn over the SHU logs which, according to Mr. Kalista's affidavit, he said he had those, but those SHU logs from the 17th to 20th show that Mr. Bland was moved from cell 146, which was, in fact, Mr. Bullock's cell, on December 19, 2003. So, if you look at those, that information, you could determine that he was moved out of the cell on 12/19 to another range or cell. They could assume that Mr. Bland was, in fact, in there with Mr. Bullock on 12/17.

In addition, I also want to address the fact that there was no mass interview form for Mr. Bland. The reason for that is, at least from what I can tell, if you look at Mr. Bullock's mass interview form that was conducted on December 22, 2003, at that particular time Mr. Bland would not have been even in the SHU as far as we could tell. That's why there was no mass interview form.

But more importantly, as Mr. Kalista's affidavit says, paragraph 21, at the time that Mr. Kalista received grand jury testimony of Mr. Bullock he was certainly aware at that particular time that Mr. Bullock had a cellmate. Mr. Kalista says this. He says, "I was aware that the Government was going to introduce testimony from Sean Bullock who was housed across from Mr. Caro at the time Sandoval was killed. I received a copy of the grand jury transcript where Mr. Bullock testified, and I reviewed the

**JA 195**

housing logs from USP Lee.  I overlooked the fact that Mr. Bullock had a cellmate at the time of Mr. Sandoval's death."

It wasn't a matter of the Government failing to disclose this.  I think the defense attorney, for whatever reason, did not, was not able to surmise at that time that, that, in fact, Mr. Bland was his cellmate.

THE COURT:  Is that ineffective assistance of counsel?

MR. GIORNO:  I don't think it is for the reasons we stated in response to their claim that it was.  Certainly Mr. Bland's declaration is far from clear about whether he would have been able to impeach Mr. Bullock.  In addition to that, if you look at Mr. Bullock's testimony, I mean, we put on Mr. Bullock because he observed something, but his observation, according to his testimony, was like a second. And to say that his, he was all of a sudden the reason why that Mr. Caro was convicted in this case, which does go to the guilt phase of it, that that was the basis of the conviction, that split second observation, ignoring all the other evidence in this case, somehow Bullock's testimony was prejudicial I think would be an overstate.

Mr. Caro, as the court heard the evidence, he confessed.  There was no denial he did it.  He gave a reason.  He said, "I did it because it was over breakfast,"

and I don't think Mr. Bullock, I think even if Mr. Bullock had been thoroughly impeached I don't think he would have made a difference in the case. I don't think Mr. Caro suffered any prejudice as a result of it.

THE COURT: Well, why don't you go ahead with your list, Mr. Giorno.

MR. GIORNO: One of the things that they argue is, again, this is pointing a finger at the Government, that somehow we, we failed to disclose evidence of Mr. Caro's status as a leader of the Texas Syndicate.

And again, I think that misstates the Government's position as it relates to Mr. Caro's leadership status. The evidence that came in from the Government as far as leadership status related to his role in the 2002 incident at FCI Oakdale. If the court would recall, a warden from down at FCI Oakdale came in and testified that happened when the Paisas and Border Brothers were coming into the facility. They sent out the word they wanted to talk to somebody from the leadership of the Texas Syndicate. Mr. Caro showed up. He made very clear that he was a leader in the Texas Syndicate at that particular time. That was the Government's evidence. We never purported to show that Mr. Caro was the leader of the Texas Syndicate or the leader of the Texas Syndicate at USP Lee. Certainly he, he had been in an altercation with another TS member there, so it

**JA 197**

would certainly suggest there was some friction between the groups. But as far as his leadership, the evidence was uncontradicted that Mr. Caro did, in fact, have a leadership role in the Texas Syndicate at some point as recently as 2002 at FCI Oakdale. It wasn't like we had to hide information. I believe there was perhaps some testimony from Mr. Murad (phonetic), in maybe the Benavidez case, saying that Mr. Caro was not in good standing.

Your Honor, where he gets that from, it's an opinion. I don't know that it would be admissible if Mr. Murad would be called to testify, certainly not at the guilt phase. Certainly there was no effort on the part of the Government to hide the ball concerning his status as a leader of the Texas Syndicate.

There is an argument concerning ineffective assistance of counsel during the capital review process, which we have addressed, and basically what we're saying is that's essentially a discretionary function of the executive branch; it's not a judicial proceeding. There's no constitutional right to a hearing, there's no statutory right to a hearing before the Attorney General's Capital Case Review Unit, and more importantly there's no standards.

What is effective assistance of counsel in the Capital Case Review Unit? Even their expert, Mr. Hammond, says it's a legitimate approach at these reviews not to put on

anything. Why? Because if you have a case like this, according to Mr. Kalista, I think realistically he said, "We knew this was going to be a penalty phase case," and you know, their best hope was to get him life in prison instead of the death sentence.

As Mr. Hammond recognizes, in a case like that it's a perfectly valid strategy to not go in and show your hand to the Government because the Government goes, "I see they're going to call Dr. So and So to come in and testify, let's see what they can find out about Dr. So and So." So, in essence you're giving the Government a snap shot of what is your only defense. It was their decision to forgo any evidence as to his mental health and his background, I think was not ineffective assistance of counsel, even if we assume the Sixth Amendment right attaches during the capital case review process.

There are a number of guilt, innocence claims. The first one relates to juror misconduct on the part of jurors 32 and 62. I found those to be, to be interesting. With regard to, with regard to juror number 32, there is, they rely on the juror questionnaire, and there is no declaration from juror 32. But there is, with regard to juror 62, they submit a declaration of, in which juror 62 supposedly said, "Once I found him guilty nothing the defense could have offered would have changed my mind with regard to the

penalty." And in that regard the courts have pretty much said that, that a consideration of a juror's statement after the trial is not reasonably probative over whether they could consider the evidence with an open mind, and follow the law. That was *Neil* v. *Gibson*. There's no statement on the affidavit they lied in the questionnaire. There's no statement that the juror number 62 lied to the court on voir dire. The court heard the voir dire of that juror, and if we compare that to the statement that the Fourth Circuit found insufficient in the *Jones* v. *Cooper* case, that's 311 F.3d 306, in that case there was an investigator's affidavit, and the investigator's affidavit recounts the jurors believed -- this is from *Jones* -- that the Bible mandates imposition of the death penalty in every case of first degree murder, and represents when the investigator asked her whether she could imagine any first degree murder case where the death penalty would not be appropriate, other than if the defendant grew up in the jungle with no contact with humanity. The affidavit we have in this case would be likewise insufficient.

Claim number four, and there are numerous subparts to claim number four that go into the guilt/innocence phase, as well, essentially the defense failed to develop a cohesive theory, the defense, and we would disagree with that.

The court has already asked me about the, about the

cross examination of Bullock, and we've addressed that.
There is, with regard to the theory of the case, you have to remember what the defense had in this case.  More than likely, didn't have.  They walk in and they have a fellow who has admittedly, there's no doubt that Mr. Caro killed Mr. Sandoval.  The way he notifies the authorities of what he had done is, "Hey, come and get this piece of shit out of my cell."  He taunts the guards later on --

THE COURT:  Well, of course, the defendant says that, that counsel should have explained that that was just bravado, that was prison bravado, that that's how he had to portray it to keep his, his status.

MR. GIORNO:  Who is going to testify to that?  I mean, Mr. Caro's going to say, "I was just doing bragging."

THE COURT:  A prison expert, is what the defendant contends, an expert in prison culture would have said any person in Mr. Caro's position has to show that he's the toughest hombre around, and is cold and unfeeling, and that's the only way you survive in a maximum security situation.

MR. GIORNO:  Is this during the guilt/innocence phase, Your Honor, or penalty, or both?

THE COURT:  Both.  Well, yes, both.

MR. GIORNO:  Let me address the, first of all the guilt/innocence phase.  We've all done a lot of cases out of

prison, people do things for a lot of different reasons. In this particular case there's no indication that Caro killed Sandoval, or that the statements he made later on were bravado. Let's, assuming hypothetically that his statements to the guards, or in the presence of the guards was bravado, that he had to show that he was, in the court's words, the biggest, baddest hombre on the block. The court, the jury still had the evidence of Caro's conversations with his family members, his correspondence with TS members, in which it's the same thing. "I killed him because he disrespected me. He was, I needed to do it. He, the guy disrespected me." There was no remorse at all in any phase. Had nothing to do with bravado.

What is the explanation for the letters to his family members, or his conversations with his family members? "I killed a guy." That was not bravado. And given the facts of the case, the, the statements Mr. Caro made, his admissions to Agent Fender, I think it would be easy to talk about the prison culture. I'm not sure the expert's testimony would be admissible at the guilt/innocence phase because there's no factual predicate for it, and even assuming it would be admissible in the penalty phase, which it probably would be, maybe, it's still that bravado argument carries very little weight in the light of the circumstances of this case.

I mean, Caro, no witness has ever said that there's bravado. People do things in prison for a lot of reasons, but there's never been any indication that his statements were bravado. So, we would submit to the court that prison culture would not be sufficient to rebut that.

I would point out to the court that as far as the evidence in this case, there is zero evidence of any motive other than articulated by counsel in the briefing, there's no gang motive, no evidence of self-defense, no evidence of provocation, no evidence of mutual combat --

THE COURT: He, well, I mean, the argument was made at trial, at the guilt and innocence phase, I mean, as you say, this is what they were left with, but the argument was that this was bound to be a second degree murder situation. It was, it was bound to be a spur of the moment deal because there were two people placed in a small cell, you know, counsel showed us how small the cell was, and that there was this disrespect, and so it likely was a flare up between the two of them. That was the argument that was made.

MR. GIORNO: That's correct, Your Honor. If the, as the court points out, the defense went through a very elaborate thing, sometimes people snap, and the court, as I recall, over the Government's objection, I think, the court wisely chose to instruct on second degree murder, and the

**JA 203**

jury received that information.  You can find him guilty of second degree murder if you want.  And the jury rejected that.  But it wasn't like they, I mean that was what they had.  I don't think that prison culture on the issue of guilt or innocence, say, yeah, if you're in prison it's somehow okay to murder someone over breakfast?  I don't think that would have been, that would have carried the day.

The defense did, in fact, put on evidence, and the court instructed the jury on second degree murder.  The jury just rejected it.  And so I think they have a cohesive theory of defense based on what they had to work with.

THE COURT:  Their claim 4C is that the defense, in the guilt/innocence phase, was negligent because they failed to put on evidence of Bureau of Prison's negligence.  This relates to claim 6H, as well, regarding the penalty phase.

MR. GIORNO:  The theory there, as I understand it, is that somehow the fact that the Bureau of Prisons put Sandoval and Caro together would have been somehow relevant to the issue of guilt or innocence, and I'll state to the court that there was no evidence to support such an argument or such evidence in this case.  In this particular case what you had was, and I went back and looked at the transcript, the initial request was, the decision to put Sandoval in Caro's cell wasn't because Sandoval asked to do it; it was done at the request of Bureau of Prisons.  They had people

come in on a bus, they tried to figure out who to put together, they said, "Okay, San doe volume and Caro are in the same gang. Let's put them in here." There's no evidence of animosity or prior bad blood between them, so they put them in the same cell together, or wanted to. Mr. Caro said, "I don't want a cellmate. Not Sandoval. I just don't care for a cellmate." Later on Sandoval is going to be placed, and Sandoval says, "Can you put me in with Caro?" They go back to Caro and Caro says, "Yeah, I'll take him. We're brothers. We've done time together." He goes in the cell with him. Okay.

According to the testimony of Watts, Gilly (phonetic) and Laster, I mean, they, they did everything they could to make sure it wasn't going to be a problem. There was no reason to think that putting these two together would end up the way it did, particularly when you look at Caro's stated reason for the killing, it had nothing to do with the fact that they were enemies, or I think they used the term a cold dose of revenge that Sandoval was going to mete out. There's no evidence of that. Things just went horribly wrong in that cell. From others that the court heard, it was over something trivial, like breakfast. I don't understand it, but that appears to be what it was, and nothing more.

There was no evidence of BOP negligence. So, I don't

think defense counsel could have been ineffective of failing to put on evidence of something that did not exist.

There are a number of penalty phase arguments, Your Honor.  The only one I think that perhaps might require a little bit of elaboration is the evidence concerning mental health.  Because when we were looking at that we thought, okay, well, where is the, where is the mental health defense?  Why isn't it here?  And the, if you look at, again, starting with Mr. Kalista's affidavit, Mr. Kalista talks about the fact that, I mean, they knew at the outset that mental health would be something they wanted to look at.  According to the affidavit they had, and the information we have, they right out of the box started getting mental health experts, mitigation specialists, things like that.  And they have, they retain Mr., Dr. Spica in January of 2006.  He's a licensed clinical psychologist and neuropsychologist.  His examinations don't suggest any brain impairment or abnormality.  Spica does ultimately report something called a frontal lobe dysfunction, but his report's inconsistent, some say it's inconsistent with frontal lobe dysfunction; some say it's consist testimony.

If you look at Dr. Spica's testimony, Dr. Caruso (phonetic), who said, "I can't help you in this case," the other defense expert, they were really left with not much of anything at the end of the day.

As I understand it in January of 2007, Dr. Spica comes along and tells him for the first time right before the trial starts, "I can't help you on the issue of mens rea." So, at that particular point the defense had very little in the way of mental health evidence that would have made a difference.  That's all they had.

The flip side of that was they knew the Government had retained Dr. Phillips.  I mean, all indication is the defense lawyers did their homework on Phillips, and knew he would have done his homework and done a good job.  They did not have the benefit of his report when they made the decision to forego the presentation of mental health evidence because under the rulings of court, as I understand, they could not get it, just as we couldn't get theirs unless and until they notified the court they were going to make that an issue at trial.

What they were left with at the time they made the decision not to put on any mental health evidence was they really didn't have the experts to be in a position to rebut Phillip's testimony, and they thought, they believed and surmised, and tactically, so when you looked at Phillips' record that, Dr. Phillips would have made a compelling case, there were no issues of mental health, no mental health issues in this case that would help the defense in this case.  Particularly when Phillips reports -- I noted this --

**JA 207**

Phillips' report cites 12 psychological reviews from seven different psychologists and five different correctional facilities which found that Caro's mental status to be within normal limits.

Now, through Caro's brief, he talks about brain damage. And perhaps I've just overlooked it in the volume of documents, but I didn't see any mental health expert who said that Mr. Caro had brain damage. The, the defense really made a pretty compelling case. They introduced teachers, they introduced family members, they introduced his wife, they introduced Dr. Cunningham, they introduced Mr. Aiken to talk about the prison things, they did an effective job of cross-examining the Government's experts, but at the end of the day there really wasn't a lot that could have been offered in mitigation that wasn't offered.

They also mentioned calling the two brothers, Noe and Jose. Noe and Jose, according to some of the family members, were the bad apples in the family, so to speak, whereas Carlos Caro was quiet and shy and grew up in a tumultuous household. The brothers were ripping and snorting and tearing up the roads. Their testimony, I would submit to the court, they could not have added anything to the testimony about his upbringing and background that the family members couldn't testify to. It would have, it could have been counter-productive given who they are. So, the

decision not to call them, I think, was a strategic decision which was certainly well supported by the record in this case.

THE COURT:  I think your initial time is just about up.

MR. GIORNO:  Thank you, Your Honor.

THE COURT:  Thank you.  All right.  Ms. Wilkinson?

MS. WILKINSON:  Thank you, Your Honor.  I think that I'd like to structure my argument first by addressing the capital case, motion to dismiss, and then the Benavidez, what we call the Benavidez case, and then Ms. Spence will address the evidentiary motion.

THE COURT:  If you wouldn't mind pulling that mic closer to you just to make sure.  That way your colleague in Arizona can also hear you better, too.

MS. WILKINSON:  Okay.  Your Honor, as we have argued in our response, the Government's motion is contrary to the law and is not supported by the existing record or the record that we have presented to the court; the factual allegations which, for purpose of this motion, must be accepted as true.

We ask the court to deny the motion for the reasons that we stated.  There's three sort of bigger picture reasons why we believe that the motion's contrary to the law.  First, the Government applied the wrong standard of

review and continues to do so today in this hearing. Two, the Government's motion, and its argument today, actually highlights factual disputes and supports the need for further discovery, and an evidentiary hearing. And the Government also improperly analyzed the issues in a piecemeal fashion which is inappropriate. And I'll address each of these in a little bit more detail.

The test before the court on these two motions is not who wins on the merits. That's not the court's job right now. But whether, accepting as true all of Mr. Caro's allegations and drawing inferences in his favor, whether his claims are patently frivolous, I think the word is palpably incredible or conclusively without merit.

The Government doesn't address this standard in its motion. In fact, doesn't present any standard to guide this court. And instead, they improperly, they dispute Mr. Caro's factual allegations, they draw inferences against Mr. Caro, they criticize his experts and other evidence, they ask the court to make credibility determinations, and they ignore the new factual, the new record that we have put before this court --

THE COURT: Well, it would be true, though, if on a particular ground that if everything that was alleged was true, it still would not have amounted to a deprivation of rights, or violation of law, then you could not prevail,

**JA 210**

that is, the Government's motion would be good.

MS. WILKINSON:  Correct, Judge.  I guess the one caveat I would put to that is at this point we have only alleged facts; we have not yet had an opportunity to present evidence supporting those facts.  But that is a correct statement.

THE COURT:  Well, certainly you haven't presented evidence except through the declarations, I suppose, but, again, isn't the question whether, assuming that everything, every fact that you allege is correct, is true, or it would be found true after an evidentiary hearing, if it still would not result in a sufficient ground to set aside the judgment, then the Government's motion would be good?

MS. WILKINSON:  That's correct, Your Honor.  What makes it a little more complicated in this case is that many of the factual issues that we have raised are not discrete; they actually are pervasive throughout the whole trial.

I think actually there was some discussion on whether an issue went to the guilt and innocence phase or penalty, and I think both the judge and Mr. Giorno agreed that actually it went to both phases, so it makes it more difficult when the court is trying to resolve an issue of prejudice because you can't just look at that isolated issue within that isolated framework.  The court has to consider, for example, the totality of the mitigation that has been

presented and how that specific allegation, you know, changes that totality.

So, for example, some of the factual disputes here, one of them, in fact, the Government just ended on is the parties dispute strongly whether Mr. Caro suffers from a brain impairment. The parties dispute whether the Bureau of Prisons could house Mr. Caro at ADX for more than three to five years. I think I'll address this in a little more detail, but I think it's disingenuous for the Government now to say their only testimony was that this was a goal, and that it wasn't what happened at ADX. And I'll get into that in more detail.

The parties dispute the reasonableness of counsel's decisions. The Government has conceded in its motion that, that without an evidentiary hearing this court doesn't know what trial counsel's reasons were. We have alleged that counsel's decisions were unreasonable, but not strategic. This court has no way to determine that now without further evidence.

And then finally, again, this piecemeal approach is contrary to the law in *Strickland*, it's contrary to the law in *Brady*, it's contrary to the law in *Williams*, it's, it's also contrary to the law of the Fourth Circuit case of *Elmore* v. *Osmond* which is a 2011 case addressing *Strickland's* claims.

**JA 212**

And under the law, we believe that the correct approach for any sort of analysis here has to be, the court has to consider, as I said, all of the mitigation, and all of the errors in looking at the prejudice. And that cannot be determined in isolation until the court has identified all of the errors, and the court can't, it's our position, the court can't identify all these errors until the evidentiary hearing has been completed and further factual development has been concluded.

And as always, I think the guiding principle is did the errors infect the trial such that Mr. Caro was denied his due process right to a fair trial. So that's the guiding principle for all, all of the alleged errors regarding the type of error.

I guess I'd like to briefly address the points raised by both the court and the Government in its time. The first claim that the court asked about was claim one which had to do with tactical delay. And I guess the test for that, as we've set out, Your Honor, is whether or not Mr. Caro has shown actual prejudice. At this stage has he alleged prejudice from that? We believe we have alleged sufficient prejudice on that. And I would just rely on our papers for that.

THE COURT: Tell me, though, about, what was done wrong? What was the problem? I mean, what should the

Government have done in relation to the prosecution of Mr. Benavidez?

MS. WILKINSON: Several things, Your Honor --

THE COURT: The prosecution involving that case.

MS. WILKINSON: Correct. First of all, Your Honor, they shouldn't have misrepresented the case to the court.

THE COURT: Wait, wait, wait. Misrepresented what to the court?

MS. WILKINSON: In one hearing before the court, I believe that it was in the change of plea hearing for Mr. Moreno-Marquez, the Government represented that it had a very strong case, that it had video, taped videos, it had DNA evidence, it had witnesses, it was a very strong evidence.

At the time of Mr. Moreno-Marquez's sentencing, which was, I believe, a day or two after Mr. Caro's sentencing, this court sentenced Mr. Caro to 327 months, and then when it came time to sentence the co-defendant, who had participated equally in the assault, the court was concerned and said, "Well, why should I allow this man to plead to possession of weapons and to a much shorter sentence when the co-defendant, I gave him just the other day 327 months," and that was an appropriate question, especially assuming the fact that Mr. Caro had 12 criminal history points,

**JA 214**

Mr. Moreno-Marquez had as many. I believe he had 26 criminal history points. There was nothing in the record to indicate that there was a difference in culpability, although the Government alleged Mr. Caro was more culpable. But there's no evidence to support that claim.

And the other, the other part of that is the Government also did not inform the court that another co-defendant, Mr. Tijerina, actually was the one who planned the assault, and ordered the assault because he wanted to become leader. Benavidez, at that time, was the current leader of the Texas Syndicate at USP Lee. And this is all according to the Government's witnesses, Your Honor --

THE COURT: How would any of that prejudice Mr. Caro? I mean, suppose, suppose I had, I had given his co-defendants more time or Mr. Caro less time, what difference would that have made, or could have made?

MS. WILKINSON: For example, if you allowed Mr. Caro to plead possession of a weapon similar to Mr. Moreno-Marquez, then he would have had no other prior crime of violence other than possession, which I guess in some circuits can be considered that --

THE COURT: I don't get to decide who gets to plead to what. The Government is in charge of placing the charges against the defendant.

MS. WILKINSON: That's exactly right, Your Honor,

but Mr. Moreno-Marquez and the others also had been charged with conspiracy to commit murder. However, at the end we had a one person conspiracy, Mr. Caro, because the Government allowed everyone else to plead to possession of weapons. They now say, "Oh, well, it wasn't their fault because Mr. Moreno-Marquez proposed the deal." I think that's disingenuous, Your Honor. The Government always controls what the offers are in these cases.

THE COURT: Again, I'm having a problem -- I'm sorry, maybe I, I'm not communicating very well. How did it harm Mr. Caro, what his co-defendants, co-conspirators in that case were allowed to plead to or got?

MS. WILKINSON: What harmed Mr. Caro was his sentence, Your Honor, and maybe this is the point that you're getting to. And he was harmed because the Government delayed in notifying this court that it was proceeding with a capital case, and that, and that the court should secure counsel for Mr. Caro. It did not make that request until after it had secured this disproportional sentence for Mr. Caro. Had the Government come forward to this court before that and said, "Your Honor, we have this case, but there's another case that's out there, too, that we plan to pursue; in fact, we've already impaneled a grand jury on this and we're collecting evidence as it is now."

THE COURT: What difference would that have made?

**JA 216**

37

MS. WILKINSON:  I think if he had capital counsel, there's no capital counsel that would have allowed Mr. Caro to plead to conspiracy to commit murder that would have been an aggravator --

THE COURT:  So, he would have gone to trial on this, that charge?

MS. WILKINSON:  He would have gone to trial, that's correct, Your Honor.

THE COURT:  And the evidence is he likely would have been convicted.

MS. WILKINSON:  Well, Your Honor, we believe if he was convicted, similar to another case before this court, the Garcia case, I think Alcantaro was the name of the alleged victim, very similar, supposedly videotape, stabbing, but that case did go to trial and the defendants were acquitted of the more serious conspiracy to commit murder charge.  I think they were found guilty of possession of weapons, and it was the same sort of thing with superficial wounds.  Mr. Benavidez had a lot of wounds, none of which were that serious.  He was taken to the hospital, he was kept there overnight for observation, and then released.  I think the same sort of case could and would have been presented in Mr. Caro's case had capital counsel said this is ridiculous; you're setting him up for a death sentence in this case --

**JA 217**

THE COURT: So, your contention is that the Government should not have, should have obtained the appointment of capital counsel for Mr. Caro before it proceeded with the Benavidez case?

MS. WILKINSON: That is one of the claims, yes, Your Honor. And again, the, at this point I believe that we have the claim that's not patently frivolous, and we have sufficiently pled it, such that the claim should survive to move forward.

THE COURT: What evidence would there be, though? I mean, isn't that the facts? What more would we know after an evidentiary hearing?

MS. WILKINSON: Well, I think we would hear the testimony of Mr. Hammond that would say that it was unreasonable of Mr. Dene to allow this to go forward. Mr. Hammond, the *Strickland* expert, would testify that a capital attorney would never have, would have advised Mr. Caro against going forward with this plea agreement.

We have requested in our discovery some of the e-mails which the court discussed earlier. We attempted to very narrowly tailor that request. We don't want to invade on all of the work product; we just want anything that goes to the timing. For example, if the Government had an e-mail saying early on in the year, "We plan to prosecute Mr. Caro for the capital case, but I don't think we should go forward

with that now because it just, let's go ahead and get this sentence done and we'll have a great aggravator, and we can proceed like that." I think that sort of evidence, and that's what we requested in our discovery, evidence there goes toward the timing, not why, but the timing of their decision.

THE COURT: All right. Go ahead.

MS. WILKINSON: Judge, moving on to the claim about ADX, again, it's disingenuous for the Government not to say Hershberger said it was only a goal. As the Government said at the very end, you know, there was no prejudice because it came out at trial that a select few inmates were there longer than three to five years, but that's, that misses the point, Your Honor. We're not saying there was one or two exceptions, that came out at trial, Mr. Silverstein was an unusual case who was there longer. What we are finding now is that, I think, our latest numbers, we have found that there were, we've discovered, and this, again, we don't have all of the available information, this is what we've been able to glean from various public sources that have recently become available, we know of 155 inmates that were incarcerated more than three years. That's not one or two, or a select few; that's a substantial amount. And 126 of these are still at ADX. At the time of Mr. Caro's trial we presented evidence that

79 inmates had been incarcerated more than three years. Sixty-three had been incarcerated more than five years. So, the evidence is not that one or two people were there more than three to five years. The evidence is that many inmates were there more than that. And the fact that ADX had a goal was very misleading because they never followed that goal. And that didn't come out. And, in fact, we cited statements by Hershberger in our pleadings, and we also cited the Government's argument at the end that says, where they argue that everyone agrees, everyone's experts agree that this man is getting out in three to five years. That was the intent of the testimony. That was the argument. And that was flat out false, Your Honor. And we've now been able to present evidence showing that that was false.

And as I said, we've even narrowed it down to BOP homicide cases. And again, we have found that 54 inmates have been continuously designated to ADX since their initial placement there, and these are inmates who have, for the most part, been convicted of BOP homicides. And that includes 22 that were there at the time of Mr. Caro's arrival.

If you narrow it down to cases where the Government sought death but eventually got life, we found ten cases nationwide. Nine of those ten have been continuously housed at ADX, not three to five years and moved, and the only

**JA 220**

inmate that hasn't suffers from schizophrenia. And according to the rules at ADX he was ineligible.

As far as the situation with Mr. Bland, we do contend, and we do allege that the Government hid the ball and misrepresented the situation. It's, the Government knew that Mr. Bullock had a cellmate three years before trial, they knew that when Mr. Bullock testified in his grand jury, yet there was no interview form, nothing to indicate -- the Government, when they produced the list of SHU inmates, they didn't say, "Well, this is what we have on the 19, but we also know there was somebody who wasn't on the list who wasn't there, too, because we, we know Mr. Bullock had a cellmate. He's not on the list because we don't have the exact date, but here it is." Later on, when they produced the grand jury testimony it was attached to a letter that said, "Oh, we've also, we also interviewed all of the SHU inmates and we've attached their mass interview forms." Again, they're saying, "Here it is; we're giving it all to you," and they don't give anything from Mr. Bland, and they don't say, "Oh, by the way, we haven't included Mr. Bland's, but he was there." It's very misleading.

THE COURT: Well, I mean, isn't it true, though, that defense counsel knew that, or should have known that he did have a cellmate?

MS. WILKINSON: We allege that also, Your Honor.

**JA 221**

One month before, there were records there that, had they scoured through the records with a fine tooth comb, they would have discovered it in the SHU logs.

THE COURT:  They knew it when they got his grand jury.

MS. WILKINSON:  They knew it at that point, and we allege at that point they should have said, "Oh, Your Honor, wait, wait, wait.  There's new evidence here.  Move to continue the trial."  And do whatever they did.  They just missed it.  There's no strategic reason.

THE COURT:  What was the prejudice to Mr. Caro?  You know, your *Strickland* expert says that this was the most important thing that led to Mr. Caro's death penalty, that this was it, that Mr. Bland had, if Mr. Bland testified Mr. Caro would not have received the death penalty.  Isn't that right?  Isn't that what he says?

MS. WILKINSON:  He says something similar to that.  I don't have the quote in front of me, but you are correct.

THE COURT:  I think he said it pretty close to what I said.  Isn't that extravagant, at the least?

MS. WILKINSON:  It's your decision, but if you look at the facts that he alleges, the only purported eye witness to this offense, the Government cited his testimony repeatedly, and we put that in, we've cited all, I don't know how many there are, 12, 15, I don't know how many,

repeatedly, he snuck up behind him, this wasn't a fair fight, he ambushed him from behind, from behind, snuck up, snuck up, and the Government took the unusual step to having a character witness to say this man is very truthful, and that's not very typical --

THE COURT:  All Bullock said was, in fact as he was cross examined about it, he thought they were tussling. He said for a second or half a second he saw Mr. Sandoval, Mr. Caro behind Mr. Sandoval, and he saw this orange towel around his neck, and that disappeared from view in a second or half second.  That's essentially what he said.  How would you strangle someone if you didn't ambush them?  How would that happen?  I mean, I guess my point is, again, I'm just struck by your expert's opinion that this was the most significant thing in the whole trial.

MS. WILKINSON:  Well, I guess my answer --

THE COURT:  I guess my point is, didn't the Government have, I mean, there's no question that he, Mr. Sandoval, was strangled with a towel, with a hard knot.

MS. WILKINSON:  Correct.

THE COURT:  And obviously, Mr. Caro did it.  There wasn't anybody else in the cell.  And, I mean, what other inference is there?  I mean, nobody likely would let -- they weren't playing.

MS. WILKINSON:  They weren't playing.

**JA 223**

THE COURT: He had to surprise him to get the towel around his neck and strangle him for two, three or four minutes is what the medical examiner said it would take.

MS. WILKINSON: To be honest, I haven't thought about the various ways you could strangle someone, but what I do know is that the tussling was in the first interview of Mr. Bullock. Later that story changed. I mean, initially he says he had his hands, and then the changed to the towel. It's like at various different stages his story changed. And I guess that Mr. Bland goes not only to what happened, but also would have been evidence that would have impeached Mr. Bullock.

We believe that we have sufficiently pled prejudice, Judge. And again, the other thing that I would make note of is that the prejudice has to be analyzed in light of the other prejudice, the other errors.

THE COURT: All right. Go ahead.

MS. WILKINSON: As far as the, there was discussion on Carlos' status as a gang leader. And again, Your Honor, our claim is not patently frivolous, which is the standard before this court. I'm typically a trial attorney, so I want to get in and fight all the facts, Your Honor, but I'm trying to hold back because that is not the question before this court. The question before this court

**JA 224**

is whether it has been sufficiently pled. Having stated that, there are many factual disputes in this claim that preclude resolution on a motion to dismiss. We agreed that the evidence at trial that was presented was that Carlos was a leader at FCI Oakdale. Our expert, Mark Beazy (phonetic) disputes that for the reasons stated in the pleadings.

As far as the Government's claim, the Government denies that it withheld that it, well, that the Government believes, didn't believe Carlos was the leader of TS at USP Lee ever. The Government never believed that. They believed it had been Mr. Benavidez and Tijerina. Mr. Caro never contended to be the leader. The Government argued at one point he's not just a member of this dangerous, disruptive group; he's a leader. That's what they say in the, in the argument. One of them goes as far, I believe just weeks or a month before trial, in a transport document, the Government said, "Be careful. He's in bad standing with the gang."

Now, Mr. Kalista never saw he was in bad standing. There's a similar one which the, one of the officers said, "Whoever did this to Mr. Sandoval is in trouble. We've taken a vote and he's in trouble." None of that came to light to trial counsel. If Mr. Caro was not a leader at USP Lee, but actually was in bad standing, then the vast majority of the Government's penalty phase witnesses, their

testimony was irrelevant because it focused on gang communication, it focused on how dangerous gangs were, how you couldn't securely house gang members. If Mr. Caro was in bad standing not only did he have the force of the gang behind him, he probably was a target of the gang. I think 11 of their penalty phase witnesses talked in some manner about gang matters.

Regarding the IAC claim regarding DOJ death certification, the argument that the Government makes shows that it's a very fact intensive issue. What we do know is that there was very little investigation that was done before that. We claim there was an inadequate investigation. Again, there's an issue of fact, that they submitted nothing in writing. We do have testimony saying that that was unreasonable for them to do that, and contrary to what the Government says, nowhere does it say it was reasonable for them not to show their cards at this hearing. Again, we've sufficiently alleged a claim.

I'm sorry, Judge --

THE COURT: Let's see, you used an hour.

MS. WILKINSON: I don't have much more. I have 30 minutes?

THE COURT: Yes, ma'am.

MS. WILKINSON: There's a couple of minutes that I would like to address --

THE COURT: I'm sorry, you haven't used an hour; you've used half an hour. I think it was 2:15 when you started. Tell you what, I'll give you time to get your thoughts in order, and give us all a break. We'll be in short recess.

(Recess from 2:47 p.m. to 3:00 p.m.)

THE COURT: All right. You may proceed.

MS. WILKINSON: I'm not very good with math, especially under pressure. Is it correct I have an hour left?

THE COURT: Why don't you give it 45 minutes. We also need to hear the discovery issue. That will give the Government an opportunity to respond, stay within our time limits. I'm not sure if I calculated it accurately when we started, but in any event, that would be great. I'm not going to hold you to the exact minute. But if you could try to do it that way, we'll finish in time.

MS. WILKINSON: The next issue that was raised by the Government has to do with claim three, juror misconduct. The only point I'd like to make with that is the basis for our juror misconduct claim which we have alleged is that the jurors made statements in their voir dire that are inconsistent with what they say now, and it is that inconsistency that we have alleged that gives rise to the misconduct. Again, we believe that we have sufficiently

**JA 227**

alleged the claim that's not patently frivolous.

For example, juror number 62 said in voir dire that she neither favored nor disfavored the death penalty. Now what she says is, "Oh, no, I'm strongly in favor of the death penalty where the evidence of guilt is obvious." Had she said that during voir dire, that would have been a basis for striking her. Similarly, juror 32 in voir dire said he would not automatically vote for death if he found the defendant guilty.

THE COURT: Let me ask you this. I've had a number of habeas cases, of course, and I guess in every capital case it's procedure for capital habeas counsel to go to the jurors and interview them. But I'm always interested in how that's presented. Do you, have you told these jurors what you're doing? I mean, how is that produced? How are their affidavits produced? I don't think I've had a capital habeas case, and I've had many, that hasn't had a juror declaration on a particular point. "If I had known this," or, "If this had happened," "If," and so on.

MS. WILKINSON: Procedurally how that happens, Your Honor, is our investigator goes out and talks to the juror and identifies herself and the fact that she's representing Mr. Caro --

THE COURT: I don't doubt that. I guess my bigger point is it just seems to me that it's, it's very tough for

these jurors, of course, to sit in a capital case, but seems to me that it's really tough for them after the fact to be presented by counsel, it's like polling, it depends on the question you ask, you know, "Did you know, Madam Juror, that if we had gotten evidence in, now that would have made a difference to you, wouldn't it?"  And what do you say as a juror?  Be cold hearted and say, "No it wouldn't have made any difference to me."  Or what do you say?

MS. WILKINSON:  Actually we've had jurors that say that.

THE COURT:  You don't file those.

MS. WILKINSON:  No, we don't file those, Your Honor.

THE COURT:  I don't know that you can answer that question, but it's always interesting to me.

MS. WILKINSON:  Judge, I guess those type of, of affidavits, they go to prejudice, would it have made a difference, we give them a hypothetical, knowing what you know would that have made a difference?  In our case I just want to make clear that that is not the only evidence of prejudice that we have put forward in our claims, that is just one portion of it, and it is just intended to show that a reasonable person could have reached a different result if they had known this.  It's not all of our prejudice, Your Honor; it's just one piece of it.

**JA 229**

Regarding the, the claim about, that we have alleged that the defense counsel did not provide a cohesive theory of defense, Your Honor, we believe that we've alleged a sufficient claim here.

The, at trial what you heard was what we call the breakfast dispute defense, which was basically two men in a small cell get in a heated argument over breakfast, and one man kills the other man. Not a very pretty story, Your Honor.

THE COURT: Well, what is the alternative story?

MS. WILKINSON: The alternative story is what we call the cold dose of revenge story, and the, quote, "cold dose of revenge" actually comes from one of the Government employees, Mr. Murad, a gang investigator, and it was from his grand jury testimony when he is talking about the Benavidez case, and also a previous Texas Syndicate case that occurred before that, too. The grand jury is basically In Re: Texas Syndicate, and what he says at the very end, the jurors are saying, "Well, why if he was a leader, why did they hit him," and that's where he says, "No, Mr. Benavidez had been the leader," and then he says, "And it wouldn't be surprising for the people who hit him to be facing a cold dose of revenge as a result of this assault."

There was then also evidence at trial, I believe, Ms. Guzman, or whatever, there was basically some testimony

**JA 230**

that the Benavidez assault had not been a sanctioned hit. Meaning that the gang had not approved it. Mr. Tijerina ordered it because he wanted to take over the gang, but there was a lot of internal tension. So, the cold dose of revenge story, Your Honor, is based on the fact that Mr. Caro, along with Mr. Moreno-Marquez, had hit, had assaulted the leader of the gang, and the gang was in turmoil, it was expected that there would be more -- in fact, the Government's SIS people in their report on Benavidez had recommended that Caro be isolated from all other TS members for that reason.

Now, that apparently was never communicated to the officers on the SHU because they did the exact opposite. They said, "Oh, yeah, they're in the same gang. Let's put them in the same cell."

THE COURT: But Caro accepted Sandoval, he said, "We're brothers. We've done time together."

MS. WILKINSON: At first he said no, and --

THE COURT: But he didn't know, he was just asked, as I recall he was asked, "Will you take a cellie?"

MS. WILKINSON: Your Honor, we don't know all of the facts. It was not established at trial whether he knew, or not --

THE COURT: We don't have another trial in this case.

**JA 231**

MS. WILKINSON: No, Your Honor, but that's evidence, I think, that would be pretty easy to get from Mr. Laster, or from the previous officer because, as I understand, standard procedure is for the inmate to gather up their belongings, walk beside the guard, go to the door, knock, knock, will you take this inmate, they can see, they know what's going on. I don't know the answer, but --

THE COURT: I think the facts here were that they had an influx of people, a bus had come, as I understood the testimony, he was seeing where there were cells that he could put these inmates. You may be right, I don't know.

MS. WILKINSON: We dispute that, and we dispute that for a couple of reasons. There was no testimony at trial that that was the reason that the BOP attempted to place Mr. Sandoval in that cell. There was no testimony about that, whatsoever, from the guards. The only person who said that was Mr. Bullock who said, "Oh, yeah they wanted to put them in there because a bus was coming in." So, we dispute that.

But getting back to the theory, the cold dose of revenge --

THE COURT: That's a speculation, I mean, maybe so Sandoval got into the cell in order to kill Caro. But what is the evidence of that? I mean, what, what could, could counsel, even with everything that we know now, have argued

that in any way more than they could have argued the, this was just a simple flare up, disrespect, and thus no premeditation?

MS. WILKINSON:  Well, Your Honor, I guess the other facts are we know Mr. Sandoval was not a full member at that time; he was a prospective member.  In order to become a full member he had to commit an act of violence.  This would have been the perfect opportunity for that.  We know the testimony at trial could have been from a gang expert, or from some of the Government's gang people, they would tell you this is a blood in/blood out gang.  In order to do that you have to commit an act of violence, and yes, he was a prospective member.

The other evidence would have been -- well, I guess the point is I think there would have been as much evidence or more of a cold dose of revenge than heat of passion over a breakfast dispute that happened nine hours after breakfast.

THE COURT:  Half dozen of one, six of the other. If they argued that wouldn't we be right here with you saying they made a terrible mistake, they argued somehow Sandoval was put in there to kill Caro, and there was no evidence of that, and they should have, in fact, argued that, you know, this just came up out of a sudden dispute in hot blood, and no premeditation?

MS. WILKINSON:  I disagree, Your Honor.  The

reason I disagree is that as you go through, and you start to put together the puzzle pieces here, the puzzle pieces fit the cold dose of revenge.  Like I said, just the things I've talked about, plus the things in our pleading, the pieces didn't fit a breakfast dispute.  The timing was off.  There was no evidence of that.  There was no motivation why, you know -- one point, the second point, Your Honor, is that the cold dose --

THE COURT:  What do you mean the timing didn't fit?

MS. WILKINSON:  Breakfast is in the morning, and if you're going to have a heat of passion it would seem that that would occur when the person wakes up and finds out that you ate my breakfast.  Their position was that it boiled, it boiled, boiled, throughout the day.  The Government's argument was premeditation, premeditation, premeditation throughout the day.  So, it was a difficult argument.

The other thing, Your Honor, the cold dose of revenge would have explained Mr. Caro's statements, because if you're a gang member, as he was, you don't disclose gang issues so he's not going to tell anybody that this was a gang matter, "He attacked me because of my hit on, my assault on Mr. Benavidez."  He can't say that.  That would have been to violate the gang rules.  He comes up with this story that says, about disrespect.  And the Government's own

agent, Agent Fender, when he was interviewing Carlos, he tells him, he says, "You've told me this breakfast story. I don't believe you. I don't believe this story. I think it had something to do with the gang." What does Mr. Caro do? He says, "This interview is over. I'm not talking to you anymore." Those pieces all fit, Your Honor. And we've alleged them in our papers.

But the bravado, the court asked about the bravado, the statements, again, it wasn't just I'm the biggest, baddest hombre on the cell block, Mr. Sandoval went in there to assault Mr. Caro, whether he went in to kill, whatever. Our story is he went in there to get retribution for Benavidez because Mr. Caro had the audacity to try to hit the leader of TS. He went in there to try assault him. After it's done he needs to send a message out to other members of the gang, don't you try this, too, because it isn't going to work.

THE COURT: Why would he tell his wife and his girlfriend, I mean, why would he give them the same, you know, no remorse story, which he did?

MS. WILKINSON: Well, possibly several different reasons, Your Honor. One is that he's aware everything is being monitored by the BOP, so he knows every letter he writes is going to get opened, every phone call is going to be recorded. He doesn't have private space to do that.

The second reason would be, and I'm just totally speculating here, Judge, but when you're, when you're acting and you have to walk the straight and narrow you don't change your story because you might slip up.  You get that story, you're in character, and you keep that story.  So, that fits the cold dose of revenge.  It explains the statements.  The impulsive breakfast doesn't fit with Mr. Caro's records.  He doesn't have the history of being involved in impulsive fights in prison.  He doesn't blow up.  That's not his personality.  So, the story fit with all the other facts that are out there and we have alleged.  They may not have been part of the trial record, but we have alleged them before this court and this needs to be considered.

Quickly, on BOP negligence, I think I've already talked about that.  The Government is ignoring the new evidence we presented as far as why that's negligence, including the Government's own report that says they shouldn't have been housed together.

The evidence regarding the mental health, there are several issues there, Your Honor.  We do dispute that Dr. Spica's exam says it doesn't show brain impairment, doesn't report it.  We think it clearly does, and the supplemental letter that we provided also helps explain that.

**JA 236**

I think there was some confusion about the words brain damage or brain dysfunction. Damage means that you had a good brain and that it was damaged because you hit your head against a tree, or something, whereas dysfunction or impairment refers to a life long problem which is what Caro's history shows. It shows in sixth grade he was placed in special ed. As a child he had learning delayed development. He couldn't tie his shoes at the age of seven. He's getting non-satisfactory in kindergarten.

But the Government raises the opinions of the prison officials. We've submitted the supplemental declaration of Dr. Schwartz-Watts who disputes that, Your Honor. Is that based on a ten minute discussion with Mr. Caro? It doesn't appear that there were tests. We believe that we have submitted more than sufficient evidence of brain impairment. And the Government says that when they came to the penalty phase they weren't, trial counsel wasn't left with much to work with, and we agree with that. And the reason, though, is because they had not done an adequate investigation up front. And the fact that they didn't even review Dr. Phillips' report until the penalty phase just enhances their negligence. If they knew they couldn't look at that report until the end, it behooved them to do even more up front investigation so once they got the report they would have someone in place, someone who knew the situation,

**JA 237**

Mr. Caro, who could then apply that to Dr. Phillips' report. They hadn't done any of that.

Dr. Caruso they had hired initially for the guilt phase, for competency, for mens rea, as far as for the offense. He wasn't prepared to do a penalty phase. He wasn't prepared to put together the evidence of the childhood trauma, the evidence that Dr. Spica had. He just did strictly tests. They needed someone to put together Spica's results with the trauma history of his childhood, with all of the background evidence that they had, whatever mental health testimony they had to explain to the jury during the penalty phase, none of that ever occurred, and it's our contention that, Your Honor, that they were deficient in that, and it did prejudice Mr. Caro.

Again, if you think of it, the mental health issue becomes more relevant when you consider that in light of the fact that Dr. Spica said he's very suggestible, and then you put someone with the reasoning ability of a ten year old under the best of situations, he's in prison and gets involved in a gang, how he responds to that and how he reacts, we believe, lessens his culpability.

All right, Your Honor. Quickly moving on, two other points that I wanted to address, the claims we feel could be resolved by the court in a motion to dismiss are claims that are record based, and there are some totally record based

**JA 238**

claims, Your Honor. Claims eight, 9A, 9B, 9D and 15, we believe all of those are just record based. We have nothing to add to those claims.

So, if you conclude, based on the record before you, that Mr. Caro has, if the files and the records conclusively show that he's entitled to no relief, then that's appropriate, but the other claims, Your Honor, they either involve disputed facts, which precludes summary dismissal, they involve the introduction of new facts, allegations, which similarly preclude summary dismissal, and even some of the systemic challenges, we have attached new evidence and we would like the opportunity to present evidence in support of these new factual allegations.

Finally, I wanted to briefly talk about this issue of the court's analysis of prejudice because it's, it's, there's a dispute on that between parties, Your Honor, and whether the court should impose or analyze this with a cumulative analysis, or whether it's an isolated analysis, our position is -- let me start first, the proof necessary for this court for reversible error, *Strickland* requires a showing of prejudice, *Brady* errors require a showing of prejudice, and all other errors, trial court errors. In, as to the *Strickland* errors, we believe that actually the *Strickland* case directs this court to do a cumulative analysis of all errors. It's, *Strickland* speaks in terms of

errors, plural. It doesn't say one error in *Strickland*, there are six different IAC claims, the court analyze those errors, and similarly the Fourth Circuit in *Elmore* v. *Osmond* applies a cumulative analysis. *Brady* does not dispute that a cumulative analysis is appropriate, and as to all other others, there's the case of *U.S.* v. *Woods*, a recent Fourth Circuit case that, again, talks about the cumulative error analysis in the context of court errors.

So, if the court has any more questions on the capital case --

THE COURT: I don't believe so.

MS. WILKINSON: I'd like to quickly move to the Benavidez case and the discovery motion. Our position in the Benavidez case was that it was timely filed, and if it was, was timely filed we would ask the court to delay its ruling on that unless it resolves the similar issues in the 2255.

There are two factual positions that overlap, and it's our position will require an evidentiary hearing. The first is Caro's mental impairment and capital counsel's ineffective assistance, both of which constitute --

THE COURT: Let me ask you, what could capital counsel have done with respect to the Benavidez case?

MS. WILKINSON: They could have done what we've done, Your Honor, only they could have done it a lot sooner

**JA 240**

than we did.

THE COURT: Well, I mean, in other words, argued that the Government set this up, and so, I mean, what would that have meant? I don't understand, you know, practically speaking, what anybody would have done to have set aside the guilty plea and judgment in that case.

MS. WILKINSON: Actually, the main focus here is on Lou Dene's failure to properly advise Mr. Caro.

THE COURT: Well, I understand, but that's a problem where the statute of limitations is, and I understand you have an argument there, but what would, what was wrong, what did capital counsel in the capital case do wrong?

MS. WILKINSON: They should have challenged, they should have challenged in a timely manner this conviction based on Lou Dene's ineffective assistance of counsel. Had they done that, and had they been successful, then that would have removed that aggravator from the capital case.

THE COURT: And what would the grounds of ineffective assistance of counsel been?

MS. WILKINSON: Failure to adequately advise Mr. Caro of the collateral consequences of the plea, and basically he, he did not advise him that this plea was really ill advised because it was setting Mr. Caro up for the death penalty, essentially. And we figure, we, that, I

**JA 241**

can't imagine a more serious collateral consequence, Your Honor.

THE COURT:  So, they would have filed a 2255, they should have filed a 2255, and that is an independent ground that allows escape from the statute of limitations?

MS. WILKINSON:  They might have been able to do it within the one year, depending on how the court defines the one year.

THE COURT:  No, no, it gets around the statute of limitations in the present Benavidez case, the 2003 case.

MS. WILKINSON:  Correct.  Our argument is that there's two extraordinary circumstances for equitable tolling, Your Honor.  You have to have diligence, prove diligence, and that there's some extraordinary circumstance that stood in Mr. Caro's way and prevented him from filing timely, or counsel.  Our position is the first extraordinary circumstance is his mental or brain impairment.  The Government does not dispute that he has a serious mental disorder, or at least I didn't think they did, and they don't dispute that that can constitute extraordinary circumstances.  But they argue, they apparently, without presenting any expert evidence, they apparently say, "Well, it wasn't severe enough because he wasn't incapacitated."

Your Honor, I'm not a mental health expert, and I have no evidence that the Government prosecution, prosecutors are

mental health experts. This is an issue that the court needs expert testimony on. We've provided evidence that Mr. Caro has the reasoning ability of a ten year old, so I suppose the court would have to conclude that the ten year old has the ability to file a 2255, and that's a ten year old with serious limitations. The other --

THE COURT: Is the law to the effect that if you don't, if you don't understand your right to file a 2255 that the statute of limitations doesn't apply? Wouldn't that apply to about 90 percent of our prison population?

MS. WILKINSON: You're right, Your Honor. The test isn't a misunderstanding of the law or failure to appreciate the law. That is not the test. There has to be something above and beyond that. Here our argument is that Mr. Caro's brain impairment, and the reasoning ability of a ten year old, made it impossible for him to file a 2255.

THE COURT: So, he was incompetent to be tried?

MS. WILKINSON: No, we're not making that allegation, Your Honor.

THE COURT: All right. Go ahead, ma'am.

MS. WILKINSON: And again, we've submitted evidence showing brain impairment, cognitive dysfunction from both a neuropsychologist and psychiatrist, and we've also submitted his school records showing he was in special education in sixth grade, and had obviously developmental

**JA 243**

problems and difficult in school until tenth grade when he dropped out.

We reject the Government's contention that somehow the plea agreement in Benavidez shows he was not mentally impaired. In fact, we contend the exact opposite. That plea agreement was completely against Mr. Caro's self interest. There was nothing for him to be gained in it, and everything to be lost. And it does not show an ability to show a reasoned judgment, but the opposite.

The last point there is that the Government argues that the IAC of Mr. Caro, capital counsel is not an extraordinary circumstance because he had appellate counsel. He had a federal public defender appointed to represent him in the appellate case. This involves facts outside the -- the appellate counsel are not authorized or equipped to investigate facts outside the record, and the appeal would not have been an appropriate forum to raise this claim. In fact, I believe they asked the court for an evidentiary hearing on one of his discovery issues, and they said no, of course you can't have an evidentiary hearing here. This claim involves facts outside the record, and it would not have been appropriate in the appeal.

Your Honor, I'm going to try to leave 15 minutes for Ms. Spence.

MS. SPENCE: May it please the court, I'm happy to

**JA 244**

start with one area that we agree on.  We're not asking the court to rule on this discovery motion before ruling on the merits of the motions to dismiss.  We are just getting it in now so that we're ready to go forward quickly and expeditiously once the issues have been --

THE COURT:  Tell me your understanding of the standard for granting discovery in a 2255 case.

MS. SPENCE:  The standard is you have to show good cause, and that has been specifically defined by the Supreme Court as where there are specific allegations before the court that show reason to believe the petitioner may be entitled to relief if he can prove those facts, then he's entitled to discovery with those facts.

THE COURT:  Will, it's not the same as discovery in a normal civil case.  Don't you have to have some reasonable grounds to believe that you will find the information that is helpful?

MS. SPENCE:  Exactly.  And that's why, as the court noted earlier, on issues where even if all the facts are accepted as true, if there's no legal grounds for relief, there's no, then you can rule that the, at the motion to dismiss, and there's no evidentiary hearing and no discovery.  But certainly on any issue where there's a factual dispute and a credibility issue, then under the language of 2255(b) the court shall grant an evidentiary

**JA 245**

hearing to resolve those issues, and the Supreme Court has said that if there's going to be an evidentiary hearing that is strong evidence that discovery is also appropriate on those issues.

THE COURT:  Well, I again, I guess it depends, doesn't it, on a 2255 case depending on what it is you want to discover.  It's certainly through that discovery is possible, but there has to be good cause to believe that you can find something that will be relevant to the issues --

MS. SPENCE:  Absolutely.  That's why in the motion we've endeavored to make it very clear what specific issues we're directing our discovery requests to.

THE COURT:  Get back to a topic we discussed earlier, you want to find and see if there are any e-mails or memoranda that Government counsel has in this case as to the sequencing for the capital case vis-a-vis the Benavidez case, but you don't know that there are any such memoranda, or have any idea, any reason to believe there are any such memoranda, right?

MS. SPENCE:  We don't know what memoranda do or do not exist.  We don't know what discussions were or were not had.  We do have the very strong circumstantial evidence that led to the factual allegation.  When the court asked the prosecutor at the sentencing hearing of Moreno, you know, why should I accept this agreement and give them 58

**JA 246**

months when we just gave Mr. Caro, for the same conduct, 327 months?  And at that point, well, you were told the video wasn't a very good quality, we have an uncooperative victim that doesn't want to testify, and all those reasons that they couldn't really make a good case on this, and that's not disclosed until after Mr. Caro has already been sentenced.  It's only then a month after he's sentenced for the Benavidez case it's brought to the court's attention we're ready to proceed on this capital case and we'd like to appoint him counsel now.

So, we have raised a legal theory.  There might be evidence to support it.  If the facts that we allege to be true can be supported we're entitled to the opportunity to make that presentation, and that's what good cause amounts to in a 2255 case, recognize it's got to be a little bit flexible to prevent a miscarriage of justice where someone's life it as stake.

THE COURT:  All right.

MS. SPENCE:  I would next note that the Government, with the exception of the arguments they raised, that they filed, they don't appear to oppose the request for discovery, if the issues that the discovery targets are allowed to proceed past the motion to dismiss.  I would respond to the items they did object to.  First they said that the request to depose Mr. Mountcastle was a fishing

expedition.  We respectfully disagree.  A fishing expedition is when you hope you will find some facts that will help you figure out a claim to make.  We've made the claim.  We know what facts we're looking for.  That's a request for discovery that's narrowly tailored to the issue we have already raised.

There's also the issue of discovery might be premature. Again, we're not asking for the court to approve discovery before it's ruled on whether or not the claim is sufficient to proceed beyond this point.

And then the last one that they objected to was the underlying Dr. Phillips' opinion in the case, and say because our theory is that defense counsel should have presented a mental defense and didn't, they weren't entitled to those reports because they didn't present the defense.

But at this stage we not only have to prove that what they did was unreasonable, we also have to prove that they were prejudiced by it, and that includes being able to consider what evidence they would have introduced and what evidence was underlying that opinion.

We've already filed, in some of our affidavits, reasons that our experts would say now Dr. Phillips' opinion wasn't addressing the right issue, and therefore wasn't really rebutting what Dr. Spica said in the first place.  But if the evidence, he relied on evidence we need to get that in

**JA 248**

our case to present a mental health defense and the circumstances that were present.

Unless the court has any questions, that's all I have to say.

THE COURT:  Thank you, Ms. Spence.  Yes, ma'am?

MS. WILKINSON:  Can I have five minutes, Your Honor?

THE COURT:  Sure.

MS. WILKINSON:  I just want to remind the court this is an early stage in this 2255 proceeding.  The Government has not yet answered, no discovery, there's been no evidentiary hearing, and this is a capital case.

As the Supreme Court said in *Kyles*, the court's duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.  The Government seeks to end this capital case through summary dismissal precluding Mr. Caro from any opportunity to actually prove his claims.  As stated earlier, the law in effect did not support summary dismissal and we would ask the court to deny the Government's motion.  Thank you, Your Honor.

MR. MOUNTCASTLE:  On the non-capital matter, Your Honor, just one item I wanted to raise with the court.  This case is appropriate for a motion to dismiss because it's untimely, and it's untimely on the face of the pleadings,

**JA 249**

and even accepting, for purposes of the motion, the issue or the fact that Mr. Caro might have some mental issues, and the fact that capital counsel may have, or Mr. Dene, his attorney, may have erred in some form or fashion, there's still a five and a half year hole in the case from August 22, 2007 when new counsel was appointed relieving both Mr. Dene and Mr., and his capital counsel of their responsibilities, to January 13, 2013 when the 2255 was filed in this case, there's a five year hole, and Mr. Caro was represented throughout that entire time by counsel.  And there's no explanation for why he was not advised to file a 2255, or one was not filed on his behalf during that time frame.

     And so the, there's no equitable tolling appropriate in this case, and we'd ask the court to dismiss the 2255 in this matter.

          THE COURT:  All right.  Thank you.  Mr. Giorno?

          MR. GIORNO:  Your Honor, I only have two brief points with regard to the capital case, and one with regard to discovery.  The first one is defense counsel --

          THE COURT:  If you wouldn't mind moving your mic.

          MR. GIORNO:  Your Honor, the first point I have related to the capital case relates to a statement that Ms. Wilkinson said, that the Government somehow miscomprehended a standard of review at this stage.  I

understand exactly what the standard of review is. We have to accept what they say as being factually accurate. What I disagree with is their assertion that somehow the mere statement by an expert concerning what should have been done or could have been done, that that creates a legitimate issue about whether trial counsel was effective. I don't agree with that.

I also don't agree with counsel's speculation about what Mr. Sandoval went in the cell for, what he was going to do. I don't think that creates a legitimate factual issue. That's what my disagreement is. But I do not disagree on the standard to be applied in assessing their claims.

The second issue I have concerns about, they are asking for an evidentiary hearing based on this new evidence, as they call it. And you know that loses sight of the fact that we're assessing the performance and competence of trial counsel with the information that they have, and what they did in connection with this case, and we would submit to the court defense counsel did everything they could or should have done. They got mental health experts, they talked to them, they got mitigation experts, they chased down all those leads. In fact, the fact that they didn't find the right one that was going to say what they were going to do isn't necessarily dispositive in the, an ineffective assistance of counsel claim. I'd ask the court to look at

what counsel did as to whether or not this is ineffective assistance of counsel. Of course, the court can make its own assessment. They have to satisfy both prongs. And if you take everything they say as true, they still don't satisfy the prongs. And I think the court can make that decision without an evidentiary hearing.

One point I want to make on discovery, Ms. Spence said the Government doesn't oppose the discovery request. If I said that, it was not what I intended. What I meant to say was that until the court articulates what, if any, issues remain, the rule does contemplate limited discovery. It's tailored to those specific issues identified by the court. I can't know whether these requests are valid or invalid until I have a ruling from the court. I don't mean to say every claim in this case is okay except for that one point. Thank you, Your Honor.

THE COURT: All right. Well, thank you, counsel, for your arguments. They've been helpful to me, and I will, of course, take the motions under advisement and issue a decision just as soon as I'm able. And if there's nothing further, then, we will adjourn court.

(Proceedings concluded at 3:43 p.m.)

**JA 252**

CERTIFICATE


        I certify the foregoing is an accurate transcript

from the record of proceedings in the above-entitled

matter.


5/30/14                         /s/ Bridget A. Dickert
Date                            U.S. Court Reporter

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP  DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 2:03CR10115 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **CARLOS CARO,** | ) | By:  James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Rick A. Mountcastle, Assistant United States Attorney, Roanoke, Virginia, for United States; Dale A. Baich and Robin C. Konrad, Assistant Federal Public Defenders, Office of the Federal Public Defender, Phoenix, Arizona, and Fay F. Spence and Brian J. Beck, Assistant Federal Public Defenders, Roanoke and Abingdon, Virginia, for Defendant.*

Defendant Carlos Caro filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255, alleging that ineffective assistance of counsel caused him to enter an invalid guilty plea.  The United States filed a Motion to Dismiss the § 2255 motion as untimely filed, and Caro responded, arguing that he is entitled to equitable tolling.  After review of the record, I find that the Motion to Dismiss must be granted.[1]

---

[1] The Motion to Dismiss has been fully briefed and orally argued.

**JA 254**

I.

A Superseding Indictment was returned in this court on December 11, 2003, charged Caro, a federal inmate, and six others with conspiracy to commit murder and unlawful possession of a weapon arising from the stabbing of fellow inmate Ricardo Benavidez at the United States Penitentiary-Lee County ("USP Lee") on August 29, 2003. Caro and codefendant Juan Moreno-Marquez, the only inmates who actually stabbed the victim, were also charged with assault with intent to commit murder.

In May 2004, five of Caro's codefendants in the stabbing case each pleaded guilty to the unlawful weapon charge in exchange for dismissal of the conspiracy charge. The charges against Caro and Moreno-Marquez were set for a jury trial in August 2004.

Caro and Moreno-Marquez, through their respective attorneys, proposed a joint plea bargain, with Caro pleading guilty to conspiracy to commit murder in exchange for Moreno-Marquez being allowed to plead guilty to the lesser unlawful weapon charge. Caro's attorney, Louis Dene, advised Caro that the agreement did not benefit him and would result in a lengthy prison sentence. Caro told Dene that "'he wasn't going anywhere,' so the long sentence did not matter to him." (2255 Motion, Ex. 3, Dene Decl., ¶ 6, ECF No. 189-1.) Nevertheless, Caro instructed

-2-

**JA 255**

Dene to pursue the linked plea agreements in order to mitigate the sentence of Moreno-Marquez, Caro's fellow Texas Syndicate gang member.

I accepted the plea arrangement, found both defendants' guilty pleas to be valid, sentenced Caro to 327 months for conspiracy to commit murder,[2] and sentenced Moreno-Marquez to 57 months for unlawful weapon possession. Judgment was entered on November 1, 2004, and Caro did not appeal.

Months before Caro entered his guilty plea to the conspiracy to commit murder charge in this case, on December 17, 2003, USP Lee officials found Caro's cellmate, Robert Sandoval, murdered in his cell, and Caro admitted killing him. The United States notified Caro in December 2004 of its intention to charge him with capital murder and seek the death penalty, and the court appointed counsel for Caro in January 2005 as to the potential capital charge. In January 2006, Caro was indicted for the capital murder of Sandoval. *United States v.* Caro, Case No. 1:06CR00001 (W.D. Va.).

---

[2] Caro's crime carried a Base Offense Level of 28, but I found that because of his prior convictions, he was a Career Offender under the then-mandatory sentencing guidelines. As such, his Adjusted Offense Level was 37, reduced by three levels for acceptance of responsibility, for a Total Offense Level of 34 and a custody range of 262 to 327months in prison. The 327-month sentence I imposed was directed to run consecutively to the 360-month sentence Caro was already serving for a prior federal drug conviction in Texas. I also imposed an alternative sentence of life in prison, based on the nature of Caro's offense and criminal history. *See United States v. Hammoud*, 378 F.3d 426, 426 (4th Cir. 2004) (advising courts to announce an alternative sentence, under 18 U.S.C. § 3553(a), treating the guidelines as advisory only), *judgment vacated and remanded,* 543 U.S. 1097 (2005).

At the time that Dene negotiated the Plea Agreement for Caro in the conspiracy to commit murder case, in June 2004, Dene knew that Caro had been implicated in the death of another inmate in December 2003. Dene understood that the government intended to proceed with a death penalty case against Caro after the conspiracy case concluded. Dene also knew that Caro had never completed high school, had limited ability to understand legal proceedings without counsel, and trusted Dene to advise him which legal choices were in Caro's best interest. Dene never advised Caro that he should reject the Plea Agreement and proceed to trial on the conspiracy to commit murder conviction, because this conviction, and the inevitable, lengthy sentence to be imposed for it, would likely be used against him in the looming capital case.

Caro was tried and convicted for capital murder in early 2007. The government listed Caro's conspiracy to commit murder conviction as an aggravating factor in its Notice of Intent to Seek the Death Penalty. In addition, the government pointed out during the penalty phase of the trial that Caro's prior federal prison sentences, totaling more than 57 years, constituted a life sentence for him. Based on that fact, the government argued, Caro would receive no

**JA 257**

punishment in the capital case unless death was imposed. The trial ended with a death sentence for Caro.[3]

Caro's § 2255 motion here alleges one claim of ineffective assistance: that Dene knew and should have advised Caro in June 2004 to reject the plea agreement and proceed to trial. Habeas counsel for Caro assert that during their interview of Dene on March 9, 2012, related to the capital case, Dene stated that he knew, but did not advise Caro, that his conspiracy conviction and sentence would likely be used against him in a capital murder prosecution. On March 11, 2013, less than a year after this interview, counsel filed Caro's § 2255 motion alleging that Dene's actions deprived Caro of the effective assistance of counsel, because Caro's guilty plea in the conspiracy case caused him to receive a death sentence in the capital case.

## II.

A person convicted of a federal offense has one year to file a § 2255 motion, starting from the latest of the following dates:

> (1) the date on which the judgment of conviction becomes final;

---

[3] The United States Court of Appeals for the Fourth Circuit affirmed the judgment, and the Supreme Court denied his petition for a writ of certiorari. *United States v. Caro*, 597 F.3d 608 (4th Cir.), *reh'g denied*, 614 F.3d 101 (4th Cir. 2010), *cert. denied*, 132 S. Ct. 996 (2012). A separate § 2255 motion challenging the capital murder conviction and death sentence was thereafter filed in Case No. 1:06CR00001, and has been denied by separate Opinion and Order entered this day.

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

Caro's § 2255 is clearly untimely under § 2255(f)(1). The conspiracy to commit murder judgment became final on November 15, 2004, when his opportunity to appeal expired. *See* Fed. R. App. P. 4(b)(1)(A) (prior version); 6(a)(1) (prior version). Caro's one-year window under § 2255(f)(1) to file a timely motion expired on November 15, 2005. Because Caro filed his § 2255 motion on January 11, 2013, his motion is untimely under § 2255(f)(1) by more than seven years.

Caro alleges that his motion is timely under § 2255(f)(4), because he filed it within one year of the date when he first learned, with due diligence, the key fact necessary to his ineffective assistance claim, namely that in June 2004, attorney Dene knew the conspiracy to commit murder conviction and sentence would likely

JA 259

be used against Caro to argue for a death sentence for Sandoval's murder. Habeas counsel assert that Caro, with his limited education and difficulty in understanding legal proceedings, could not have learned of Dene's error on his own soon enough to file a timely § 2255 motion. They also assert that Caro is entitled to equitable tolling because of his mental limitations and ineffective assistance from his later capital counsel. In addition to Dene's alleged failure to advise him to go to trial in his case, it is argued that his capital counsel in the Sandoval murder case should have advised him to challenge the prior conviction.

In response, the government asserts that Caro cannot show the due diligence required for equitable tolling. It points out that federal public defenders took over Caro's defense in the capital case appeal and that Caro has been thereafter always represented. By the time of his capital trial, at the latest, Caro knew both of the government's use of his prior guilty plea and the fact that Dene had not advised him that it would likely be so used. The government asserts that while Caro may have "social and intellectual deficits . . . [these] do not come close to establishing . . . incompetency . . . supporting equitable tolling." (Gov.'s Reply 5, ECF No. 198.)

## III.

To prove that counsel's representation was so defective as to require reversal of the conviction or sentence, Caro must meet a two-prong standard, showing that

-7-

**JA 260**

counsel's defective performance resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, Caro must show that "counsel's representation fell below an objective standard of reasonableness," considering circumstances as they existed at the time of the representation. *Id.* at 687-88. Here, Caro must overcome a strong presumption that counsel's performance was within the range of competence demanded from attorneys defending criminal cases. *Id.* at 689.

Second, to show prejudice, Caro must demonstrate a "reasonable probability" that but for counsel's errors, the outcome would have been different. *Id.* at 694-95. When a criminal defendant alleges that counsel's pretrial error led him to enter an invalid guilty plea, he shows prejudice by demonstrating "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985). If it is clear that the defendant cannot satisfy one aspect of the *Strickland* standard, the court need not inquire whether he has satisfied the other aspect of that standard. *Strickland*, 466 U.S. at 697.

Caro purports that his single claim of ineffective assistance meets the two elements of the *Strickland/Hill* standard in this manner: (a) counsel performed deficiently in failing to advise Caro to reject the plea and go to trial on the conspiracy to commit murder charge, because the conviction and sentence for that offense would likely be used to seek the death penalty in the murder case; and (b)

-8-

**JA 261**

if counsel had advised Caro to reject the plea and go to trial, there is a reasonable probability that Caro would have followed that advice, because Caro had little education, had no ability to understand legal proceedings without counsel's help, and trusted counsel.

Although the Motion to Dismiss does not argue that Caro's claim itself is deficient, even if he wins on the timeliness arguments, I have authority to summarily dismiss Caro's § 2255 motion as without merit. *See* § 2255(b); Rule 4 of the Rules Governing § 2255 Proceedings. Because I find from the motion and the record that Caro not has satisfied either of the *Strickland/Hill* elements, I conclude that he is not entitled to relief under § 2255.

Caro argues that because the death sentence was such a severe collateral consequence of Caro's plea to the conspiracy charge, Dene had a per se obligation to advise Caro of this consequence. Caro relies on *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010), a case in which the Supreme Court cited American Bar Association professional standards as one basis for ruling that defense counsel was ineffective in failing to warn the defendant that his guilty plea would result in his deportation. In addition, Caro presents the opinion of a standard of care expert that Dene's omission of this collateral consequence warning was far below acceptable performance standards.

**JA 262**

Caro's arguments ignore the importance of considering *all* the circumstances counsel faced in determining the sufficiency of his performance. *Strickland*, 466 U.S. at 687-88. In *Padilla*, the Supreme Court recognized that "[p]revailing norms of practice . . . are guides to determining what is reasonable." 559 U.S. at 366. In finding that Padilla's counsel did not satisfy the constitutional standard under *Strickland/Hill*, the Court considered more than counsel's failure to inform Padilla of all collateral consequences of the conviction as professional norms recommended.

> Instead, Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country. This is not a hard case in which to find deficiency: The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect.

*Id.* at 368-69. The Court reemphasized that counsel's constitutional obligation in plea context was to inform Padilla of "the advantages and disadvantages of a plea agreement," compared to the alternative of going to trial. *Id.* at 370 (internal quotation marks and citation omitted).

Taking Caro's evidence in support of his § 2255 motion as true, I do not find from Caro's evidence that Dene failed to fulfill this obligation. The circumstances

-10-

**JA 263**

Dene faced in advising Caro were grim indeed. If the case had gone to trial,[4] the government would have presented evidence that Caro, Moreno-Marquez, and the other coconspirators were members of the Texas Syndicate gang. A prison employee would have testified that he saw Caro and Moreno-Marquez chasing the victim and stabbing him with knives. The government also had surveillance camera footage of the assailants' moving attack on the victim and of their retreat through the same area, their disposal of one weapon beside the television stand, and their later return to the television room. Physical evidence included medical records of the 28 stab wounds the victim suffered to his head and torso, the homemade Plexiglas knives officials recovered from the television stand and elsewhere in the television room, and DNA test results establishing that the victim's blood was on the clothing of both defendants. The government also had a statement from Moreno-Marquez admitting that "'We hit him like we hit Alcantara,'" referring to another inmate assaulted a month earlier by Texas Syndicate members at USP Lee. (Hr'g Tr. 16.)

Caro does not offer any evidence of a viable defense he could have presented at trial, in light of the government's strong case against him. He presents no evidence that the government would have considered a different plea bargain

---

[4] The government's evidence against Caro summarized here is taken from the prosecutor's presentation at the change-of-plea hearing (Hr'g Tr. 14-18, Aug. 3, 2004, ECF No. 182) and the Presentence Investigation Report ("PSR").

**JA 264**

allowing Caro to plead to anything less than conspiracy to commit murder or that without the agreement he entered, he could have achieved a less severe sentence. The PSR indicates that if Caro had been convicted after a trial, he likely would not have received the three-level reduction for acceptance of responsibility, which would have resulted in a mandatory custody range of 360 months to life in prison.

Dene reasonably could have believed that Caro's conviction was a foregone conclusion. Clearly, regardless of whether Caro was convicted after a guilty plea or after trial, counsel also knew that he would have inevitably received a lengthy prison sentence and that his conviction and sentence would have been used against him at the capital trial. Under these circumstances, I cannot find that Dene performed deficiently in focusing his discussions with Caro on the advantages and disadvantages of the plea agreement relating directly to the case at hand.

Even if Dene's representation could be deemed deficient because he failed to tell Caro about a consequence that he faced, regardless of his choices in the conspiracy case, Caro cannot demonstrate prejudice. As the Court in *Padilla* emphasized, the prejudice prong in the guilty plea context requires more than a showing of what the defendant himself would have done with the information counsel failed to provide.

> [T]o obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.

-12-

**JA 265**

559 U.S. at 372.  Trial counsel's opinion that Caro would have gone to trial if counsel had advised him to do so is not sufficient to demonstrate prejudice under this standard.  Caro does not submit his own affidavit, stating that he would have rejected the Plea Agreement if fully advised about the potential impact of his conspiracy conviction and sentence on the capital case.  Even if he submitted such evidence, however, it would not prove that rejection of the plea bargain was a rational choice to make under the circumstances as a whole.

Caro offers no alterative course he could have taken to increase his chances for a lesser sentence in the conspiracy to commit murder case or to improve his odds on avoiding the death penalty in the capital case.  By taking the plea bargain he allowed his prison gang associate to receive a lighter sentence, the result Caro desired.

## IV.

For the stated reasons, I find no reasonable probability that absent counsel's alleged omission, it would have been a rational decision for Caro to have rejected the Plea Agreement and proceed to trial on all charges in this case.  Therefore, I will summarily deny relief on his § 2255 claim under Rule 4 of the Rules Governing § 2255 Proceedings and terminate as moot the Motion to Dismiss this action as untimely filed.

A separate Final Order will be entered herewith.

-13-

**JA 266**

DATED:  May 4, 2015

/s/  James P. Jones
United States District Judge

**JA 267**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:03-cr-10115-JPJ |
| Plaintiff, | |
| vs. | |
| | Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure Rule 59(e) |
| CARLOS DAVID CARO, | |
| Defendant. | |

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Defendant Carlos David Caro, through counsel, respectfully requests that this Court alter or amend the judgment in its Opinion (ECF No. 202), and Final Order (ECF No. 203), entered on May 4, 2015, by which the Court denied Mr. Caro relief on his motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, ECF No. 189. In accordance with Rule 11(c)(1) of the Local Civil Rules for the United States District Court for the Western District of Virginia, this motion is supported by the attached Memorandum of Points and Authorities.

Respectfully submitted this 1st day of June, 2015.

s/Robin C. Konrad
Jon M. Sands
Federal Public Defender
Robin C. Konrad (Alabama Bar No. 2194-N76K)
Office of the Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
robin_konrad@fd.org
Telephone: 602-382-2816
Facsimile: 602-889-3960

**JA 268**

Fay F. Spence (Virginia Bar No. 27906)
Federal Public Defender's Office
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Telephone:  540-777-0880
Facsimile:  540-777-0890

Brian J. Beck (Virginia Bar No. 78049)
Federal Public Defender's Office
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Telephone:  276-619-6080
Facsimile:  276-619-6090

Attorneys for Defendant
Carlos David Caro

**Memorandum of Points and Authorities in Support of Rule 59(e) Motion**

Although Rule 59(e) does not itself set forth grounds for altering a judgment, the Fourth Circuit recognizes three grounds for altering a judgment pursuant to the rule.  They are: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998). Thus, the rule permits a district court to correct its own errors, "sparing the parties and the appellate courts the burden of unnecessary appellate proceedings." *Id.* (quoting *Russell v. Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995)).

In this motion, Mr. Caro invokes the third ground. Specifically, he submits that this Court committed a clear error of law and misconstrued the record in such a way that its judgment, if allowed to stand, will result in a manifest injustice. For the reasons given below, the Court should exercise its discretion and grant Mr.

1

**JA 269**

Caro's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (hereinafter "2255 Motion").

## I.     Factual Background

While this case was pending, Mr. Caro's cellmate was found dead in their cell, and Mr. Caro admitted to killing him. Mr. Caro's attorney, Louis Dene, anticipated that Mr. Caro would be prosecuted for the death of the cellmate and that the Government would seek the death penalty. Decl. of Louis Dene, Nov. 9, 2012 (hereinafter "Dene Decl."), attached as Ex. 3 to 2255 Motion, ECF No. 189-1. Nevertheless, Mr. Dene did not advise Mr. Caro that signing the plea agreement offered in this case essentially amounted to signing his death warrant in the anticipated capital case. Mr. Dene did not advise him that a conviction in this case for attempted murder would be used against him in the capital case as an aggravator in support of a death sentence, and that for this reason, Mr. Caro should not plead guilty. *Id.* ¶ 6. The plea agreement did not provide Mr. Caro with any benefit, such as a reduced sentence, as he would spend the rest of his life in prison whether he was sentenced after a guilty plea or after trial. Mr. Caro pled guilty, and on November 1, 2004, the court sentenced him to 327 months of incarceration. ECF No. 168.

On January 27, 2005, the Court appointed Stephen Kalista and James Simmons to represent Mr. Caro in his capital case. *See United States v. Caro*, No. 2:05-mc-00001-JPJ, Appt. Orders, Jan. 27, 2005, ECF Nos. 4, 6. On January 11, 2006, the Government filed its Notice of Intent to Seek Death, which stated the Government's intent to use Mr. Caro's prior conviction from this case as an aggravating circumstance in the capital case. *See United States v. Caro*, No. 1:06-cr-00001-JPJ, Notice, Jan. 11, 2006, ECF No. 8. At that time, capital counsel were aware that the conviction in this case would be used against Mr. Caro in securing a death verdict.

2

Although Mr. Kalista contacted Mr. Dene, he did not ask Mr. Dene about the reasons for Mr. Caro's guilty plea or Mr. Dene's advice to Mr. Caro. Dene Decl. ¶ 9. Moreover, despite knowing the conviction in this case would be used against their client at trial, capital counsel did nothing to challenge Mr. Caro's prior conviction. Declaration of Stephen Kalista, Dec. 31, 2012, ¶ 22, attached as Ex. 5 to Resp. to Mot. to Dismiss, ECF No. 196-1. Mr. Caro's capital case went to trial, and the Government, as it had indicated, relied upon Mr. Caro's conviction and sentence in the instant case during the penalty phase to support a death verdict. *See Caro*, No. 1:06-cr-00001, Tr. Feb. 13, 2007, at 26–27 (arguing that another life sentence would be "like water off a duck's back" and that "[Caro would] be getting a pass" for killing Roberto Sandoval); *id.* at 42 (arguing that Mr. Caro's prior sentence was the equivalent of a life sentence); *id.* at 89 (arguing that unless sentenced to death, Mr. Caro will return to prison as "a conquering hero"). The jury returned a death verdict, *see Caro*, No. 1:06-cr-00001-JPJ, Special Verdict Form, Feb. 13, 2007, Dkt. 639, and Mr. Caro was sentenced to death, *id.*, Judgment, March 30, 2007, Dkt. 694.

## II.    The Court Should Correct the Manifest Errors of Law and Fact Upon Which the Judgment Rests

Acting through counsel, Mr. Caro filed his 2255 Motion on January 11, 2013. ECF No. 189. The Government subsequently filed a Motion to Dismiss the 2255 Motion. ECF No. 195. Mr. Caro filed an opposition to the Motion to Dismiss, ECF No. 196, and the United States filed a reply to Mr. Caro's opposition, ECF No. 198. After hearing oral argument, ECF No. 199, the Court summarily denied relief on the 2255 Motion, and terminated the Motion to Dismiss as moot. ECF No. 202 at 13; ECF No. 203 at 1. The Court's decision contains critical errors that warrant altering the judgment.

First, the Court erred by misinterpreting the rationality requirement in *Padilla v. Kentucky*, 559 U.S. 356 (2010). "Rational," as that term is used in

3

**JA 271**

*Padilla*, goes by its plain meaning: based on facts or reason. It does require something higher than rationality, as the Court erroneously determined. Second, the Court erred by failing to consider viable defenses available to Mr. Caro and instead concluding that the "circumstances Dene faced in advising Caro were grim indeed"—so grim that "regardless of whether Caro was convicted after a guilty plea or after trial, counsel also knew that he would have inevitably received a lengthy prison sentence and that his conviction and sentence would have been used against him at the capital trial." ECF No. 202 at 10-12. But the circumstances were not altogether grim, and despite the Court's assumption otherwise, his conviction and sentence at trial were not foregone conclusions. The Court erred by ignoring this possibility and instead focusing on the prosecution's case against Mr. Caro. ECF No. 202 at 11. The Court thus committed clear errors and its judgment, if allowed to stand, would result in a manifest injustice.

> **A.** **The Court erred by imposing a higher standard than the rationality requirement of *Padilla* and thereby failed to consider that Mr. Caro would have rejected the plea agreement and proceeded to trial had he received effective assistance of counsel.**

In *Padilla*, a petitioner convicted on drug-related charges filed a motion for post-conviction relief, alleging that his attorney was ineffective in misadvising him about the potential for deportation as a consequence of his guilty plea. *Padilla*, 559 U.S. at 359. He alleged that he would have insisted on going to trial if he had not received incorrect advice from his attorney. *Id.* In applying *Strickland* to the petitioner's claim, the United States Supreme Court explained that, "to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances. There is no reason to doubt that lower courts—now quite experienced with applying *Strickland*—can effectively and efficiently use its framework to separate specious claims from those with substantial merit." *Padilla*, 559 U.S. at 372 (citing *Roe v. Flores-Ortega*, 528 U.S. 470, 480 (2000) (holding that "counsel has a

**JA 272**

constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think . . . that a rational defendant would want to appeal")).

Thus, "rational," as that term is used in *Padilla*, goes by its plain meaning: based on facts or reason. It does not mean highest or best, as this Court suggests when pronouncing that "[t]rial counsel's opinion that Caro would have gone to trial if counsel had advised him to do so is not sufficient to demonstrate prejudice under this standard." ECF No. 202 at 13. The fact that Mr. Caro would have gone to trial if counsel had advised him to do so plainly satisfies the rationality requirement. As the Supreme Court made clear, the rationality requirement is about separating the "specious claims from those with substantial merit." *Padilla*, 559 U.S. at 372 (citing *Roe*, 528 U.S. at 480). Mr. Caro's 2255 Motion establishes that his claim has substantial merit. It further establishes that his claim is a rational one. This Court therefore erred in concluding, on the basis of the rationality requirement, that "[t]rial counsel's opinion that Caro would have gone to trial if counsel had advised to do so is not sufficient to demonstrate prejudice under this standard." ECF No. 202 at 13. The Court's imposition of a higher standard that *Padilla* requires is clear error.

**B.    The Court erred by failing to consider the various avenues of defense available to Mr. Caro and instead concluding that Mr. Caro would have inevitably received a lengthy prison sentence that would have been used against him at the capital trial.**

The Court faults Mr. Caro for not offering "any evidence of a viable defense he could have presented at trial," ECF No. 202 at 11, and cites this alleged lack of evidence as support for the conclusion that Mr. Dene fulfilled his obligations, *id.* at 10-11. In the view of the Court, Mr. Dene "could have believed that Caro's conviction was a foregone conclusion," in which case he rightly "focus[ed] his discussions with Caro on the advantages and disadvantages of the plea agreement" rather than the trial. *Id.* at 12. The Court's speculation as to what Mr. Dene "could have believed" is inappropriate when dismissing the case on the pleadings. As this

5

**JA 273**

Court recognized in its opinion, it must take the evidence supporting the 2255 Motion as true. ECF No. 202 at 10. The fact is, however, that Mr. Caro had an available avenue of defense.

On August 29, 2003, inmate Ricardo Benavidez was attacked and received multiple stab wounds at United States Penitentiary ("USP")-Lee. Seven prisoners, including Mr. Caro, were implicated in the stabbing and charged with conspiracy to commit murder and possession of weapons. ECF No. 2. The grand jury testimony presented by the Government demonstrated that Benavidez had been the leader of a gang called the Texas Syndicate at USP-Lee prior to his assault, but that the current leader of the gang was a prisoner by the name of Francisco Tijerina, who was also a defendant charged in the Benavidez stabbing. *See United States v. Caro*, No. 1:06-cr-00001-JPJ, Dkt No. 782, Sealed Ex. 28 at 15 (W.D. Va.). When a juror asked "why the [gang] would attack their own leader," the officer testified that he believed that Tijerina wanted to "assume the leadership role of the Texas Syndicate" as USP-Lee. *Id.* at 18. The SIS Officer also concluded that all seven of the inmates conspired in the crime, but that the "attack was planned by inmate Tijerina . . . in an attempt to gain control of the Texas Syndicate Leadership" at USP-Lee. *United States v. Caro*, No. 1:06-cr-00001-JPJ, Dkt No. 782, Sealed Ex. 51 at 12. Six of the seven inmates were allowed to plead to the lesser possession of a weapon charge, including Mr. Tijerina.

Although the Court sets forth what it believes was a solid case against Mr. Caro, ECF No. 202 at 11, the Government's case was not as strong as the Court suggested as so admitted by the Government. At the time of one of Mr. Caro's codefendant's sentencing, the Court asked the Government why it should impose such a low sentence. ECF No. 184 at 5. In responding to the Court, the Government did not mention either a prison eyewitness or the DNA evidence—both of which this Court relied upon in its dismissal of Mr. Caro's 2255 Motion, ECF No. 202 at 11. And Government explained that the video—that this Court also

6

**JA 274**

relied upon—was not "of high quality." ECF No. 184 at 5. Based on the Government's representation of the evidence, it was not certain that Mr. Caro would have been convicted if he went to trial. In fact, a valid defense could have been to challenge the strength of the Government's case, including its ability to prove a conspiracy.

To the Court, a "custody range of 360 months to life in prison" following a conviction at trial was a foregone conclusion. ECF No. 202 at 12. A trial, the court surmised, would have offered little or no advantage when compared to the nearly identical terms of the plea agreement. *Id.* at 12 (stating that Mr. Caro "would have inevitably received a lengthy prison sentence"). However, Mr. Caro had a viable defense, and the Court erred by ignoring this possibility. ECF No. 202 at 11. The Court thus committed clear error and its judgment, if allowed to stand, would result in a manifest injustice.

## C. This court should grant Mr. Caro a certificate of appealability on this claim.

This Court erred in denying a certificate of appealability (COA) on the claim presented in Mr. Caro's 2255 Motion. Mr. Caro need only make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and demonstrate that reasonable jurists could debate the Court's resolution of the claim. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "In requiring a question of some substance, or a substantial showing of the denial of [a] federal right, obviously the petitioner need not show that he should prevail on the merits. He has already failed in that endeavor." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983) (internal quotations omitted). "[T]he holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge . . . that he or she would prevail." *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003). As the *Miller-El* Court noted, "[t]his threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." *Id.* at

7

**JA 275**

336.

Although this Court denied Mr. Caro relief by finding that his claim was meritless, for the reasons explained above, Mr. Caro has made a substantial showing that he was denied his constitutional right to counsel; and reasonable jurists could debate this Court's resolution of the claim. As such, the Court clearly erred in denying a COA and should amend its judgment accordingly.

**III. Conclusion**

For the foregoing reasons, Mr. Caro requests that the Court alter its Opinion and Final Order in this case and grant Mr. Caro appropriate relief.

**JA 276**

**Certificate of Service**

I hereby certify that on June 1, 2015, I electronically filed the foregoing Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure 59(e) with the Clerk's Office by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Stephanie King
Legal Assistant
Capital Habeas Unit

9

**JA 277**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| **Plaintiff,** | ) | Case No. 2:03-CR-10115 |
| **v.** | ) | |
| | ) | |
| CARLOS DAVID CARO, | ) | |
| | ) | |
| **Defendant.** | ) | |

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO ALTER OR AMEND JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59(e)**

The United States of America, by counsel, opposes Defendant's Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure 59(e) because the Court did not commit a clear error of law nor was there manifest injustice when it summarily denied Defendant Carlos David Caro's ("Caro") claim for relief pursuant to 28 U.S.C. § 2255 ("§ 2255 Motion").

**Procedural History and Facts**

Caro filed a motion under 28 U.S.C. § 2255 on January 11, 2013, seeking to vacate, set aside, or correct sentence imposed on November 1, 2004, following his guilty plea, pursuant to a plea agreement, to conspiracy to commit murder. The following facts are in the record before the Court:

(1)     On August 29, 2003, Caro and co-defendant Juan Moreno-Marquez ("Moreno-Marquez"), inmates at the United States Penitentiary-Lee County, attacked and, using homemade knives, stabbed fellow inmate Ricardo Benavidez in the prison's recreation room. § 2255 Motion, pp. 1-2, ECF No. 189.

(2)     Five other similarly armed co-defendants were nearby but were denied access to the recreation room and did not directly participate in the stabbing. *Id.* at 2.

1

**JA 278**

(3)      On December 11, 2003, the grand jury issued a superseding indictment charging Caro, Moreno-Marquez, and the five others with conspiracy to commit murder and unlawful possession of a weapon.  Opinion, p. 2, ECF No. 202.

(4)      On December 17, 2003, Caro's cellmate, Roberto Sandoval, was found dead in the cell and Caro confessed to killing him.  ECF No. 189 at 2.

(5)      Caro and Moreno-Marquez, through their respective attorneys, proposed a joint plea bargain calling for Caro to plead guilty to conspiracy to commit murder in exchange for the Government's agreement to allow Moreno-Marquez to plead guilty to the unlawful weapon charge.  ECF No. 202 at 2; *see also* Declaration of Louis Dene, Esquire, ¶ 5, ECF No. 189-1 (as part of his representation of Caro, Dene worked to obtain a plea agreement providing for Caro to plead guilty to the most serious offense of conspiracy to commit murder in exchange for the Government allowing Moreno-Marquez to plead to the lesser offense).

(6)      Dene advised Caro that if he pled guilty to the conspiracy to commit murder offense he would likely receive a long sentence, but Caro's reason for signing the plea agreement was to help the younger Moreno-Marquez leave the Bureau of Prisons while still relatively young.  ECF No. 189 at 3.

(7)      At the time Caro signed the plea agreement on June 29, 2004, Dene was aware of the Sandoval murder and anticipated that the Government would charge Caro with the murder and seek the death penalty.  *Id.*  Dene did not advise Caro that his conviction for conspiracy to commit murder and resulting sentence would likely be used against him in the later capital case, did not advise him to reject the plea agreement, and did not advise him to proceed to trial.  *Id.*

**JA 279**

(8)     Dene was aware of Caro's limited education and limited ability to understand legal proceedings. *Id.* at 4. Dene believed that Caro liked and trusted him and has the opinion that if he had told Caro to go to trial, Caro would have followed his advice. *Id.*

(9)     Both Caro and Moreno-Marquez entered their respective guilty pleas on August 3, 2004, and the Government's summary of its evidence for both included the following:

> (a)     Caro, Moreno-Marquez, and the five others were incarcerated at USP-Lee and were members of the Texas Syndicate gang;
>
> (b)     A prison employee saw Caro and Moreno-Marquez chasing Benavides and stabbing him with knives;
>
> (c)     Surveillance camera footage showed the attack, the disposal of the knives, and the defendants' return to the location of the attack;
>
> (d)     Medical records documented that Caro and Moreno-Marquez inflicted 28 stab wounds to the victim;
>
> (e)     The homemade knives were recovered from the place where the surveillance video showed that Caro and Moreno-Marquez disposed of them; and
>
> (f)     DNA test results showed the victim's blood on the defendants' clothing.

ECF No. 202 at 11; *see also* Transcript of Change of Plea Hearing for Moreno-Marquez, pp. 12-13, ECF No. 183 (summarizing evidence against Moreno-Marquez).

(10)    On November 1, 2004, the Court sentenced Caro to serve 327 months in prison, consecutive to the 360-month sentence he was already serving from the Northern District of Texas. ECF No. 189 at 4.

**JA 280**

(11)     On November 2, 2004, the Court sentenced Moreno-Marquez to 57 months in prison.  During that hearing, the Court asked the Government to explain why it was appropriate to accept Moreno-Marquez's plea agreement when there was evidence that he participated in the stabbing and when Caro had received a lengthy sentence for his role in the attack.  Government counsel advised the Court that the plea agreements of Caro and Moreno-Marquez were linked and that the Government believed that the linked plea agreements were in the best interests of the Government because Caro appeared to be the most culpable of all of the co-defendants and because of obvious problems of a trial with an uncooperative victim and a somewhat unclear surveillance video.  Transcript of Sentencing of Moreno-Marquez, pp. 5-6, ECF No. 184.

(12)     The conspiracy to commit murder judgment became final on November 15, 2004, when Caro's opportunity to appeal expired.

(13)     In December 2004, the Government notified the Court of its intent to seek the death penalty against Caro for the murder of Sandoval.  ECF No. 189 at 4.

(14)     As early as February 13, 2007, Caro gained knowledge of the Government's use of his conviction and sentence in this case as an aggravating circumstance to argue for the death penalty in his trial for the Sandoval murder.  ECF No. 189 at 4-5.

(15)     On January 11, 2013, Caro filed this § 2255 Motion.  ECF No. 189.

On May 4, 2015, after review of the record and briefs and after oral argument, this Court summarily denied Caro's § 2255 motion.  It did not rule on the Government's motion to dismiss the § 2255 action as time-barred, instead denying that motion as moot.

4

**JA 281**

Caro now moves, pursuant to Federal Rule of Civil Procedure 59(e), for the Court to alter or amend its judgment claiming that the summary denial of his § 2255 motion was clear error and would result in manifest injustice.

## Standard of Review

A Rule 59(e) motion to alter a judgment is appropriate, among other reasons, to correct a clear error of law or prevent manifest injustice. *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Trust for S. California*, 508 U.S. 602, 622 (1993). "A 'factually supported and legally justified' decision does not constitute clear error." *Leftridge v. Matthews*, Civil Action No. ELH-11-3499, 2013 WL 5604666, at *1 (D. Md. Oct. 10, 2013) (quoting *Hutchinson v. Staton*, 994 F.2d 1076, 1081-82 (4th Cir. 1993)). Mere disagreement with how the district court ruled does not support a Rule 59(e) motion. *Hutchinson,* 994 F.2d at 1082.

"[A] motion under Rule 59(e) is not authorized 'to enable a party to complete presenting his case after the court has ruled against him.'" *Pac. Ins. Co.*, 148 F.3d at 403 (quoting *In re: Reese,* 91 F.3d 37, 39 (7th Cir.1996) (internal citations omitted)). In general "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." *Id.* (quoting 11 Wright et al., Federal Practice and Procedure § 2810.1, at 124 (2d ed. 1995)).

## Discussion

This Court summarily dismissed the § 2255 Motion because the motion and the record established that "Caro [has not] satisfied either of the *Strickland/Hill* elements." In particular, the Court:

5

**JA 282**

(1)    "[Did] not find from Caro's evidence that Dene failed to fulfill [the] obligation [to inform Caro of 'the advantages and disadvantages of a plea agreement,' compared to the alternative of going to trial] (ECF No. 202 at 10 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 370 (2010) (internal quotation marks and citation omitted)); and

(2)    "[Found] no reasonable probability that absent counsel's alleged omission, it would have been a rational decision for Caro to have rejected the Plea Agreement and proceed to trial on all charges in this case." *Id.* at 13.

Caro asserts two grounds for his motion – first, he argues that the Court misapplied the rationality requirement set forth in *Padilla v. Kentucky*, 559 U.S. 356 (2010) and second, he claims that the Court erred by failing to consider the defenses available to Caro if he had proceeded to trial. ECF No. 189 at 3-4. Finally, Caro demands that the Court grant a certificate of appealability under 28 U.S.C. § 2253(c)(2). *Id.* at 7.

The Rule 59(e) motion does ***not*** argue that the Court erred when it found that the record did not support Caro's claim that Dene's performance was deficient but, instead, focuses only on the Court's analysis of whether Caro was prejudiced by any alleged deficiency. As described below, the Court's findings ***both*** that Caro failed to establish that Dene's performance was ineffective and that Caro failed to show that he suffered prejudice as a result of any alleged deficient performance are supported by the facts in the record and the summary dismissal was, therefore, correct.

1.    **The Court's Finding that Dene Provided Caro With Effective Assistance in His Decision to Plead Guilty is Supported by the Evidence.**

The Rule 59(e) motion does ***not*** challenge the Court's finding that Caro failed to establish that Dene's assistance with his guilty plea was deficient for failing to inform Caro of the

6

**JA 283**

advantages and disadvantages of the plea bargain.  Accordingly, the Court should reject the motion on that basis alone.  In any event, the evidence in the record supports the Court's ruling.

Caro's § 2255 Motion claims that Dene provided ineffective assistance in connection with his guilty plea because Dene failed to advise him that a collateral consequence might be the prosecution's use of that conviction as a death penalty aggravating factor in his subsequent prosecution for the Sandoval murder.  ECF No. 189 at 6-7.  Caro claims that because he was facing a lengthy sentence even with a guilty plea, the plea bargain provided no benefit and Dene was, therefore, duty-bound to advise him to reject the plea agreement and to proceed to trial.  *Id.* at 7.  This claim is contrary to the evidence in the record.

It is true that "[b]efore deciding whether to plead guilty, a defendant is entitled to 'the effective assistance of competent counsel.'"  *Padilla*, 559 U.S. at 364.  The factual record, however, sustains the Court's finding that Dene's assistance was not ineffective under the circumstances and that Caro obtained significant benefit from the plea bargain.  Indeed, the Government's case against Caro was overwhelming and included a non-inmate eyewitness, surveillance video of the attempted murder, the homemade knives used in the attack, and DNA evidence directly linking both Caro and Moreno-Marquez to the assault.  ECF No. 182 at 14-18; ECF No. 183 at 12-13.  In the face of this evidence, it was Caro and Moreno-Marquez who proposed the linked plea agreements, and it was Caro who directed Dene to "work[] to obtain a plea agreement" in which Caro would plead guilty to the conspiracy to commit murder in exchange for the Government allowing fellow gang member Moreno-Marquez to plead guilty to the lesser offense.  ECF 189-1 ¶ 5.  Clearly, Caro knew the Government's case was overwhelming and that the only way to accomplish his goal of helping Moreno-Marquez was through a linked plea bargain.

7

**JA 284**

Even though Dene correctly advised him that he would receive a very long sentence as a result of the plea bargain, Caro directed Dene to work to obtain the agreement to benefit his younger associate.  ECF No. 189 at 3.  Caro acknowledged and dismissed Dene's advice stating that the prospect of a long sentence did not matter to him because he was already serving a 360-month sentence and "he wasn't going anywhere."  ECF No. 189-1 ¶ 6.  Thus, there can be no dispute that the record establishes that Dene fully advised Caro that the plea bargain would not benefit him personally in any way and, implicitly, Caro could do just as well by going to trial. Caro admits that he understood and acknowledged that advice, but decided to enter into the plea bargain anyway for the purpose of benefitting Moreno-Marquez.

Caro's reliance on *Padilla* as authority to support his claim that Dene was deficient is misplaced.[1]  In *Padilla*, defense counsel affirmatively misled the defendant by telling him that his guilty plea would have no collateral consequence to his immigration status when the law plainly stated that his deportation was ***mandatory***.  Caro does not allege that Dene provided him with erroneous legal advice about the consequences of his plea bargain, but instead claims that Dene should have ***predicted*** how the Government might make use of his plea bargain in a ***possible*** death penalty prosecution for the Sandoval murder.  Unlike *Padilla*, the collateral consequence that Caro complains about was not mandated by law and, at the times he signed the plea agreement and entered his guilty plea, June 29, 2004 and August 3, 2004, respectively, it was not at all certain that the prosecution would even be allowed to seek the death penalty for the Sandoval murder.  This is true because all federal death penalty cases must be approved by the United States Attorney General after a detailed, fact-driven review and approval process (the

---

[1] Caro's cause of action predates the Supreme Court's decision in *Padilla* and it is, therefore, dubious that *Padilla* should be applied retroactively to this case.  *See United States v. Mathur*, 685 F.3d 396 (4th Cir. 2012) (holding that *Padilla's* requirement that defense lawyers inform clients whether plea agreements carry risk of deportation is not retroactively applicable to cases on collateral review).  A detailed discussion of this issue is not necessary to resolve Caro's Rule 59(e) motion.

**JA 285**

"death penalty protocol"). *See* ECF No. 189 at 4 (("The government notified this Court of its intent to prosecute Mr. Caro for the death of Mr. Sandoval and to seek the death penalty against Mr. Caro in December 2004, and in January 2005, the Court appointed counsel to represent Mr. Caro in pre-indictment proceedings."); *see also* United States Attorneys' Manual, § 9-10.000, Capital Crimes (setting forth the death penalty protocol to include consultation with the Department of Justice's Capital Case Section, consultation with family of victim, requirement for Capital Review Committee to meet with defense counsel and representatives of United States Attorney's Office, and final approval by the United States Attorney General). At all times material to this case, the death penalty protocol had not been completed and the Attorney General had not decided whether to authorize the death penalty for the Sandoval murder.

Also in contrast to Caro, *Padilla* had been a lawful, permanent resident of the United States for over 40 years, had served honorably in the armed forces during the Vietnam War, and his immigration status was clearly a concern that he raised with his counsel. Caro, on the other hand, was already serving a lengthy prison sentence and had already admitted to the Sandoval murder. Finally, *Padilla's* plea bargain provided only for the disposition of the charges against him, while Caro sought a linked plea agreement to obtain a favorable disposition for a younger fellow gang member.

Caro also argues that Dene should have directed him to reject the plea agreement and proceed to trial. Dene speculates that Caro would have followed his recommendation to go to trial.[2] This statement, in addition to being rank speculation about Caro's state of mind and intentions, overlooks the basic principle that "[a] defendant . . . has the ultimate authority to determine whether to plead guilty . . . ." *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (internal quotation marks and citations omitted). The record makes it clear that Dene provided accurate

---

[2] Tellingly, Caro fails to provide the Court with a corroborating declaration.

9

**JA 286**

legal advice to Caro about the consequences of his guilty plea, that Caro directed Dene to obtain a linked plea agreement to help Moreno-Marquez, and that it was ultimately Caro's decision, notwithstanding Dene's admonition that the plea bargain did not personally benefit him, to enter into the plea agreement to obtain the benefit of a lesser sentence for Moreno-Marquez.  For these reasons, the evidence in the record supports the Court's finding that Dene did not provide ineffective counsel and, therefore, that finding was not clearly erroneous.

> **2.    The Court's Application of the "Rational" Standard Stated in *Padilla v. Kentucky*, 559 U.S. 356 (2010) is Supported by the Evidence.**

Caro argues that the Court misapplied the standard stated in *Padilla v. Kentucky*, 559 U.S. 356 (2010).  Of course, in *Padilla* the Supreme Court held that counsel was deficient when she provided the defendant with erroneous advice about the plea bargain's effect on his immigration status.  The *Padilla* court, however, did not address the prejudice prong of the *Strickland* test, instead remanding to the state courts to consider that issue.  *Id.* at 369.

The Supreme Court did describe the "high bar" set for a defendant seeking to overturn a conviction arising from a guilty plea on the ground that his plea was the product of ineffective assistance of counsel, reiterating that "to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Id.* at 372.  Caro's Rule 59(e) argument appears to be that Dene's speculative declaration alone was sufficient to meet the "high bar."  That argument is incorrect.  First, the Court correctly found that the Government's case against Caro was overwhelming.  Second, in the face of the overwhelming evidence against both Caro and Moreno-Marquez, the Court correctly found that it would not have been rational for Caro to reject the linked plea agreement and abandon the plea bargain's primary objective of benefitting Moreno-Marquez.

**JA 287**

### a.  The Court Properly Evaluated Caro's Defenses and Sentencing.

Caro cites to Moreno-Marquez's sentencing to argue that the Court committed clear error in describing the strength of the Government's case against him and that it erred by ignoring the possibility that "Caro had a viable defense." ECF No. 205 at 8. Caro posits that the Court should have considered that "a valid defense could have been to challenge the strength of the Government's case, including its ability to prove a conspiracy." *Id.* at 6-7. But Caro advances no new argument to support this theory and merely relies on a colloquy between the Court and the Government at Moreno-Marquez's sentencing. After the Court requested an explanation for the difference in the handling of the two cases, the Government explained that the two dispositions, ***which had been sought by Caro***, were dependent on one another and were considered to be in the best interests of the United States because it believed that Caro was more culpable and because of inherent and obvious issues involved in trying a case with an uncooperative victim and unclear videos. ECF No. 184 at 13. The eyewitness and DNA evidence were still present and the case against both defendants was overwhelming. ECF No. 183 at 12-13. The record as a whole provides substantial evidence to support a finding that Caro, much less Dene, understood the strength of the Government's case and sought a linked plea bargain to benefit Moreno-Marquez, since he (Caro) was already serving a lengthy prison sentence.

### b.  Under the Circumstances, It Was <u>Not</u> Rational for Caro to Reject the Linked Plea Agreements.

As described above, the Government's evidence against Caro and Moreno-Marquez was overwhelming. The two co-defendants plainly recognized this because Caro directed Dene to work to obtain a linked plea agreement that would benefit the younger Moreno-Marquez. Caro also recognized that he was already serving a lengthy 360-month prison sentence, "wasn't going

11

**JA 288**

anywhere," and, therefore, was unconcerned that the plea bargain might result in an additional lengthy sentence. Under these circumstances, Caro's rejection of the linked plea agreements would **not** be rational because he would have scuttled the plea bargain's primary objective of helping the younger Moreno-Marquez leave the Bureau of Prisons while still relatively young.

Caro submits no statement to indicate he would have abandoned this objective if Dene had advised him that the guilty plea might be used to argue for the death penalty in the Sandoval trial. Moreover, Dene's speculative opinion that Caro would have gone to trial if he had so recommended, which stands alone, is inconsistent with the directive he was given to work to obtain the linked plea agreements. Moreover, the fact that Caro repudiated Dene's admonition that he would still receive a lengthy sentence under the plea agreement and, therefore, by implication would fare no worse if he went to trial, contradicts this speculation.

### 3.    Caro is Not Entitled to a Certificate of Appealability

Caro has not made a substantial showing that his constitutional rights have been violated and is not entitled to a certificate of appealability.

As described above, Dene's representation met the *Strickland* standard for effective assistance of counsel because it did not fall below the reasonable standard of representation and, even if Dene erred, Caro did not suffer prejudice. A certificate of appealability is appropriate only if the applicant has made "a substantial showing of the denial of a constitutional right . . . [which] includes showing that reasonable jurists could debate (or for that matter agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, n.4 (1983)). The certificate of

12

**JA 289**

appealability determination requires an overview of the claims in a habeas petition and a general assessment of their merits. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

In this case, the evidence in the record supports the Court's finding that Dene's assistance was not deficient and, even if deficient, under the circumstances it would not have been rational for Caro to abandon his goal of obtaining linked plea agreements to help Moreno-Marquez leave the Bureau of Prisons while still relatively young, an option not available to Caro because of the lengthy prison sentence he was already serving. Caro made the "conscious decision to accept both the benefits and burdens of [the linked plea bargain]," a "decision [t]hat may not be lightly undone by buyer's remorse on the part of one who has reaped advantage from the purchase." *United States v. Fugit*, 703 F.3d 248, 260 (4th Cir. 2012). Accordingly, the evidence in the record shows that Caro failed to meet *Strickland's* high bar to claim ineffective counsel in deciding to plead guilty and reasonable jurists would not conclude otherwise.

### 4.    Caro's Claims are Time-barred.

Caro's motion to amend or alter judgment should be dismissed because the § 2255 Motion from which it originated was untimely filed. 28 U.S.C. § 2255 imposes a definitive one-year time limit on a defendant's right to collaterally attack a criminal conviction and sentence. 28 U.S.C. § 2255(f)(4) states: "The [one year] limitation period shall run from the latest of . . . (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence."

Caro's argument that he did not learn of Dene's "omission" until March 2012 is unpersuasive. At least by February 13, 2007, Caro knew that his attempted murder conviction and sentence in this case had the potential to enhance his sentence in the capital case. ECF No. 189 at 4-5. Therefore, Caro, and counsel representing him continuously since August 22, 2007,

13

**JA 290**

knew the salient facts underlying his § 2255 Motion, but did nothing until January 11, 2013.

Caro's § 2255 Motion should have been filed by February 12, 2008, at the latest.  Therefore,

Caro's claim was filed more than eight years and three months after final judgment and almost

six years after Caro knew, or could have discovered through the exercise of due diligence, the

facts supporting his claim.  Thus, Caro's § 2255 motion is time-barred and should be dismissed

on that ground.

## CONCLUSION

Based on the forgoing, and the record before this Court, the United States respectfully

requests that the Court deny Caro's Motion to Alter or Amend Judgment Pursuant to Federal

Rule of Civil Procedure 59(e), dismiss the claims with prejudice, and strike this matter from the

Court's docket.

Respectfully submitted,

ANTHONY P. GIORNO
Acting United States Attorney

Dated:  July 2, 2015

/s/ Rick A. Mountcastle
Rick A. Mountcastle, VSB No. 19768
  Assistant United States Attorney
Lily Jenkins
  Third Year Law Student Admitted to Practice
United States Attorney's Office
P. O. Box 1709
Roanoke, VA 24008-1709
Tel: (540) 857-2254; Fax: (540) 857-2283
Email: rick.mountcastle@usdoj.gov

14

**JA 291**

C E R T I F I C A T E

I certify that on July 2, 2015, I caused the foregoing Response in Opposition to

Defendant's Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure

59(e) to be filed with the Clerk of the Court using the CM/ECF system, which will send

notification of this filing to counsel of record for the defendant.

/s/ Rick A. Mountcastle
Rick A. Mountcastle
Assistant United States Attorney

15

**JA 292**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:03-cr-10115-JPJ |
| Plaintiff, | |
| vs. | Reply to Response to Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure Rule 59(e) |
| CARLOS DAVID CARO, | |
| Defendant. | |

Defendant Carlos David Caro, through counsel, files his reply to the Government's response to Mr. Caro's Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure Rule 59(e) (ECF No. 209). The Government's fact-specific response further demonstrates that this case was improperly dismissed on the pleadings. For the reasons stated in his motion and in this reply, Mr. Caro respectfully requests that the Court alter or amend its judgment.

**I.      The Court clearly erred in its application of *Padilla*.**

The Court erred by misinterpreting the rationality requirement in *Padilla v. Kentucky*, 559 U.S. 356 (2010). (*See* ECF No. 205 at 4-5.) The Government attempts to explain why it would not have been rational for Mr. Caro to reject the plea agreement. (ECF No. 209 at 11-12.) This argument, like most of the Government's response, is fact specific and is inappropriate to support a dismissal on the pleadings. The Government claims that Dene's opinion—which was not rebutted and must be taken as true for purposes of the dismissal—that Mr. Caro would have gone to trial if Dene advised him to do so is "inconsistent" with Dene working to reach a plea agreement. (ECF No. 209 at 12.) In other words, the

**JA 293**

Government suggests that because Mr. Caro was interested in a plea agreement, then he would not have opted to go to trial. Mr. Caro, however, could have certainly made a different choice had he been fully advised of the consequences he would likely be facing if he had a conviction for conspiracy to commit murder. On this record, it is undisputed that had he been advised to go to trial, then he would have done so. The Court's analysis under *Padilla*'s "rational basis" test was clearly erroneous.[1]

The Government also suggests that because Dene advised Mr. Caro that the plea agreement would not benefit Mr. Caro, then Dene was not ineffective in failing to inform his client that it could actually cause *harm* by supporting a death sentence. (ECF No. 209 at 8.) The distinction that the Government attempts to draw between the facts of *Padilla* and this case is meaningless. Dene indicated that it was his understanding that the Government was going to seek the death penalty against Mr. Caro after the instant case had been resolved. (ECF No. 189-1 at 2, ¶4.) Given that he knew that the Government intended to seek death as a penalty for the Sandoval homicide—regardless of whether the prosecution would get approval by the Attorney General (ECF No. 209 at 8)—he was obligated to inform his client of this serious consequence. Dene, however, failed to do this.

Finally, the Government defends Dene's actions by repeatedly stating that Mr. Caro "directed" Dene to work to obtain the plea agreement. (ECF No. 209 at 7, 10, 11.) But neither Dene's declaration nor Mr. Caro's 2255 Motion states that Mr. Caro *directed* his attorney to do this. Moreover, even if Mr. Caro directed his attorney to work out a plea agreement to benefit Moreno-Marquez, such a directive

---

[1] The Government further misconstrues Mr. Caro's argument by claiming that Mr. Caro appears to contend "that Dene's speculative declaration alone was sufficient to meet [*Padilla*'s] 'high bar.'" (ECF No. 209 at 10.) The problem, however, with the Government's argument is that the Court dismissed the case *on the pleadings*, which necessarily meant that the Court was required to construe the allegations as true—as even the Court itself recognized. (ECF No. 202 at 10.)

2

**JA 294**

*does not* relieve Dene of his duty to advise his client of the severe consequences that would result from a guilty plea. Indeed, Dene specifically stated, "I did not advise [Mr. Caro] of the implications that the plea agreement would have on the prison killing case. I did not advise Mr. Caro that the Conspiracy to Commit Murder conviction would likely be used against him in a later capital case and that he should not sign the plea agreement." (ECF No. 189-1 at 3-4, ¶6.) The Government plainly ignores this fact and instead spends the majority of the response demonstrating why this does not matter. But the failure to inform Mr. Caro of the collateral consequences is exactly what does matter.[2]

**II.    The Court clearly erred in its analysis of the case against Mr. Caro.**

The Government's response to Mr. Caro's second argument in support of reconsideration further supports his motion. The Government recognizes that there were "inherent and obvious issues involved in trying a case with an uncooperative victim and unclear videos." (ECF No. 209 at 11.) This statement refutes the Court's finding that Dene believed it was a "foregone conclusion" that Mr. Caro would be convicted. (ECF No 202 at 12.) Indeed, the Government's response ignores that Benevidez received only superficial wounds such that, even if Caro did commit a crime, he was more likely guilty of conspiracy to assault and *not* conspiracy to murder. This is a factual issue which should not have been resolved by a motion to dismiss on the pleadings. Moreover, the Government merely states (without factual support) that Mr. Caro understood the strength of the Government's case—a statement that does not address that the Court erred by ignoring Mr. Caro's possible trial defense. The Government did not address the remainder of the argument made in section B of Mr. Caro's motion, and this Court

---

[2] Although the Government chides Mr. Caro for not submitting his own declaration, there is no requirement that a defendant is required to support a 2255 Motion with a personal declaration. Indeed, in a case such as this one where the defendant's attorney has provided one, the need for one from Mr. Caro seems redundant.

3

**JA 295**

should reconsider its decision.

### III.    The Court should, at minimum, issue a certificate of appealablity.

In support of its opposition to the issuance of a COA, the Government argues that Dene was not ineffective because "Caro made the 'conscious decision to accept both the benefits and burdens of [the linked plea bargain]." (ECF No. 209 at 13) (alteration in original). But that argument ignores entirely the claim made by Mr. Caro.  There was not a "conscious decision" to accept the burdens of the plea agreement because Dene failed to inform his client of the most critical burden— that a conviction for conspiracy to murder would be used to support a sentence of death. The Court dismissed this case on the pleadings.  The Government's fact-based response also shows that, at minimum, reasonable jurists could debate whether the pleadings were sufficient to allow further discovery and evidentiary development to support Mr. Caro's claim of ineffective assistance of counsel.[3]

For these reasons and for the reasons set forth in the motion, this Court should alter or amend its judgment.

Respectfully submitted this 16th day of July, 2015.

s/Robin C. Konrad

Jon M. Sands
Federal Public Defender
Robin C. Konrad (Alabama Bar No. 2194-N76K)
Office of the Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona  85007
robin_konrad@fd.org
Telephone:  602-382-2816
Facsimile:  602-889-3960

---

[3] The Government also argues that the claim is time barred. (ECF No. 209 at 13-14.) This argument is improper because the Court did not reach its decision on this basis and it was not raised in Mr. Caro's motion.

JA 296

Fay F. Spence (Virginia Bar No. 27906)
Federal Public Defender's Office
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Telephone:  540-777-0880
Facsimile:  540-777-0890

Brian J. Beck (Virginia Bar No. 78049)
Federal Public Defender's Office
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Telephone:  276-619-6080
Facsimile:   276-619-6090

Attorneys for Defendant
Carlos David Caro

5

**JA 297**

**Certificate of Service**

I hereby certify that on July 16, 2015, I electronically filed the foregoing Reply to Response to Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure 59(e) with the Clerk's Office by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Teresa Ardrey
Legal Assistant
Capital Habeas Unit

JA 298

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 2:03CR10115 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **CARLOS DAVID CARO,** | ) | By:  James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Rick A. Mountcastle, Assistant United States Attorney, and Lily Jenkins, Third Year Law Student Admitted to Practice, Roanoke, Virginia, for United States.  Jon M. Sands, Federal Public Defender, and Robin C. Konrad, Assistant Federal Public Defender, Phoenix, Arizona, and Fay F. Spence and Brian J. Beck, Assistant Federal Public Defenders, Roanoke and Abingdon, Virginia, for Defendant.*

Defendant Carlos Caro filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255, alleging that ineffective assistance of counsel caused him to enter an invalid guilty plea.  I denied the § 2255 motion. *United States v. Caro*, No. 2:03CR10115, 2015 WL 1964493 (W.D. Va. May 4, 2015).  Caro has now timely filed a Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure 59(e).  The motion to alter or amend has been fully briefed.

"A Rule 59(e) motion may only be granted in three situations:  (1) to accommodate an intervening change in controlling law; (2) to account for new

evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) (internal quotation marks and citation omitted). "It is an extraordinary remedy that should be applied sparingly." *Id.*

Here, the defendant relies on the third ground. The Supreme Court has stated that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [court] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993) (citation omitted). "[M]ere disagreement does not support a Rule 59(e) motion," and a judgment that is "factually supported and legally justified" is not clearly erroneous. *Hutchinson v. Staton*, 994 F.2d 1076, 1081-82 (4th Cir. 1993).

The facts of this case are set forth in detail in my earlier opinion, and I will not repeat them here. In his present motion, Caro argues that I erred by failing to consider whether it would have been rational for him to reject a plea bargain had he known that the government might use his guilty plea against him in seeking the death penalty in another case. He further contends that I failed to consider an available avenue of defense and erred in concluding that had he gone to trial, Caro inevitably would have received a lengthy sentence that would have been used against him in his capital case. Finally, Caro asserts that I erred in denying him a

-2-

certificate of appealability.

I have reviewed and considered all of the evidence and arguments submitted by the defendant in support of the § 2255 motion and the motion to alter or amend the judgment.  I am unconvinced that the judgment is clearly erroneous, and I find that none of the circumstances justifying a motion to alter or amend a court's judgment are present in this case.  Accordingly, it is **ORDERED** that the Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure 59(e) (ECF No. 205) is DENIED.

ENTER:   November 6, 2015

/s/  James P. Jones
United States District Judge

-3-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | |
|---|---|
| **CARLOS DAVID CARO,** | **Case No.  2:03CR10115** |
| **Defendant,** | **Judge James P. Jones** |
| **vs.** | |
| **UNITED  STATES OF AMERICA,** | **Notice of Appeal** |
| **Plaintiff.** | |

Notice is hereby given that Carlos David Caro, Defendant, appeals to the United States Court of Appeal for the Fourth Circuit from the Opinion and Final Order entered in this action by the United States District Court for the Western District of Virginia on May 4, 2015, denying his Motion to Vacate, Set Aside or Convert his sentence pursuant to §2255 (ECF Nos. 202, 203), and from the Opinion and Order denying his Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure Rule 59(e) entered on November 6, 2015 (ECF No. 211).

//

//

//

Respectfully submitted this 4th day of January, 2016.

s/Robin C. Konrad
Jon M. Sands
Federal Public Defender
Robin C. Konrad (Ala. Bar No. 2194-N76K)
Assistant Federal Public Defender
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
robin_konrad@fd.org
602.382.2816 / 602.889.3960 facsimile

Fay F. Spence (Virginia Bar No. 27906)
Federal Public Defender's Office
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
540.777.0880 / 540.777.0890 facsimile

Brian J. Beck (Virginia Bar No. 78049)
Federal Public Defender's Office
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
276.619.6080 / 276.619.6090 facsimile

Attorneys for Defendant Carlos David Caro

2

## Certificate of Service

I hereby certify that on January 4, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Anthony Giorno, AUSA and Rick A. Mountcastle, and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: N/A


s/ Elise Knepper
Assistant Paralegal
Capital Habeas Unit

3